## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLOMBIA

|  |  |  |
|---|---|---|
| **JOHN DOE (pseudonym)**<br>**4540 MacArthur Blvd. NW**<br>**Apt. 109**<br>**Washington, DC 20007**<br>**786-858-7853**<br><br>*Plaintiff*<br><br>**v.**<br><br>**GEORGETOWN UNIVERSITY**<br>**3700 O St., N.W.**<br>**202 Healy Hall**<br>**Washington, D.C. 20057**<br>**202-687-0100**<br><br>*Defendant*<br><br>**and,**<br><br>**DR. JOHN PARTRIDGE**<br>**3900 Reservoir Rd NW,**<br>**Med-Dent NW408**<br>**Washington, DC 20007**<br>**202-687-5196**<br>jp374@georgetown.edu<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:25-cv-01415<br>Assigned To : Unassigned<br>Assign. Date : 5/9/2025<br>Description: TRO/Prel. In. (D–Deck) |

## COMPLAINT

## INTRODUCTION

1.　　Plaintiff John Doe brings this action against Georgetown University ("Georgetown") and

　　　Dr. John Partridge for their actions contributing to his wrongful dismissal from the

Georgetown University School of Medicine ("GUSOM"). He alleges breach of contract, breach of the implied covenant of good faith and fair dealing, and the intentional infliction of emotional distress due to the university's failure to follow university policy, allowing academic dishonesty, retaliation and misapplying dismissal procedures outlined in the school's handbook. Georgetown violated its contractual obligations, the implied covenant of good faith, and academic norms by failing to provide a fair and consistent grading process, applying arbitrary academic standards, willful indifference to medical evidence and authority, allowing retaliatory grading/post hoc justification, and willful indifference and a deliberate mischaracterization of John's claims during his appeal; these events led to a flawed academic review for unsatisfactory performance, dismissal, and denial of appeal.

2.    A central issue in this complaint arises from the grading process in John's Medical Pharmacology course which directly resulted in his "unsatisfactory progress" (distinct from a failure per the student handbook) deviated from established academic norms as Dr. Partridge did not apply a consistent grading rubric to all students. A critical procedural error arose when Dr. John Partridge the course director, deducted 0.2 points from one of John's Pharmacology assignments for an answer that was medically correct regarding the possible state of a patient in the post-seizure period because it did not specifically match his teaching objective for the question.

3.    This deduction resulted in John receiving a final score of 69.92% (181.1 points) when a 70% (181.3 points) was needed to make satisfactory progress and ultimately required John to take a remediation examination in which he was unsuccessful.

4.      John was informed that he would be dismissed due to his unsuccessful attempt at the

remediation examination by Dean Kumar. During this call she told him that the COSA does

not overturn grade dismissals but he should appeal just to say that he did all he could do.

5.      At the end of the academic year, Dr. Partridge expressed regret for making the deduction

and said that he would not make it again if he could "go back". Prior to his dismissal appeal

meeting, John explicitly asked Dr. Partridge if he would support correcting the deduction

based on the supporting references that he curated in support of his answer. Dr. Partridge

confirmed that he would support a grade correction if given permission by the administration.

Relying on this assurance, John prepared for his appeal proceedings accordingly, believing

he only needed to demonstrate that Dr. Partridge made an honest grading error. The first

condition COSA lists as one of the grounds to overturn a dismissal is the demonstration of a

material error which compromised the process; as John believed that the deduction was a

grading error which triggered the review for this class, he believed that this constituted a

procedural error.

6.      However, when John shared the letter from a Clinical Neurology Professor, written after

review of the references curated, in support of his answer (in its original form) with Dr.

Partridge and Dean Kumar, Dr. Partridge reversed his stance, claiming that additional

deficiencies in the assignment had "warranted" the deduction and that had John initially

submitted the assignment with the references he curated he would have considered it an

"upgrade", despite the assignment never stating that references were required. The day before

the appeal meeting, Dr. Partridge sent John a Google Doc introducing these additional

critiques. Examination of this document in comparison to other student submissions confirms

that Dr. Partridge penalized John for providing the same or materially equivalent answers as

classmates who received full credit. In some instances, Dr. Partridge noted John's answers as

deficient for not addressing items not included in the original grading rubric/question asked

and similarly not addressed by other students who received full credit. Additionally,

considering the leniency for less specific answers from other students, the initial rational for

the deduction becomes less clear as John's original answer and the question following it

addressed the teaching objective that the deduction was made for in a manner that Dr.

Partridge awarded full credit for in other students' responses to other questions. These

actions indicate that John was unfairly targeted and subjected to post hoc evaluations in

direct response to using the assignment as a central element of his appeal.

7.      Dr. Partridge's refusal to correct the deduction (or initiate the process of correcting the

deduction), despite acknowledging the validity of the answer even in his email informing

John and Dean Kumar of other alleged deficiencies, demonstrates arbitrary decision-making

and bad faith. His decision to apply heightened scrutiny came only after John's decision to

use this assignment as a component of his appeal process. Sharing the Google Doc in

response to a letter from an authority in the question's subject matter suggests an effort to

avoid admitting an error rather than a genuine academic revaluation. Dr. Partridge's initial

assurances that he would support a correction induced John into believing that the matter

would be resolved, causing him to structure his appeal and living arrangements accordingly.

The later reversal and introduction of new grading criteria, without precedent or application

to other students, constitutes misrepresentation leading to an unjust dismissal. This reinforces

the argument that Georgetown failed to ensure a fair and consistent grading process for John.

Moreover, university policies are in place to prevent retaliation after raising a complaint and

to protect students from appeal procedures in which professors use inappropriate grading criteria or ignore grading standards. Dr. Partridge's actions violate both of these policies.

8.     Furthermore, the university initiated and justified John's dismissal under a misapplication and later modification a dismissal policy. Per the GUSOM Student Handbook, a student on academic probation can face dismissal proceedings if they receive a failing grade ("F") in an academic unit recorded on the transcript. This is the policy that GUSOM cited for John's dismissal following an unsuccessful attempt at a remediation exam for the Year 1 portion of his longitudinal Medical Pharmacology course which was still "In Progress" at the time of dismissal; remediation examinations are not academic units and are not recorded on the transcript. The course, which spans two academic years, had not yet been completed, and thus no failing grade had been assigned on his transcript for the Academic Year 2023-2024 (AY 2023-2024). When John raised this point in his appeal letter, it was not addressed and in his letter denying his appeal, the examples of "academic unit" included in the policy were removed. Per school policy, failure of a remediation exam results in a student retaking the entire academic year, no policy modifies this for students on probation. Therefore, the university's decision to dismiss John was in direct violation of its own policies, constituting a breach of contract.

9.     Additionally, compounding the complaint, GUSOM's Committee on Student Appeals ("COSA") failed to conduct an unbiased review of John's case. John presented evidence of the inconsistent grading, clinical authority letter, and medical evidence which led to a materially compromised academic review leading to the remediation. John's explained the significance of the deduction and clarified that he was presenting a case to meet the condition allowing for dismissal to be overturned by showing that an error (initially what he believed to

be an honest error and later retaliation/biased grading) occurred. COSA dismissed John's concerns as a mere grade appeal and cited that they do not hear grade appeals. However, the school handbook contains recusal policies for COSA members when reviewing cases including adverse grades and directly states that COSA can review whatever material they deem relevant; acknowledging that review of grades is a plausible committee affair. Despite this, the committee did not engage with the evidence of inconsistent grading by Dr. Partridge and clinical authority from the Clinical Neurology professor. The COSA cited that John did not follow the formal grade appeal process outlined in the student handbook, despite the knowledge that suspicion and evidence of material academic dishonesty only reasonably becoming available to John two days prior to the meeting. Furthermore, the student handbook required that resolution with the professor must be attempted within 30 days of the grade being released. Although John did not use the term "appeal" in his communication, he contacted Dr. Partridge asking for the deduction to be reversed within the necessary timeframe and received no response. This occurred days before his COS hearing which, via the handbook, procedurally terminated rights to the formal appeal process. Additionally, during the call informing him that he would be dismissed, Dean Kumar also informed John that the COSA does not overturn dismissal decisions and encouraged him to appeal just to say that he did all that he could. This implies that the outcome was predetermined and that the appeals process was conducted in bad faith.

10.     Furthermore, Dr. Partridge and Dean Kumar both strongly discouraged John from mentioning the assignment during his appeal, imploring him to "be strategic" and "present himself globally". However, during his presentation of the evidence of the grading inconsistencies, Dean Kumar interjected to tell the committee that Dr. Partridge made the

deduction for Case 4 regarding the seizure patient, despite inclusion in the communication where Dr. Partridge directly said that these newly shared deficiencies "warranted" his deduction. During this time, the critiques of the alleged deficiencies were displayed with his name and Google Profile on the screen. Since his dismissal, John has received two additional letters from physicians who reviewed his assignment and provided letters of support of his original answer based on the evidence shared. By refusing to correct an acknowledged grading error and instead imposing new grading criteria after the fact, Georgetown and Dr. Partridge violated their duty of good faith and fair dealing. The university's reliance on this uncorrected error in its dismissal decision further compounds this breach of contract.

11.    In addition to the breach of contract, Georgetown also violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Once John documented his Attention Deficit Hyperactivity Disorder ("ADHD"), the university was obligated to consider its impact on his academic performance. Furthermore, John's communication with the university gave the school constructive notice of his symptoms which they had a duty to act on. However, Georgetown failed to give due consideration to his disability in its dismissal decision or accommodation considerations once on constructive notice. Specifically, John's ADHD contributed to his receipt of internal and unofficial "Low Pass" grades, which were later cited in review of his academic record; their inclusion in official review of his record as a part of dismissal proceedings introduced bias to reviewers and they indicated a material deficiency where no actual deficiency existed. These "Low Passes" are arbitrary and capricious within GUSOM's Pass/Fail pre-clinical curriculum, as they do not constitute failing grades under the

university's grading system. Thus, their use in official proceedings is arbitrary as they do not contribute to a student's official standing. Georgetown failed to consider the impact of John's disability on his academic standing. By using an ambiguous academic standard to partially justify dismissal without properly accounting for the role of John's documented disability, the university violated both its contractual obligations and federal disability protections.

12.     Given the irreversible impact of a medical school dismissal on future career prospects, John has suffered irreparable harm, warranting judicial intervention. Furthermore, shortly after a request for remediation accompanied with two additional physician letters and a petition with over 250 supporters, Georgetown terminated John's SEVIS record, terminating his status in the country. He seeks declaratory and injunctive relief to correct the error leading to his dismissal, reinstatement at GUSOM with appropriate accommodations into Year 2 of the curriculum, corporation with SEVIS reinstatement, and damages for the various forms of harm suffered due to the university's actions. Furthermore, he seeks that Georgetown be mandated to make an exception to its seven-year graduation policy to account for the time lost. The evidence presented demonstrates breaches of academic and legal standards, requiring immediate correction to restore fairness and uphold the principles of academic integrity.

## THE PARTIES

13.     John currently has permanent residency in Nassau, Bahamas and is a citizen of The Commonwealth of The Bahamas.

14.     Pursuant to Federal Rules of Civil Procedure 5.2 John has simultaneously filed a Motion

to Proceed Anonymously requesting that he be referred to as John Doe in all filings and that

all information that could lead to his identification be redacted in all pleadings and

documents in this lawsuit. John has requested anonymity because he is an individual with a

mental health disability. The Complaint includes sensitive medical and educational

information. Revealing John's identity in public record could limit future employment

opportunities as well as unnecessarily expose John to stigma based on his mental health. *Doe*

*v. Blue Cross & Blue Shield, 794 F.Supp. 72, 74* (D.R.I. 1992) (explaining that plaintiffs may

proceed anonymously in cases involving "abortion, mental illness, personal safety,

homosexuality, transsexuality and illegitimate or abandoned children in welfare cases").

15.     Defendant Georgetown University is located in the District of Columbia and is a District

of Colombia non-profit corporation with a principle place of operation in the District of

Colombia. Dr. Partridge serves in the official capacity of course director at the Georgetown

University School of Medicine.

16.     Georgetown is a public accommodation as defined in 42 U.S.C. § 12182 (7) subject to the

requirements of Title III of the ADA.

17.     Georgetown operates programs, services, and activities receiving federal funds, and is

therefore subject to the requirements of Section 504 of the Rehabilitation Act. See 29 U.S.C.

§ 794.

18.     This action is brought for (1) declaratory and injunctive relief and damages under the

ADA, (2) declaratory and injunctive relief and damages under Section 504 of the

Rehabilitation Act, (3) declaratory and injunctive relief and damages for Violation of the

District of Columbia Human Rights Act DC law, (4) declaratory and injunctive relief and

damages for Intentional infliction of emotional Distress Under District of Colombia Law, (5) declaratory and injunctive relief and damages for Breach of Contract Under District of Columbia Law, (6) declaratory and injunctive relief and damages for Breach of the Implied Covenant of Good Faith and Fair Dealing Under District of Columbia Law, (7) declaratory and injunctive relief and damages for Breach of contract under District of Columbia Law and/or Fraud under District of Columbia Law and/or Retaliation under District of Columbia Law, (8) declaratory and injunctive relief and damages for Undue Influence.

## JURISTICTION AND VENUE

19.    This court has jurisdiction over John's federal claims arising under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 pursuant to 28 USC §1331.

20.    This court has supplemental jurisdiction over the state law claims under 28 USC §1367 because these claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the US Constitution."

21.    This court has diversity jurisdiction pursuant to 28 U.S.C § 1332 because John and Georgetown do not share citizenship in the same state and the amount in controversy exceeds $75,000, exclusive of costs and interest.

22.    This court has personal jurisdiction over Georgetown on the grounds that Georgetown is a citizen of the District of Colombia.

23.     Venue properly lies in this district pursuant to 28 U.S.C § 1391 because a substantial part

of the events or omissions giving rise to the claim occurred in this judicial district and

because Georgetown conducts business in this district.


## FACTS

24.     John applied to medical school during the 2021-2022 application cycle. His application

included leadership positions, community service, Division 1 Athletics, substantial clinical

experience, diverse research activities, a 3.888 GPA from the Miller School of Medicine's

Master's in Biomedical Sciences program (University of Miami), strong recommendation

letters from medical school professors, and a 510 MCAT score (ranging between 78th-80[th]

percentile).

25.     In February of 2022, he was accepted to GUSOM which was his number one choice.

During his time at GUSOM, John served as Treasurer of the school's chapter of the Student

National Medical Association ("SNMA"), was an integral part of two separate Orthopedic

research teams, and was selected to lead a multi-institution research project in the field of

Anatomy. Those who have worked with John in these capacities speak highly of him. During

his clinical skills training sessions, John has been told by preceptors that he is "confident,

compassionate, and genuine" and that he possesses a "good natural flow" for patient

interactions.

26.     While John excelled outside of the classroom and learning the hands on aspects of the

medicine, he initially struggled to adjust to Georgetown's curriculum and fluctuating weekly

schedule due to executive functioning issues as a result of his undiagnosed ADHD.

27.    Under GUSOM's current curriculum, individual classes are housed in varying

percentages in various system modules taught concurrently; with examinations containing

differing numbers of questions for each class approximately 2 months apart. For example,

while many medical schools teach then test either one system at a time (ie. Cardiology) or

one subject matter at a time (ie. Pharmacology) generally in 2-4 week increments, GUSOM

typically teaches two or three system modules concurrently (ie Cardiology, Respiratory, and

Renal) then grades the individual classes (ie. Pharmacology, Histology, and Physiology) by

aggregating the points scored in module tests in each subject taken at the end of the two-

month period after all material for each module is finished. Many of John's peers at other

medical schools have expressed to him that they believed that they would struggle under

GUSOM's curriculum because of the way the information is delivered and tested.

28.    According to the official website of the Attention Deficit Disorder Association, people

like John with ADHD experience a symptom of the disease referred to as "time blindness"

defines as, "…the inability to sense how much time has passed and estimate the time needed

to get something done." The website teaches adults with ADHD that, "it [time blindness] can

significantly affect how you plan and carry out [your] daily activities." This symptom (as

well as many others discussed later) of ADHD made GUSOM's curriculum more difficult for

John to navigate due to the simultaneous nature classes and modules compared to his non-

ADHD peers. The level of executive functioning required to navigate GUSOM's curriculum

places a high demand on students navigating the symptoms of ADHD, especially when not

diagnosed.

29.    This proved particularly difficult for him during the exam periods were students prepared

for their examinations with material from anywhere between approximately 18 to over 30

class sessions with two to three days in between examinations. While John was able to keep up with the material through the semester, evident by his contribution to group work and discussions, his ADHD made it difficult for him to allocate the appropriate amount of time needed to prepare for the very detailed the examination questions. As previously mentioned, the added level of difficulty came from not only dividing the appropriate amount of time for each examination, but specifically dividing the amount of time for each class housed in each examination.

30.     For instance, his Respiratory module examination itself did not contribute to a "Respiratory Module" grade on his transcript. Instead the examination contributed to the following classes with the corresponding number of questions, "DRT [Diagnostics, Reasoning, & Testing] : 18, Embr[yology]: 4 , Hist[ology]: 4, Micro[biology]: 8, Path[ology]: 21, Pharm[acology]: 13, Phys[iology]: 35" per the email containing the examination breakdown. Thus, it is possible for a student to pass all of their examinations but still fail/not make satisfactory progress in multiple classes depending on the examination points gained in the individual classes. The inverse is also true. The passing mark for module examinations is 70%. However, since modules are not recorded on the transcript, a student can still pass/make satisfactory progress in all of their classes if they have succeeded in cumulatively reaching the designated mark in each class without scoring a 70% on every examination. Students who score below 70% on module examinations receive no academic penalty and are just reminded to review the relevant model system information more carefully during preparation for the USMLE Step 1 Examination. Traditionally, across the country medical education is taught and tested using either a systems based approach or a class based approach. Georgetown used this traditional method of teaching until 2017. John's

Master's in Biomedical Sciences program covered the medical education portions of the curriculum in a systems based approach which he excelled in. The relatively new approach used by Georgetown proved difficult for John to navigate, especially because of his ADHD and the associated issue with time management. This was apparent by his grades after his first examinations during the semester of Fall 2022.

31.    John found it difficult to multitask, transition to studying other subjects, and divide his attention effectively enough to perform satisfactorily in each of his classes. Despite this, during both of his attempts at the first year of the curriculum, John ended the first semester with satisfactory progress in both Biochemistry and Physiology which are both subjects that a considerable amount of students end the first semester with an interim score below the passing mark each year. However, during both attempts he performed poorly in the first semester's Histology component; which houses a comparatively small amount of the total percentage for year 1compared to other subjects and where students traditionally perform well.

32.    This is another textbook symptom seen in people with ADHD. The website of the Attention Deficit Disorder Association states that, "many adults with ADHD tend to over-rely on task urgency… ADHD can lead to a lack of motivation to complete specific tasks. But this isn't because you're lazy or lack willpower. The ADHD brain is wired uniquely, leading to a possible motivation deficit…". This explains why John performed well in Biochemistry and Physiology at the beginning of the school year during both attempts; both of these classes are highly concentrated in the first semester and both completely housed in the first year of the curriculum leaving less room for error. Although John did not know about his condition yet, these symptoms were discussed both times he appeared before the

COS made up of several physicians and during his psychiatric evaluation by the school's counseling center.

33.    During the Fall 2022 semester, Dr. Michael Terao, Assistant Dean for Student Learning gave a presentation about study strategies for success in medical school where he cautioned the class against "learning everything". He advised that students know "just enough to answer the questions" and told the students not to worry if while studying "you feel like you cannot explain anything." He stated that knowing the "main points" and "key differences" from lectures would be enough for success in examinations. He advised that "studying like this may make you feel like you do not know the material well but you will be able to answer questions." Although this was different from his approach though his educational career to this point, John followed this advice for the remainder of the semester as he trusted Dr. Terao's position and sought to improve his academic standing after the block 1 examinations. However, he performed worse as he found that most of the exam questions that he encountered required a more thorough understanding of the material.

34.    John scheduled an individual appointment with Dr. Terao to discuss his academic struggles, however his meeting was cancelled.

35.    Ultimately, after the first semester of Year 1, it was evident that John's early struggles affected his grades in multiple classes due to the curriculum's concurrent design. Exams from this semester contributed to individual grades in 11 separate classes. This made a successful first year numerically impossible for John based on the remaining percentages of some of these classes. This heavily contributed to John along with five other students not being able to continue with their class and remediating Year 1 of the curriculum as members of the Class of 2027.

36.     On his second attempt at Year 1, John's performance improved. He became better at managing his study time and also made use of the peer tutoring service offered by the school, specifically for the Pharmacology course. He saw his Pharmacology grade improve a considerable amount compared to his performance through the first semester a year prior. Unfortunately, due to the schedules of the upperclassman tutors, his tutor was unable to work with him for the second semester and he was unsuccessful in securing a replacement.

37.     Dean Princy Kumar – Senior Associate Dean of Student Affairs recommended that John receive a Psychological screening from the university's Counseling and Psychiatric Services ("CAPS") for his mental health brought on by his first year struggles and the family issues the John shared with her. On September 20, 2023, John had said appointment with Dr. Jade Sanders with CAPS. John took this virtual appointment on campus and relocated outdoors for more privacy as he was indoors near a group of friends he was studying with. The appointment ended after a substantial amount of time and thorough mental examination due to a drop in connection.

38.     In an email response to John's follow up sent on the same day explaining the connection drop, Dr. Sanders said that she, "was mostly finished with the triage and was about to discuss follow up options/preferences." John was coming up on an examination period so he told Dr. Sanders that he would follow up after his tests. However, his emotional state improved so he did not return to discuss further appointments. To the best of John's recollection, he does not recall a discussion regarding testing for ADHD or any other disorder during the appointment and instead remembers talk therapy being discussed to manage emotional hardships. A physician that John spoke with after his dismissal who was also diagnosed with an attention deficit disorder in a similar fashion during medical school told John that GUSOM should

have detected his attention deficit disorder after his first year as her medical school did and is commonly detected in medical education when a student is struggling. **(Exhibit 14)**.

39.     In April of 2024, John's class attended a Poisoning Cases conference and completed an assignment containing information from the cases covered. John received a 2.8/3 for this assignment. An answer for a question involving a seizure patient did not match the answer the assignment grader, John Partridge, Ph.D. (Pharmacology) - Professor of Pharmacology, initially intended students to arrive at for the question.

40.     The question involved a fictitious patient who ingested various medications. It asked, "Twelve hours after arrival [to the hospital] his mental status had not improved.  He had a generalized seizure. What might be happening now?" John said "Medications reached peak affect due to him remaining in the hospital and not eating, his BP fell severely". Dr. Partridge's initial assignment feedback sated that one of the anti-diabetic medications would cause have caused the patient's blood sugar to fall. However, a fall in blood pressure in the post seizure period is a medically accurate possibility and an appropriate response to "What might be happening now?" within the clinical context of the case and question as confirmed by a professor of Clinical Neurology via a letter **(Exhibit 1)**. Published medical literature (Nass et al., 2019 – **Exhibit 2**) and (Bozorgi et. al., 2013 - **Exhibit 3**) also warns that a life threatening drop in blood pressure can occur after a generalized seizure which show the plausibility of John's response; especially considering the open ended nature of the question, the liberal grading rubric employed for other students for this assignment, the danger of not considering a potentially life ending complication, the evidence based practice of medicine endorsed at GUSOM, and the clinical reasoning taught to students.

41.    Clinical Unified Reasoning Activity, "Cura", sessions are a part of the Clinical Skills

class that students take at GUSOM meant to foster the some of the basic skills that physicians

need, including clinical reasoning. During these sessions, students maneuver in groups

through different aspects of a patient encounter and work together with physician preceptors

to consider the facts of the case presented and to ultimately come up with a list of differential

diagnoses. Cura sessions teach students that the differential diagnosis, which involves

compiling a list of potential diseases/conditions/symptoms to look out for, is crucial in

patient care and medical practice as it guides clinicians in considering a range of possibilities

when evaluating a patient. This process ensures that no potential diagnosis or complication is

overlooked, promoting thorough and accurate patient assessment. If a disease is excluded

from the differential diagnosis, it is unlikely to be identified. It is essential to include both

common and rare diseases in the differential diagnosis to provide comprehensive care and

improve patient outcomes. As a standard practice in medicine, differential diagnosis is a

foundational concept in clinical decision-making, enabling healthcare providers to rule out

conditions systematically and arrive at the most accurate diagnosis. In essence, clinical

reasoning dictates that rigidly only considering one disease/condition as possibility can result

in misdiagnoses and in the worst case easily preventable patient death.

42.    During the differential diagnosis portions of Cura sessions, students are taught how to

"develop an appropriately prioritized differential diagnosis" **(Exhibit 13)**. Dr. Deborah

Topol, Clinical Reasoning Lead, teaches students to accomplish this by ranking diagnoses

into tiers as follows: Ia – "Everything fits" (everything referring to presentation, history,

exam findings, etc.), Ib – "must consider/rule out urgently or else the patient could die"

(some elements fit presentation while others do not however, missing these conditions could

result in a loss of life), II – "most things fit", and III – "less likely, but a few things fit". John's answer for this question would fall into the Ib category on a differential list due to the high potential for mortality of a severe drop in blood pressure and the patient's post seizure status; specifically, a physician taking care of a patient in this state would need to monitor patient's blood pressure after his generalized seizure to be prepared to correct a potential severe drop.

43.     John did not pursue the formal grade appeal process at the release of the grade, although he believed in the correctness of his answer, he chose not to engage in the process based on his perception of its structural limitations and the broader institutional futility surrounding appeals.

44.     Under the procedures outlined in the student handbook, John would have been required to first appeal his grade directly to Dr. Partridge, the faculty member who issued the grade. If that did not result in resolution, the next step would have been to appeal to the Department Chair Dr. Kellar, a colleague of Dr. Partridge within the same department. The handbook also notes that "errors and corrections resulting in grade changes are extremely rare," language that is not found in policies governing other types of disciplinary processes such as academic dishonesty or Title IX matters.

45.     In another course, Embryology, the grade appeal policy for the manuscript review assignment discourages student appeals by directly advising that appeals should only be made in cases of "major errors" despite many students facing academic hardships for being fractions of percentages away from passing/satisfactory progress each year. Based on these examples, John understood that grade changes through appeal were highly unlikely.

46.     Additionally, during his first year, John had also spoken with the then-Dean of Medical Education (who has since left the institution) regarding challenges he was facing. The Dean told him, "course directors can do what they want," **(Exhibit 14)** which further reinforced John's view that there would be little institutional support or recourse specifically for seeking redress in appealing a grade assigned by Dr. Partridge the course director or academic matters in general.

47.     These experiences and documented policies contributed to John's decision not to pursue a formal appeal of the grade appeal at grade release.

48.     At the end of the year, John finished the Year 1 portion of the Pharmacology class with a 69.92%, 0.08% shy of the 70% needed to proceed the continuation of the course Medical Pharmacology in Year 2. This percentage corresponded to the point equivalent of the deduction in question of 0.2 of a point.

49.     When he saw his final grade, he worried about the upcoming review from the COS as policy states that the COS may dismiss students that they deem unsatisfactory. John emailed Dr. Partridge regarding his final score in the class.

50.     At the time, despite addressing the effect of the medications ingested in the first part of the question, John informed Dr. Partridge that he had accidentally said that the patient's blood pressure had fallen instead of his blood sugar as a possible state of the patient. Although he did not elaborate further in that message, seeking resolution rather than conflict, John's clinical reasoning was based on his understanding that both hypoglycemia and postictal hypotension could be relevant considerations in the context of the case; hypoglycemia as a potential cause of the seizure and postictal hypotension as a possible consequence of a generalized seizure. He also reasonably interpreted the question, "What

could be happening now?" as asking about a potential suggestion as to what could be happening in the patient's postictal state, which rationally prompted consideration of postictal hypotension. While hypoglycemia likely contributed to the seizure, and may have been the specific answer Dr. Partridge had in mind, John believed that both hypoglycemia and postictal hypotension were valid clinical frames supporting the rationale behind his response.

51.    Additionally, John believed that the first part of his answer *"Medications reached peak effect due to him remaining in the hospital and not eating"* was substantively aligned with the statement made during the lecture regarding this case: *"This kid ate all the meds, was fine when he got there because it hadn't started working yet, then he just spent 12 hours in the ICU not eating."* His reasoning addressed the pharmacologic consequences of all ingested medications, including the known hypoglycemic effect of Glyburide. Furthermore, John specifically addressed the fall in blood sugar in the subsequent question that asked for a potential treatment.

52.    Furthermore, he addressed the drop in blood sugar by responding to the following part of the question by answering with a treatment for low blood sugar as he believed correcting the patient's blood sugar levels would improve his condition as the antidiabetic medication would likely still have an effect after reaching its peak because it likely would not be cleared yet.

53.    Dr. Partridge did not respond to this email.

54.    In a letter of support (**Exhibit 4**), an Internal Medicine and Palliative Care physician addressed this by saying, "I believe [John] in his attempt to give a broader explanation in part 2 of the question he forgot to mention hypoglycemia [low blood sugar] but as you can see in

part 3 of the question " What treatment is recommended ? " he answered IV dextrose as a part of the management of hypoglycemia I strongly believe he presented good evidence in support of his answers and hopefully he gets credit on his final score."

55.     John met with the COS to discuss his performance in his Medical Pharmacology and Histology (which he made satisfactory progress in the previous year) classes, both of which he missed the mark for satisfactory progress for by less than 1%. In his letter to the COS **(Exhibit 5)** and in the meeting, John expressed difficulty multitasking and juggling his classes as a primary reason his grades suffered as he did the year before. He also referred to 2023 as "the worst year of his [my] life" due to the stress and anxiety that came with a subpar academic performance and personal tragedies.

56.     GUSOM knew about the state of John's mental health. In his letter he described symptoms of adult ADHD, anxiety, and depression. Here is an excerpt from his letter to the COS prior to their meeting where he explained his struggles and showed where he has improved during his remediation year with symptoms of the conditions placed in bold and/or parenthesis: "…to me the nature of our longitudinal/integrated curriculum felt like juggling many priceless items made of glass at the same time; haphazardly studying hoping to keep my head above water and unsuccessfully attempting to keep any of the items from dropping **(poor multitasking)** ….Also, time management is another area where I improved. In the past I struggled with the day to day variability in my schedule **(time management)**. In the past, I always did better when I could keep the same structure and routine like in college/during MCAT studying. I also felt like I could not be productive in the 1-2 hour gaps between morning lectures and afternoon sessions. Last year I felt like I needed 6-7 uninterrupted hours of study time a day so I scheduled my study time in the evenings/nights when I knew I

would never have school sessions/events **(struggle with transitions).** Not only did this appointed time prove tough to adhere to consistently, but also I noticed that the days I did study during these times I felt drained from a full day of school sessions or other obligations. This led to me falling behind very easily. Fortunately, in February I found a daily routine that works well for me. Since then, I've found a way to structure my consistency around the variability in our schedule. First, I wake up at 5AM to go to the gym for my mental/physical health. Then return home to eat breakfast then stream my lectures for that day. I felt much better because this was a consistent way for me to start every day which built a lot of positive momentum as well as gave me motivation/discipline to be productive during the rest of the day whether we have a session or not because I knew my alarm would go off at 5AM every day no matter how late I went to bed **(reliance on urgency).** Furthermore, starting my day off with two big accomplishments was tremendous for my mental health and also provided me with the momentum needed work toward mastery in my afternoon/ evening study sessions while leaving the night open for physical and mental recovery. Remediating the year caused me a lot of **mental anguish**; even during the hard days on my journey to medicine before starting medical school, I never doubted my ability to see it through. This year, even though I felt far more comfortable with the material, I felt **more anxious and overwhelmed than I ever felt before because I had already messed up once (reduced executive functioning, feelings of helplessness and hopelessness).** Through blocks 1-2 this led to me spending a few days completely shutting down/ freezing **(ADHD Paralysis).** when I felt these **negative feelings.** In my personal assessment of last year, block 3 is where I dropped the ball. So this year during block 3, especially during exams, this **unrelenting anxiety** took full effect. When I finished exam season, I slept for the entire spring break which is

something I had never done before. I only left the house that week to walk my dog. **(sleep changes, loss of interest in daily activities).** Even during intersession and through most of the month of April, I had **very low energy and affect**. I spoke with a trusted family counselor from back home and he helped me to see that pulling myself together to study for my exams took all of the mental fortitude due to **the perpetual fear I had that everything would go terribly, again (sense of impending danger, panic, or doom).** With his help, I was able to pull myself together again and meet satisfactory progress in most of my classes."

57.    John presented several systematic changes and new strategies he planned to implement in the next academic year to ensure his performance improved and was granted an opportunity to remediate this portion of both classes via cumulative examinations over the summer. John's letter from the COS informed him that upon successful completion of the remediation exams, he would proceed to Year 2 of the curriculum on academic probation. Following this, the letter reminded him of the policy stating that a failed academic unit while on academic probation would result in dismissal without further consideration. Dean Kumar called John to inform him of his remediation and said "You need to pass." Given that the remediation opportunity was granted, John took this to mean that a passing performance was needed to proceed into Year 2 per the COS's letter as school policy states that a failed remediation attempt results in remediation of the academic year with no adjustments stated for those on probation.

58.    John did not pass his remediation examination for Medical Pharmacology. During preparation for this examination, he was assigned a job an hour away from his home in Washington, D.C. as a research assistant which he needed for living expenses as the summer is not covered in the cost of living calculations by Georgetown. While John was assigned

summer housing near the job, he was unable to bring his dog which resulted in him traveling back and forth very often. His father was also injured in a vehicular accident during preparation for the examination. Furthermore, school authorities directed John to Dr. Partridge for guidance in preparation for the remediation examination. In an email (**Exhibit 6**), Dr. Partridge instructed John, "Dont' memorize the names of drugs! Concentrate on bigger items like what is a half-life? What can a specific beta-blocker do that a non-selective alpha and beta blocker do better (or worse)." As John found this (instruction to not memorize drug names for a pharmacology examination) unusual, he asked Dr. Partridge for clarification regarding this instruction in a follow up Zoom meeting. During the meeting Dr. Partridge once again instructed John not to memorize the names of drugs for this examination as it would not be an effective use of his study time. He assured him that any questions asking for drugs would require John to select a drug class rather than a specific drug by name (ie. "a beta blocker" vs "propranolol") and to the best of John's recollection, that specific differences within classes for specific situations would not be tested (ie. which member of a specific class would be more appropriate). Dr. Partridge then said "maybe some antibiotics". (**Exhibit 14**) This greatly impacted John's study approach as he focused on the "bigger items" from the material covered for this exam instead of the names of specific drugs and ideas beyond key points from each lecture as he was instructed to do by the course director Dr. Partridge. Despite this, the examination contained questions requiring the knowledge of the specific names of drugs to understand the question, correctly respond, or both, or questions reasonably considered beyond the scope of "bigger items" from each lecture. For instance, one question specifically asked for, by name, the specific combination of drugs needed to treat Tuberculosis. John also recalls one question requiring him to pick a drug from

the disease-modifying anti-rheumatic drug (DMARD) class for his answer choice. This not only affected John's performance on these questions, but his performance on the examination in general due to feeling severely underprepared after having focused on the "bigger items" and the high stakes of the examination.

59.    John was informed that he did not pass the remediation examination via an email from pharmacology professor Dr. Hernandez who informed John that Dean Kumar would contact him regarding next steps. Dean Kumar called John later that evening and told him that he would be dismissed due to failure of the remediation exam and about his right to appeal. During this phone call, she told him that the COSA does not overturn dismissals but he should appeal just to say that he did all that he could (**Exhibit 14**).

60.    Since John had time as he no longer had his Histology examination to prepare for, he made an appointment to get his mental health evaluated by providers not associated with Georgetown as a second opinion. He was diagnosed with ADHD by Circle Medical (**Exhibit 7**). John also made an appointment with CAPS after receiving the diagnosis who referred him to an outside agency (citing that the university does not diagnose ADHD) to complete further testing which he was unable to complete due scheduling conflicts at work and the loss of his school insurance as a result of his dismissal.

61.    In addition to his ADHD diagnosis, John prepared a document in defense of his original answer for the Clinical Toxicology assignment in question to present to the COSA consisting of cited support from several peer-reviewed papers, case studies, medical text books, and academic medical websites on generalized seizures, postictal (post seizure) hypotension, effects of the fasted state on blood pressure and the specific drugs mentioned in the clinical

vignette which could have affected both seizure likelihood and blood pressure **(Exhibit 8)**. This document totaled 17 pages and cited 24 references.

62.     John discussed his appeal with a physician mentor of his who encouraged him by saying, "You should be fine. I mean I just googled it [postictal hypotension] and its right here. You'll have doctors at your appeal meeting, just show them the evidence." **(Exhibit 14)**.

63.     In addition to the Cura sessions mentioned earlier, students at GUSOM are taught the importance of making evidence based decisions and thinking of all conceivable possibilities when approaching patient care, especially the possibilities which may result in the loss of a life such as postictal hypotension. In fact, Evidence Based Medicine is a class housed in the preclinical curriculum. In the introductory lecture for this class, the slide entitled "EBM is a Key Paradigm for Clinical Medicine" teaches students to "Use the medical literature as the basis for clinical decision making." **(Exhibit 9)**

64.     Dr. Partridge met with John several times via Zoom during the summer where he expressed regret for the deduction on more than one occasion and admitted that he would not make the deduction if he could "go back" **(Exhibit 14)**. On a Zoom meeting on July 29, 2024, John specifically asked Dr. Partridge if he would be willing to update this assignment's grade based on the evidence shared in the document in order to definitively confirm his (Dr. Partridge's) position on the matter going into his appeal meeting scheduled for a week later. Dr. Partridge confirmed that he would update the grade if given permission by "the deans." **(Exhibit 14)** With this knowledge, John prepared for his appeal accordingly. As a result, he did not spend the time preparing for his appeal proving that Dr. Partridge's grading was wrong/biased (in the spirit of a grade appeal) or dedicating time to other aspects of his appeal. Rather, he prepared under the impression that he merely had to demonstrate that an

error occurred and the professor in question supported a grade change based on medical evidence.

65.     On August 2, 2024, a Professor of Clinical Neurology reviewed the document John prepared and responded, "While I agree with the original answer that was being looked for, I do think, [John], you make a compelling, evidence-based argument and should be awarded back the points lost.  In medicine, there is never one answer, so learning this is very important and I think you proved that well." She wrote a statement to this effect to be used in his appeal (**Exhibit 1**) and said in an email response to John, "…I was once a med student too- we should never forget the challenges faced on the journey."

66.     Given Dr. Partridge's statement on July 29, 2024 John shared this statement with him and Dean Kumar via email in order to start the process of getting the deduction corrected. Dr. Partridge responded to the statement by stating that there were other issues with John's submission never previously mentioned. In his email response he said, "As you know, I have drafted in my letter to the COSA the results you were able to achieve in the Pharmacology course. I stated in the letter if you had turned the version of the assignment that you forwarded to me more recently I would consider this an upgrade. There were other deficiencies in your original submission outside of the case you refer to, that warranted my grade for this bonus assignment." (**Exhibit 15**) For clarity, the "version of the assignment" referred to is the 17-page document with 24 references that John prepared in defense of his original answer. John did not alter his response, he merely provided supporting evidence; the assignment did not require supporting evidence for this or any other question and the submissions of this assignment by other students that John reviewed in preparation for his appeal also provided no supporting evidence for this or any other question.

67.     The letter to COSA referrers to the letter that Dr. Partridge offered to write on John's

behalf to advocate for his dismissal decision to be reconsidered. In an email (**Exhibit 16**) on

July 17, 2024, Dr. Partridge offered this help by saying "Hi [John]-- Thanks for the email and

update. I have been in this type of situation before [John] and I have drafted a letter on behalf

of the student. This letter was then forwarded to the COS[A]. I am happy to do this for you

moving ahead. I would outline in this letter, how you made good progress in one of the

hardest courses in M1 up through Block 3 and came up less than a point short of the passing

mark. Please let me know your thoughts moving forward and if you'd like to meet over

zoom/in-person. Hang in there! Dr. Partridge". (Dr. Partridge later confirmed that the student

that he referred to had their dismissal upheld). This letter was submitted directly to the COSA

for John's file. Dr. Partridge read John select portions of the letter via a zoom meeting where

he briefly mentioned John's struggles in the course, stating that he "had to put that in there".

Despite this, the overall sentiment of the excerpts of his letter that Dr. Partridge shared with

John were positive. Before the documents for the file were finalized however, John was

offered a chance to review the documents in the folder. Upon review of the letter in question,

Dr. Partridge did not advocate for John despite the fact that Dr. Partridge directly referred to

the letter as "a letter of appeal on your behalf for the upcoming COSA meeting" in an email

to John on July 24, 2024 (**Exhibit 17**). He did the opposite by pointing out his poor exam

performance in comparison to other students (particularly in portions of the course that he

(Dr. Partridge) considered easy; as stated earlier, examination performance is only one

contributing factor to a total class score), by claiming that John was distracted by his family's

extensive health problems, and by ultimately saying that he is not sure that John should be

given a chance to continue the course thus directly contradicting support of his appeal

**(Exhibit 14)**

68.    Dr. Partridge later told John that he is worried he (John) is getting "hung up" on this

assignment and discouraged him from mentioning it during his appeal. John responded to

each item listed on the Google Doc with either a quote from the lecture in support of his

answer, an example of another classmate's answer where they responded similarly, or both.

John shared his responses with Dr. Partridge who did not respond to them.

69.    The newly shared deficiencies demonstrated that Dr. Partridge graded his responses more

stringently than those of his classmates either initially or in retaliation to his effort to defend

his answer. *(Due to student privacy and John's retaliation concerns for his classmates who*

*supported him, exact student responses will not be reproduced or paraphrased.)* For

example, one question asked about the delivery method and time course that the medicine

Acetylcysteine ought to be administered. John responded *"IV over 21 hours".* In his ex post

facto critique, Dr. Partridge stated that the medication could also be given orally and noted

this as a deficiency in John's response. In reference to this drug, the lecturer for the

Poisoning Cases Conference Dr. Clancy stated *"it is given IV almost entirely".* Furthermore,

the review of peer submissions who received a score of 3/3 revealed that the mention of the

possibility of oral delivery of the medication was not consistently required to receive full

credit for this question and the lack thereof was not consistently labeled a deficiency.

Another question asked about the usefulness of the antidote activated charcoal for the

hydrocarbon poisoning described in a clinical vignette. John responded, *"No, not useful in*

*hydrocarbons"* and Dr. Partridge said, *"Point not addressed was toxin was distributed to the*

*lungs, not the GI tract."* However, the review of peer submissions who received a 3/3

revealed that for this question, as well as several others which asked for a yes or no response, reveal that a detailed explanation or mechanism was not consistently required to receive full credit and the lack thereof was not consistently labeled a deficiency.

70.    Another part of the case involving hydrocarbons asked *"What treatment is recommended?"* to which John responded "*Supportive care is the mainstay of treatment, beginning with control of airway, breathing, and circulation".* Again, the review of assignments scored a 3/3 showed that Dr. Partridge exercised leniency and consistently awarded full credit to answers not containing substantive treatment plans or students saying no treatment would be required. To a question regarding a patient with an Acetaminophen overdose asking, *"How would you confirm or discredit her history?",* John responded *"Blood work"*. Dr. Partridge listed this as a deficiency in John's response saying, *"A more thorough answer would include deciphering toxicity from the nomogram below."* When discussing the case during class, Lecturer Dr. Clancy said *"How would you confirm or discredit that history? We do labs."* Additionally, the review of peer submissions who received a score of 3/3 revealed that the mention of deciphering the nomogram was not consistently required to receive full credit for this question and failure to mention it was not consistently labeled a deficiency. Furthermore, other students did not have their answers deemed deficient for being "less thorough" in other questions where additional treatments options or calculation practices were discussed. Dr. Partridge commented *"No answer given here"* next to a question subheading regarding an unresponsive patient. John answered the question *"What treatment is recommended?"* and addressed the subheading *"Activated Charcoal?"* in his answer saying *"Naloxone, Activated charcoal via NG tube if intubated".* The review of peer submissions receiving 3/3 showed that individually addressing every

subheading/element asked in this question and other questions asked in this format was not consistently required to receive full credit and the lack thereof was not consistently deemed a deficiency; provided that the answer provided reflected all of the subheading/element asked. Outside of his Case 4 feedback, the rest of the grading inconsistencies follow a similar pattern. **(Exhibit 19) (Exhibit 21).**

71.    Regarding Case 4, he stated that "I gave written feedback on 4/25/24 that 'case 4 diabetic medication glyburide caused blood sugar to crash…'" To help with students who may have missed this point with poisoning cases you need to consider drug half-lives" indicating that rather than finding John's answer to "What could be happening now?" medically inappropriate, Dr. Partridge made the deduction because John's response focused on a different clinical assessment given the patient's immediate state as a patient post seizure; despite addressing the effect of Glyburide (low blood sugar) in his broad response including *"medications reached their peak effect"* aligned with how this case was spoken about during the lecture and in the following question asking about treatment.

72.    Dr. Partridge's grading of this assignment had a significant, negative impact on John's summative assessment as far as the Medical Pharmacology portion of his academic record was concerned. The grading inconsistencies between assignments and academic reasoning used by Dr. Partridge were also unknown to both John and the COS at the time of their meeting to discuss remediation or to John at the time he received his grade. Had John known about the inconsistencies compared to his classmate's assignments when the grade was released, he claims that he would have appealed regardless of the futility in hopes of restorative justice given substantial amount of evidence revealed in the Google Doc. John's corroboration of his position that the deduction should not have occurred with the medical

literature shared, validation from an authority in the field of Clinical Neurology, Dr.

Partridge's statement that he would have considered the document shared "an upgrade"

(showing the validity of John's answer while implying that he should have initially provided

the 24 references, a level of support was not required from other students), and the newly

found evidence that Dr. Partridge's initial assessment contained deductions from reasoning

reflective of teaching goals rather than established medical evidence (later defended with

what can be seen as retaliation by reassessing John's assignment more stringently than

others'), or made the deduction in error due to his area specialty being Pharmacology and not

Clinical Neurology all reasonably constitute sufficient cause and evidence to meet the criteria

for all three conditions.

73.     John presented evidence of the inconsistent grading, the letter from a clinical authority,

proof of his recent ADHD diagnosis, a statement from his sister with the details of their

father's accident, the medical evidence in support of his answer, and two faculty letters of

support for his appeal meeting with the COSA.

74.     John believes that the chairperson Dr. Donnelly and other members of the committee

openly showed no apparent interest in hearing his case during the appeal meeting. John

entered his virtual meeting and greeted the members of the committee as they were

introduced and thanked them for their time. Despite this, according to John, Dr. Donnelly

interacted with John in a quite precipitous and defensive manner for the duration of the

meeting. As John shared his screen to demonstrate the examples of biased grading, Dr.

Donnelly interrupted him during the introduction of the evidence and asked, "So you're

saying you got a 93[%] [for this assignment] and wanted higher?". John claims that the

question surprised him to say the least considering that he discussed the deduction made in

this assignment and its context of importance at length in his letter outlining the reasons for his appeal provided for the committee members to review prior to the meeting; as the deduction had substantial relevance even before John discovered the biased grading. John responded that he had not "done the math" as to what 2.8/3 equates to as a percentage. He clarified that he did not mention this assignment simply because he wanted a higher grade but once again, as explained in his letter, explained the deduction had no medical basis, without the deduction he would have had his true grade reflected for this class, he should not have met with the COS regarding medical pharmacology, and additionally that he now has evidence of Dr. Partridge's reassessment which was comparatively more stringent and inconsistent with how classmates were graded. Dr. Donnelly's response to this exchange was to tell John that 2.8/3 is 93% after he stated that he had not done the calculation. **(Exhibit 14)**

75.    Furthermore, despite her inclusion in the chain of email messages between Dr. Partridge and John from the day before where Dr. Partridge explicitly stated that these perceived deficiencies "warranted" (past tense, implying that they were likely taken into consideration at time of grading) his grade for the assignment and her response in this chain to John's request to share the Google Doc as evidence of biased grading during the meeting **(Exhibit 23)**, Dr. Kumar interjected during John's presentation of this evidence to tell the committee that she spoke with Dr. Partridge and he told her that the deduction was only made because of John's response to the question related to the seizure patient in Case 4. **(Exhibit 14).**

76.    Additionally, John's letter contained three elements to his appeal; this class' grade, his recent ADHD diagnoses, and his father's accident. These elements were outlined in his appeal letter for committee members to review before his meeting. Dr. Donnelly attempted to end the meeting after John only presented the first two factors of his appeal. His hearing

would have ended prematurely if John did not speak up and inform Dr. Donnelly that he had another element. Furthermore, John decided to focus on Dr. Donnelly continuously during the meeting as he served as the chairperson. He observed Dr. Donnelly appearing actively disengaged as John made his cases concerning his ADHD and his father's accident by looking off into the distance in his office resting his head on his hands on multiple occasions. **(Exhibit 14)**

77.    The COSA decided to uphold the decision. This decision was then again upheld by Dean Beauchamp who conducted the final appeal. There was no objection or reference to the demonstrated inconsistencies in grading or medical validity of the answer in the letters detailing the committee's decision. The COSA only commented that the assignment was not formally appealed in accordance with the student handbook, that accommodations cannot be granted for conditions retroactively, and that they did not find his father's accident significant enough to reconsider the decision.

78.    John appealed the COSA's decision to Dean Norman Beauchamp Jr., Executive Vice President for Health Sciences as of July 1, 2024, who upheld the dismissal decision citing a review of school policies. Dean Beauchamp, via his Chief of Staff Sean Hawkins, declined John's request to meet as a part of his appeal; Mr. Hawkins informed John via email that "The Executive Vice President ordinarily reviews appeals based on the written record."

79.    John has made many efforts to resolve this issue after his appeals were unsuccessful. He garnered support from physicians, his classmates, friends, and family sharing the details of the case via a petition with all of the relevant evidence embedded which received over 250 signatures. He also received two additional letters of support from physicians, one who is a graduate of GUSOM who in addition to supporting his grade change stated, "As an alumnus

of the School of Medicine in [redacted], I understand and acknowledge the expectations required to progress through the preclinical and clerkship years at Georgetown. However, I firmly believe that these expectations must not be evaluated within a vacuum, but to consider the overall picture. Much like Georgetown's focus on *Cura Personalis*, Care of the Whole Person, I urge you to take a similar approach in evaluating the competency of Mr. [Doe]. As such, I support that he be given the opportunity to resume his medical training within your program." **(Exhibit 27)**

80.     John shared all of this with GUSOM via a mediation service that he attempted to hire for the case however GUSOM declined the proceedings. Shortly after this, GUSOM initiated a termination of his SEVIS record citing a withdrawal.

81.     Despite these setbacks, John has remained dedicated to doing all he can for the advancement of his medical career. When not doing work on his reinstatement case, John spent the past months studying material that would be relevant for his return to his medical education and his eventual Step 1 examinations. He has also been implementing ways to manage his ADHD.

82.     Since the onset of the issues with GUSOM and Dr. Partridge, John has experienced significant emotional distress, manifesting in both physical and psychological symptoms. As a result of the stress and anxiety related to the academic issues and the subsequent battle to address them, John's weight has fluctuated, and he has lost substantial muscle mass. This physical decline is directly linked to his reduced diet and exercise routine, both of which were significantly impacted by the stress of the situation. During a visit to a plasma donation center, John's blood pressure was initially recorded at over 130 systolic and over 80 diastolic, and these measurements were subsequently confirmed with three trials at a pharmacy. While

this does not constitute an official diagnosis, these readings are indicative of a concerning elevation in his blood pressure, which research has shown is often directly linked to chronic stress.

83.      The emotional toll has also had a profound impact on John's personal relationships. His relationship with his girlfriend, "Jane", ended partially as a result of the ongoing emotional strain this ordeal placed on them both. John attributes part of this to experiencing heightened anxiety in general but especially when discussing matters related to medicine as she was a nursing student, a subject that had previously brought them closer.

84.      John's dismissal has also resulted in significant financial hardship. Due to the time he has dedicated to challenging the actions of GUSOM, John has incurred credit card debt, depleted savings/investing accounts, and borrowed money from family to meet his financial obligations. He has also utilized several months of his student loan separation period for three student loans, a period that he will not be able to recover even if he is reinstated at GUSOM, further compounding his financial difficulties. He has also had to remain in the country without status which has prevented him from working and has left him vulnerable to potential removal proceedings which has also increased his anxiety while fighting his case.


## FIRST CAUSE OF ACTION

### Breach of Contract

77.      John repeats the allegations of all of the above paragraphs as if fully set forth herein.

78.      The Georgetown University Notice of Non-Discrimination and the Georgetown University School of Medicine Medical Student Handbook afford John certain rights that are contractual in nature. *See Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34 (1st Cir. 2007) ("A

student's relationship to his university is based in contract…The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook.")

79.     The Notice of Non-Discrimination covers all Georgetown students, including medical students, while the Medical Student Handbook is specifically applicable to those attending the Georgetown University School of Medicine.

80.     Georgetown breached its contract with John by allowing a retaliatory action from Dr. Partridge as defined by Georgetown's Non-Retaliation Policy as "conduct that adversely and unjustifiably affects the terms and conditions of another's education status, quality of life, or educational experience and that is motivated by an intent to cause harm because of the targeted individual's involvement in the filing of a complaint, or participation in an investigation, relating to mistreatment or any other wrongful conduct or policy violations. This policy ensures that ethical, moral, and legal matters may be raised without fear of repercussion."  In *Kennev v. Aspen Techs., Inc.,* No. 19-1027, 2020 WL 3638388 (6th Cir. July 6, 2020), the court noted that "[g]enerally speaking, heightened scrutiny is reflected by a similar three-step pattern: an employee engages in conduct that, while technically objectionable, is blessed, or at least tolerated, by the employer; the employee engages in protected activity; the employer then takes an adverse action against the employee for conduct the employer had previously allowed." This increased scrutiny is seen in the Google Doc that Dr. Partridge provided in response to John's appeal which constitutes a protected activity via the student handbook.

81.     Georgetown breached its contract with John by failing to "prohibit[s] discrimination or harassment on the basis of any protected characteristic…".

82.     Georgetown's Expulsion of John will preclude him from completing his medical school

degree in a timely fashion or at all.

83.     As a direct and foreseeable consequence of these breaches, John has sustained damages.

I.     Georgetown University, through Dr. Partridge's grading, breached its academic

contract with the John and violated principles of fair academic evaluation. Dr.

Partridge's grading breached faculty responsibility to provide grading done "honestly,

fairly, and without bias, using appropriate criteria" and consistent with current

medical literature given the school's emphasis on evidence based medicine and

clinical reasoning. The grading of the assignment in question constitutes a material

procedural error.

84.     In regards to the assignment in question, if Dr. Partridge did not know that a generalized

seizure could result in postictal hypotension, he then failed the requirement found under the

Teaching section of the Faculty Rights and Responsibilities mandating Georgetown faculty "To

remain current in their subjects and courses," as he made himself responsible for grading a

question containing clinical elements that he was not well versed in.  If he was aware that

John's answer was valid, the initial grade and the Google Doc he prepared violate the faculty

responsibility to "provide[ing] grades in the manner and within the deadlines specified by the

Registrar, doing so honestly, fairly, and without bias, using appropriate criteria and following

stated procedure." Furthermore, it can be reasonably argued that making a deduction for a

medically correct answer because it did not explicitly align with teaching objectives violated the

criteria of "honesty" and the use of "appropriate criteria". While the Faculty Responsibilities

policy technically governs faculty conduct vis-à-vis the institution, its provisions are reflective

of the standards Georgetown holds out to its students and may be used as evidence of the

university's broader obligations to provide fair and unbiased academic evaluation. Even if John

cannot bring a direct claim under the faculty policy, the deviations from these stated standards

bolster his claim that Georgetown acted arbitrarily and in bad faith, thus breaching the covenant

of good faith and fair dealing implicit in their academic relationship.

85.     Had Dr. Partridge written a question directly asking about the primary intended effect of

the anti-diabetic medication, a fall in blood sugar would be the only acceptable answer. The

same applies to the post hoc commentary regarding the half-life of the medication in question. If

Dr. Partridge had written a question asking which of the drugs ingested was most likely still

active after twelve hours, the anti-diabetic would have been the only correct answer. However,

as medicine is inherently multifactorial in nature, the clinical context in which the question was

framed as well as the question's open ended phrasing *"What could be happening now?"*

reasonably warrants more than one possibility. To expect John to forgo the evidence based

medicine and clinical reasoning, that he learned at GUSOM, perfectly infer Dr. Partridge's

pedagogical objectives, and consider the patient's possible state only based on medication

ingested twelve hours ago rather than his immediate post seizure state simply because the

question was asked on a Pharmacology assignment instead of in a Cura session is unreasonable.

86.     Deducting points for John's inclusion of postictal hypotension suggests a conclusion that

such a complication could not occur after seizures. However, determining the plausibility of

post-seizure complications falls more squarely within the domain of clinical medicine than

pharmacological theory. As Neurology lies outside Dr. Partridge's primary field, a practicing

neurologist or clinician would likely be better situated to evaluate the medical soundness of

such a claim. In the context of medical education, particularly when clinical reasoning is being assessed, it is important that grading decisions reflect interdisciplinary standards consistent with actual patient care. Where there is no demonstrable clinical consensus against the answer provided, penalizing such reasoning falls short of fair academic evaluation.

87.     This grading decision, more reflective of a student deducing teaching objectives than medical evaluation, violates the principles of fair academic evaluation under both substantive due process and the implied contractual obligations between student and institution. Even under the deferential standard set forth in *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985), academic decisions must not be arbitrary or made in bad faith. While courts generally avoid second-guessing academic judgments, they require that grading decisions be tethered to legitimate academic criteria. Here, the deduction was not based on any medical inaccuracy or implausibility (as supported by published references, a patient case study, three physician support letters, and Dr. Partridge's admission that the answer would have been "an upgrade" with references) but rather on the instructor's pedagogical objective. Penalizing a student for failing to deduce a specific learning goal, rather than for providing a medically incorrect response, renders the grading decision arbitrary.

88.     Following Dr. Partridge's logic, an English as a Second Language teacher administering a test on "Colors in English" could deduct points from a student who answered "White" to the question, "There is an animal at the zoo with black stripes. What color could the animal be?" on the basis that the question was intended to elicit the answer "Orange" by referencing a tiger. In doing so, the teacher would be disregarding plausible and accurate alternatives such as zebras or white tigers. This would effectively penalize the student not for providing an incorrect answer, but for failing to intuit the teacher's unspoken expectations, despite those expectations being

inconsistent with reality. [the court used this reasoning in *Keen v. Penson*, "Keen's argument, taken to its logical extreme, would prevent a university from punishing a professor who failed a student for refusing sexual advances." *Keen v. Penson*, 970 F.2d 252, 258 (7th Cir. 1992)]. As seen in *Ahern v. Board of Education*, teachers/professors do not have the right to instruct outside of their field of expertise, "as phrased by the district court, "to teach politics in a course in economics." 327 F. Supp. 1397." *Ahern v. Board of Education of Sch. Dist*, 456 F.2d 399, 404 (8th Cir. 1972).

89.    *Keen v. Pearson* has also made findings relevant to this case. Some of which include a "University['s] interest in ensuring that its students receive a fair grade" *Keen v. Penson*, 970 F.2d 252, 258 (7th Cir. 1992), limits on academic freedom "As noted in Clark, "we do not conceive academic freedom to be a license for uncontrolled expression [* * *] internally destructive of the proper functioning of the institution." 474 F.2d at 931. *" Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992), the fact that "The judge also held that the giving of a grade is not protected by the principle of academic freedom." *Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992), and deferment to evidence in cases which thoroughly demonstrate unfair grading/non validity of grading ex post facto based on new criteria not applicable to other students and not previously outlined "Ample evidence supports the conclusion that Johnson did not receive a fair grade (the grade was based, ex post facto, on her "failure" to apologize properly in letters written over the summer)" *Keen v. Penson*, 970 F.2d 252, 258 (7th Cir. 1992)

90.    The court further noted that professors are not above reproach by stating "[***] Keen abused his power as a professor in his dealings with his former student and deserves sanctions." *Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992). This is also seen again in their statement referencing Professor Keen's actions within the context of the American Association of

University Professors and responsibility to have a student's true merits reflected which said, "In the "Statement of Professional Ethics" approved by the Council of the American Association of University Professors, April, 1966, [***], it is asserted that, "As a teacher, the professor encourages the free pursuit of learning in his students. He holds before them the best scholarly standards of *his discipline* [not original italics]. He demonstrates respect for the student as an individual, and adheres to his proper role as intellectual guide and counselor. *He makes every reasonable effort to foster honest academic conduct and to assure that his evaluation of students reflects their true merit.* [not original italics]" The committee believes that Professor Keen seriously violated that standard when (1) he assigned a grade of "F" to Ms. Johnson in the course 38-226 when the evidence available to him clearly indicated that she had completed what was required of her by the syllabus, (2) when he required, as a condition of receiving a passing grade in the course, that she write letter after letter of apology until she had apologized in a way acceptable to Professor Keen [***]" *Keen v. Penson*, 970 F.2d 252, 256 (7th Cir. 1992). Dr. Partridge making a deduction for John's medically correct answer then saying that he could have only received "an upgrade" if he initially provided an evidentiary burden not required by other students is in the same vein.

91.     The post hoc justifications provided further show that Dr. Partridge's grading of the pharmacology assignment reflects a material procedural error in failure to follow a consistent and academically appropriate grading rubric that compromised the fairness, consistency, transparency, and falls outside the jurisdiction of academic discretion expected in academic evaluation. Regarding the feedback to the question "What could be happening now?", Dr. Partridge initially implied that he made the deduction in reference to Glyburide and blood sugar not being explicitly mentioned in John's response. While it could be argued (albeit, contrary to

established medical evidence and opinion) that the deduction falls under the academic discretion afforded to professors. Upon evaluation of the of Dr. Partridge's reasoning, both original and post hoc justifications provided, it becomes clear that he did not follow a consistent grading rubric with John's assignment compared to other submissions and relied more heavily on personal interpretations fitting his teaching goals rather than clinical relevance.

92.    His revised feedback for Case 4 reveals this by saying: "I gave written feedback on 4/25/24 that 'case 4 diabetic medication glyburide caused blood sugar to crash…' To help with students who may have missed this point with poisoning cases you need to consider drug half-lives[.]" further indicating that rather than finding John's answer to be medically inappropriate, he made the deduction for John arriving at a clinical assessment given the patient's immediate state as a patient post seizure that was different from his intended teaching objectives. This, would suggest that students were required to make the correct inference to what his teaching goals were rather than coming up with a medically valid possibility after assessing the vignette. Importantly, Dr. Partridge did not merely leave "feedback", he made a deduction that had a critical and adverse effect on John's grade. Taken together, these facts demonstrate that Dr. Partridge's grading was not based on a neutral, consistently applied academic standard, but rather on shifting, post hoc justifications aligned with his personal teaching agenda. In doing so, he departed from both the principles of fair academic evaluation and the boundaries of protected academic discretion. When a grade hinges not on a student's medical reasoning or adherence to clinical standards, but on their ability to perfectly infer a professor's objective, the process ceases to be educational and becomes arbitrary. This departure from transparent and objective grading principles materially prejudiced John's academic standing and raises serious due process concerns.

93.      This inconsistency is further emphasized by Dr. Partridge's grading of other student assignments who received full credit for some answers that omitted details, were vague, and in some instances substantively equivalent to the things he listed as deficiencies in John's submission. Penalizing John for addressing the effect of the medications ingested broadly by saying, *"Medications reached peak effect…"* in accordance to how it was discussed in the lecture in one instance while rewarding similarly non-specific or less direct answers in other instances illustrates a lack of consistent application of the grading rubric.

94.      Furthermore, the criterion to prioritize half-lives in the clinical assessment was not indicated in the question prompt, rubric, or original feedback, and emerged only later, after the student shared plans to use this assignment in his dismissal appeal and provided a letter from a clinical authority supporting his answer in its original form. Thus strongly suggests that it was either a post hoc justification or an initial misuse of discretion rather than an established evaluative standard.

95.      Additionally, and principally, John did not miss the "point with poisoning cases you need to consider drug half-lives", as Dr. Partridge suggested in his post hoc rationalization. John's full answer of *"Medications reached peak effect due to him remaining in the hospital and not eating, his BP fell severely"* include the hypoglycemic state of the patient as his answer encompasses the anti-diabetic effect of Glyburide (in addition to the other medications ingested that had reached their full effect and had worn off) and the additional clinical context included in the conference that the patient's long time in the hospital without eating also likely contributed to his hypoglycemia as discussed in the conference. Furthermore, John also addressed the fall in blood sugar in the question asking for a treatment recommendation by answering with a treatment option to correct the low blood sugar condition brought on by the

anti-diabetic medication which could have led to the seizure. This was acknowledged in a physician support letter which stated: "as you can see in part 3 of the question " What treatment is recommended ? " he answered IV dextrose as a part of the management of hypoglycemia I strongly believe he presented good evidence in support of his answers and hopefully he gets credit on his final score.". Again, while it could possibly be argued that it would fall under Dr. Partridge's academic discretion to make a deduction for not specifically addressing this question element by name under "What could be happening now?", that defense falls apart when analyzing how he graded other submissions. Where one student is penalized for a lack of specificity and another is not, the process becomes arbitrary. And where medically sound answers are downgraded for failing to mirror a professor's instructional objectives rather than clinical standards, it ceases to reflect legitimate academic evaluation.

96.     Further addressing the post hoc justifications, in reference to the "Point not addressed was toxin was distributed to the lungs, not the GI tract[.]" comment left by Dr. Partridge, a question later in Case 6 asked for *potential treatments for a CO poisoning patient* in which John addressed both *"Oxygen, hyperbaric chamber"* as potential treatments while review of peer submissions showed that failure to mention the hyperbaric chamber as a treatment was did not result in a deficiency to deny full credit.

97.     Any new attempts to justify the deduction such as claiming that John's answer did not align with course material, John's response included a lack of speculative language, or any other perceived deficiency such as grammar/syntax would not only be further post-hoc justifications, but also would not hold sufficient weight under scrutiny to assert academic discretion. Academic discretion cannot allow for a student to be penalized for giving an additional valid possible complication while simultaneously and selectively allowing broad leniency to accept

similarly vague or incomplete answers from other students. During John's Master's in Biomedical Sciences program, he took a course on Neurological Physiology and worked in a research lab studying Neurological conditions. This class along with his lab work led to him spending time reading and researching various neurological elements which would be covered during year 2 of Georgetown's curriculum. It cannot be considered within the realm of academic discretion to punish John for the use of relevant outside knowledge.

98.     Furthermore, while John's response of *"his BP fell severely"* may be characterized as lacking speculative language in a context where some degree of speculation might have been appropriate, this does not justify a grading penalty when evaluated against the grading treatment of comparable responses. In fact, in other instances, students provided speculative or equivocal answers to questions that called for a more definitive answer and were not penalized. For example, in Case 6, which involved a family experiencing a simultaneous poisoning episode, the question posed asked: "What is the most likely diagnosis?" John answered directly and accurately with *"Carbon monoxide poisoning,"* identifying the most probable and clinically supported diagnosis under the circumstances. In contrast, students who received full credit sometimes answered more speculatively stating that CO poisoning may be the most likely diagnosis and with other similar statements that reflected a degree of uncertainty, which failed to directly answer the specific question posed. As with other examples in this matter, the issue is not a matter of permissible academic discretion, but a procedural error that resulted in disparate treatment of students under similar evaluative criteria, thereby denying John the academic outcome to which he was entitled under the implied terms of the academic agreement between student and institution.

99.     These inconsistencies go beyond the bounds of academic discretion and rise to the level

of procedural error. The failure to apply a consistent, objective grading standard resulted in John

not receiving the grade he earned and triggered unsatisfactory progress in the class. Such

deviation from established evaluative norms constitutes a breach of contract by the institution

and undermines the fairness and reliability of its academic assessment process.

100.     Dr. Partridge's actions undermine the institution's claim to protected academic

discretion. The summative impact of the deduction further elevates the issue. This single

grading decision triggered a broader academic review beyond the true scope of his performance

and ultimately contributed to the student's dismissal. Given this outcome, the lack of clarity,

consistency, and timely rationale behind the grade is particularly troubling. In such high-stakes

contexts, institutions are expected to ensure transparent and equitable processes; a standard that

appears to have been unmet here. John worked over the course of a year to redeem himself from

the failure a year prior and performed at a satisfactory level to continue into this year's Medical

Pharmacology's second portion; Dr. Partridge's initial grading and subsequent retaliation

denied him of this accomplishment.

101.     To be clear, the issue here is not one of mere pedagogical disagreement or a student

failing to grasp course content. The issue is that Georgetown, through Dr. Partridge,

fundamentally failed to adhere to the institutional commitments it makes to students regarding

the integrity of its academic processes. When a grade is imposed based on shifting rationales,

inconsistent standards, or unstated expectations, it no longer functions as an educational

measurement but rather as an arbitrary assertion of authority. That is not protected academic

discretion, rather, it is a procedural breakdown that falls outside the boundaries of what any

reasonable university promises to its students. Academic discretion must operate within a

framework of transparency, fairness, and academic integrity. When that framework collapses, so too does the institution's ability to claim that its grading decisions are entitled to deference.

102.    The school's policies, including the Faculty Responsibilities policy mentioned earlier, reflect an institutional understanding of this framework. Georgetown's own language requires grading that is *"honest, fair, and without bias, using appropriate criteria."* It is not merely aspirational; it is a representation of the standards by which the university holds itself out to students and accrediting bodies alike. That Dr. Partridge deviated from those standards by applying unique evaluative criteria after-the-fact, disregarding clinical perspectives on the answer's medical validity, and grading inconsistently across students is not simply unfortunate. It is a breach of the academic compact between student and institution. Where Georgetown failed to uphold its side of this compact, John was denied not only a fair grade but the procedural protections to which he was entitled under the implied contract.

103.    Certainly, students are expected to satisfy academic requirements and comply with institutional procedures. However, this obligation presumes that those requirements and procedures are applied fairly, consistently, and in good faith. A student cannot be said to have failed to uphold their end of the bargain when the terms of that bargain, namely, the grading criteria are applied arbitrarily, altered retroactively, or inconsistently enforced among similarly situated peers.

104.    Courts have repeatedly held that while deference is owed to academic decisions, this deference does not extend to procedural irregularities, unequal treatment, or grading decisions grounded in impermissible factors rather than academic merit. See *Keen v. Penson*, 970 F.2d 252, 258 (7th Cir. 1992) (holding that a student did not receive a fair grade when the evaluation was based ex post facto on unstated expectations). Where the process by which the student is

judged deviates from the stated or implied terms of the academic contract, it is the institution, not the student, that has failed to honor the bargain.

105.     When a university proclaims itself committed to "evidence-based medicine" and "clinical reasoning" as pillars of its curriculum as Georgetown does, it cannot then penalize a student for using those very tools when answering a clinically-oriented prompt. Yet that is precisely what occurred here. The punishment of John's medically supported and wide ranging answer, in favor of an answer more specifically aligned with the professor's pedagogical goal, is not reflective of the university's educational mission. Worse, it suggests that student evaluations are governed less by professional or scientific standards than by the personal preferences of individual faculty. Courts have recognized in multiple cases, from *Keen* to *Ewing*, that when academic decisions are arbitrary, made in bad faith, or fundamentally unfair, they are not entitled to deference. This is such a case.

106.     While it may be argued that Dr. Partridge's initial deduction was made in good faith, this does not excuse the later post hoc justifications that sought to defend the grade on grounds not originally articulated. Good faith at the outset does not insulate subsequent conduct from scrutiny, particularly when later explanations appear designed to rationalize an adverse outcome rather than reflect a consistent academic standard. Moreover, Dr. Partridge's assurance that he would revise John's grade if given permission, followed by his withdrawal of support after receiving additional supporting evidence and expert input, can be seen as behavior which would rationally undermine the legitimacy of his grading process. This sequence suggests a defensive entrenchment rather than an objective academic assessment, raising serious concerns about transparency, fairness, and the sincerity of institutional review mechanisms.

107.     Ultimately, the record demonstrates that the grade John received was not the product of

honest academic judgment but rather a result of an idiosyncratic and inconsistently applied

evaluative process. Insofar as Georgetown allowed that process to stand, failed to remediate the

harm when presented with medical evidence and expert support, and ratified the flawed

evaluation at multiple institutional levels, it cannot now rely on the shield of academic

discretion to avoid responsibility. The procedural error was not only material; it was

determinative. As such, it gives rise to a viable claim for breach of contract and denial of fair

academic treatment under the standards Georgetown itself has articulated.


II.     Georgetown Breached Its Express and Implied Contractual Obligations by Failing to
        Provide a Fair and Policy-Compliant Appeal Process


108.     According to "Article II: Promoting and Defending Professionalism in Medical

Education" found in the student handbook, Dr. Partridge's actions regarding this assignment

constitute "serious failures in respect and *honesty* - including sexual harassment, *bias*,

*discrimination*, *abuse*, and *academic dishonesty* [not original italics]".  Via the Google Doc

prepared, Dr. Partridge violated the university mandate stating that, "Any such appeal procedure

should be designed to *protect students against evaluation in which the professor uses*

*inappropriate criteria* or *ignores* stated procedures and *grading standards*. [not original italics]"

**(Exhibit 22).**

109.     Georgetown's policy language concerning appeals and grading standards is not

aspirational, it reflects binding institutional commitments that form part of the implied academic

contract between the university and its students. Courts have long recognized that handbooks,

policies, and official communications can give rise to enforceable contractual rights when they

set forth clear, specific expectations. *See Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34 (1st

Cir. 2007) ("A student's relationship to his university is based in contract…The relevant terms

of the contractual relationship between a student and a university typically include language

found in the university's student handbook.")

110.    The provision stating that appeal procedures must be designed "to protect students

against evaluation in which the professor uses inappropriate criteria or ignores stated procedures

and grading standards" is not couched in discretionary or suggestive language. Instead, it uses

the imperative "should be designed to protect," signaling a mandatory process requirement, not

a general ideal.

111.    Georgetown's student handbook also includes a non-retaliation clause designed to protect

students who raise concerns in good faith. Dr. Partridge's actions following John's notice of

intent to raise the grading issue, including the creation of a supplemental critique document and

a shift in the rationale for his grading decision, appear to constitute retaliatory conduct. Rather

than addressing the concern through normal academic channels, Dr. Partridge instead imposed

new and heightened evaluative standards after learning the assignment would be used as

evidence in an appeal. Such actions violate the university's own stated protections and further

undermine the integrity of the grading process.

112.    Moreover, the evidentiary burden Dr. Partridge applied to John's assignment deviated

materially from the standards used to evaluate other students. For example, John was told he

could only receive an "upgrade" if he had initially provided extensive citation support, even

though no such requirement was communicated in advance or imposed on peers who received

full credit. This asymmetric and selective enforcement of grading criteria, which was not

uniformly applied across the class, violates Georgetown's own policy language promising

protection against evaluations where "inappropriate criteria or [ignored] stated procedures and

grading standards" are used.

113.     Finally, if Georgetown attempts to defend its actions by asserting that John failed to

follow formal appeal procedures, such a claim cannot stand in light of its own procedural

failures. John attempted to engage Dr. Partridge for clarification and resolution before his COS

hearing, but Dr. Partridge did not respond.

114.     This delay directly undercut John's ability to formally appeal the grade with all relevant

information available. Had Dr. Partridge shared these additional perceived deficiencies at the

time the grade was issued, or even in response to John's attempt at resolution prior to the COS

hearing, John could have reasonably escalated the issue through the university's formal

mechanisms with concrete, comparative evidence demonstrating that grading standards were

applied arbitrarily and inconsistently. This would have materially strengthened his claim beyond

simply asserting that "my answer was also correct," which, standing alone, is rarely sufficient to

overcome institutional deference to faculty judgment given the documented institutional

tendency to defer to faculty without scrutiny, which John encountered firsthand. The need for

such evidence was particularly crucial at Georgetown, where the record reflects strong collegial

alignment and administrative deference to course directors, as seen in Dr. Kumar's

discouragement of appeal and other remarks by senior faculty that course directors "can do

whatever they want." This institutional climate rendered the appeal process illusory even with

proof of bias or inconsistency, proof that John only obtained after the fact.

115.     Where an institution's internal procedures render the appeal process effectively

unavailable or futile, courts may excuse procedural noncompliance. Georgetown cannot impose

procedural bars that it functionally prevents students from satisfying, especially when those failures occur at the hands of faculty or administration.

116.     Therefore, Dr. Partridge's assessment of John's assignment specifically made in response to his appeal used inappropriate criteria, ignored grading standards, did not follow a constant grading rubric, and violates school policies and academic norms; constituting a breach of contract (non-retaliation and grade appeal protection) and procedural error which improperly triggered a review ultimately leading to John's dismissal. Also, his non response and withholding of true reasons behind the grade given materially impacted John's ability to meaningfully file a formal appeal. Furthermore, the post hoc justifications tainted John's preparation for his appeal case as, not only were they academically dishonest intrinsically staining his appeal process, they were not shared until the day before his dismissal appeal meeting effectively preventing John from mounting a more thorough defense. Dr. Partridge deprived him of fair notice of the criteria against which his assignment grade was based upon, both in the grade appeal process in the handbook and for his dismissal appeal process. Thus, Dr. Partridge's conduct constitutes a breach within the contractual relationship between John and GUSOM and John suffered direct harm as a result.

117.     Unlike cases that improperly ask courts to second-guess educational quality or general academic decisions, this case concerns Georgetown's failure to adhere to its own express policies governing grading and appeals, which courts have long recognized as enforceable contractual obligations.

118.     Thus, these are not challenges to subjective academic judgment, but rather to the procedural integrity of the evaluation process which can be recognized as a material breach of contract when institutional policies are not followed and students are directly harmed as a result.

III.    Georgetown breached its contract by dismissing John not in a manner in line with

GUSOM rules and academic norms, constituting a procedural error.

119.    The decision dismiss John was also not in accordance to GUSOM regulations and/or

acceptable academic norms. The student handbook states, "while on Academic Probation, any

student who receives a failing grade in any academic unit recorded on the transcript (courses in

the first and second year; clerkships in the third and fourth year) will be dismissed from the

School of Medicine without further consideration by the COS." John did not fail the class

OMED 205-06 Medical Pharmacology because the class does not conclude until Year 2 of the

curriculum; there are no "Year 1 Medical Pharmacology" or "Year 1 Medical Pharmacology

Remediation" units in the curriculum or on the transcript. The Medical Pharmacology Course

book for the Class of 2027 contains language that makes this distinction where it refers to the

class as "**this longitudinal course**" (**Exhibit 25**) in this exact font formatting. In regards to

grading, the course book says, "Year-one grading: The criteria for demonstrating "Satisfactory

Progress" at the end of Year 1: This course will remain "In Progress" at the end of Year 1.

Students must demonstrate "Satisfactory Progress" (are passing the course) at the end of Year 1

before advancing to Year 2. The transcript will show a ZZ for "In Progress." The following

constitutes "Satisfactory Progress" in this Course: ≥70% of the course point total must be

accomplished." Thus, the class Medical Pharmacology is "In Progress" until it's conclusion in

Year 2. John's alleged unsatisfactory performance is internally noted as "ZU" per the student

handbook not as a failure on his transcript. Further regarding a failure of the course, the course

book states, "OVERALL GRADING POLICY: The overall passing grade for the Medical

Pharmacology course is >- 70% (of at least ~340 total points). This grading policy allows the

Department of Pharmacology to establish a minimal performance level deemed satisfactory, and allows all students to pass the course regardless of the class mean. *Students who score below passing at the end of the course in Year 2, will have a Fail ('F') recorded on the transcript* [not original italics]" this shows that a failure is not recorded on the transcript until a student has received under a 70% at the end of Year 2.  This is further emphasized by John's Histology course, although he ended the first semester during both attempts at year one below the passing threshold, they are not noted as failed courses or failed semesters or failed sections of courses, but rather as ZZ for in progress. **(Exhibit 26)** As the transcript is recorded in semesters, to allege that "Unsatisfactory Progress" in a longitudinal class at the end of the second semester receives a different treatment/notation than "Unsatisfactory Progress" in a longitudinal class at the end of the first semester simply due to a school year being completed is arbitrary and capricious due to the fact that they are both incomplete portions of the same course. If the registrar did indeed record an "F" on John's transcript after dismissal, this goes against course and school policy. John was placed on academic probation and told that failure of a course would result in dismissal; he structured his studying with this in mind and when necessary dedicated more time to courses ending in year one. At no point did he receive a failing grade in any course in AY 2023-2024, nor did the school define "unsatisfactory progress" as equivalent to failure in any written policy or probation terms. To now equate an in-progress performance concern with a course failure contradicts the school's own grading structure, which states that course failures are issued upon completion. This renders the dismissal procedurally invalid, as it was not grounded in the stated terms of probation. John raised this point during his appeal in written documents and it was not addressed.

120.    A potential counter-argument could assert that Semester 2 serves as the end of Year 1 and a checkpoint for determining academic standing, while Semester 1 does not. While this distinction may fall under the university's discretion to designate checkpoints for evaluation, it would not support a dismissal under a policy requiring failure based on a prematurely designated failure before the course's official conclusion. The "In Progress" designation indicates that the course has not concluded, and a student's academic standing should not be determined precipitately. Again, John navigated the year with the terms of his probation in mind which stated that he would be dismissed if he received an F on his transcript while on probation; which did not happen for his Pharmacology course. The lack of a definitive final grade for the course at this point further underscores the absence of any legitimate basis for dismissal under the cited policy. Therefore, the decision to dismiss John is inconsistent with generally accepted academic practices, which would not allow for such a drastic measure prior to the completion of the course.

121.    The school's strict established difference between longitudinal courses and courses completely contained within one semester/one year is further emphasized by the way the COS treats remediation. After block examination periods, students who are below passing in one or more of the classes tested in said period receive a call from Dr. Kumar to discuss their overall performance. After Block 3 in the Academic Year 2023-2024, Dr. Kumar called John because his histology grade was still below the passing threshold (Block 1 contained approximately 40-50 exam questions, Block 2 contained 0 exam questions, Block 3 contained approximately 8-10, as mentioned previously classes have a running total). During this call, she commended him for his academic performance thus far during his remediation year and told him to focus on ensuring that his other classes remain above the passing threshold as the COS will grant him

summer remediation for Histology if needed "because it continues into Year 2". (**Exhibit 14)**

Effectively, reaffirming that if John had failed one of his classes that ended in Year 1 he would

not have received an opportunity to remediate because they are terminal, do not "continue into

Year 2", and thus he would receive an "F" recorded on his transcript while on academic

probation resulting in his dismissal by the COS. The COS dismissed John for a having a score

under a 70% before the course's end per school policy. Following the dismissal's reasoning to

the most logical extreme, the COS could have dismissed John on November 6, 2023 after a low

score on a quiz which dropped his total point percentage to a 66.6% because neither at that point

nor at the end of the school year was the course completed.

122.    Furthermore, in a section speaking about types of remedial status, the student handbook

contains a distinction stating, "[…] any student who receives a failing grade and/or

Unsatisfactory progress (defined as performing below passing) [...]" (**Exhibit 22)** which further

denotes distinction between failing a class and making unsatisfactory progress. While

institutions may exercise discretion in academic judgments, they are bound by the policies they

establish and the distinctions they codify. Georgetown's explicit separation of "failing grades"

from "unsatisfactory progress" suggests these categories carry distinct procedural meanings and

consequences. To collapse that distinction when convenient, particularly in a high stakes

dismissal, constitutes an arbitrary and inconsistent application of institutional policy; conduct

that courts have found may violate contractual and procedural obligations.

123.    The fact that the Medical Pharmacology course has a continuous point total spanning

from the first semester of the preclinical phase to the last, has the same course number and

notation on the transcript throughout the curriculum, has the same Canvas site throughout the

curriculum, and that Class of 2027 students received an email with the subject line "Submission

Posted: Final Letter Grade, Medical Pharmacology.Fall2023" on January 22, 2025 upon the completion of Block 6 grading (housed in the Fall 2024 semester) all prove that Medical Pharmacology is one continuous course and thus, according to codified school and course policies, not possible to fail before completion.

124.    While Georgetown's communication regarding the remediation policy warned of dismissal for students on probation who receive a failing grade ('F'), that warning followed a statement indicating that John, upon completing remediation, would enter Year 2 on probation due to being required to remediate. This created a degree of ambiguity about whether the dismissal warning applied to the ongoing remediation process or the upcoming academic year. John was uncertain but reasonably believed that the remediation of the Year 1 material would not by itself result in dismissal absent a second-year failure; especially considering that school policy mandates remediation of the entire year after an unsuccessful remediation exam and that per school policies an "F" would not be recorded on his transcript even with an unsuccessful remediation. Moreover, the student handbook does not state that unsuccessful remediation of a longitudinal course while on probation results in automatic dismissal; it describes only that remediation must be completed prior to progression and that failure may result in repeating the year. Applying the "fail on probation" dismissal policy to remediation failure reflects a lack of procedural clarity, rendering the dismissal decision arbitrary under the institution's own published policies; especially where such action is not explicitly codified constitutes a discretionary expansion of policy without proper notice. This ambiguity undermines the fairness and transparency of the process and further calls into question the legitimacy of the dismissal decision.

125.     Any actions or distinctions to the contrary, ie. dividing the one course into several

courses or specific semester enrollments without actually making them into their own individual

self-contained courses, violate academic norms and practices and John's rights as a student

enrolled at GUSOM in the Medical Pharmacology course, "the relationship between a private

school and its student has by definition primarily a contractual basis." Id. If such were not the

case, neither the school nor the student would have a remedy at a private institution in situations

in which non-performance caused damage. Accordingly, where a private college or university

impliedly agrees to provide educational opportunity and confer the appropriate degree in

consideration for a student's agreement to successfully complete degree requirements, abide by

university guidelines, and pay tuition, a contract exists." *Southwell v. University of the

Incarnate Word,* 974 S.W.2d 351, 356 (Tex. App. 1998).

126.     For example, although Organic Chemistry is one discipline, it is standard practice to

divide the course content required across multiple semesters like GUSOM has done with

Medical Pharmacology. However, when this is done, each division is given its own unique

course name (ie. Organic Chemistry I, Organic Chemistry II), course code (ie. CHM 201, CHM

202), and the points scored are contained in each individual semester division. In this regard,

failing a semester would equate to failing an individual class regardless of the content of the

division between the courses. However, this is not the course structure of Medical

Pharmacology at GUSOM as the school places great emphasis on how the course is

longitudinal. What GUSOM has done with John's Medical Pharmacology grade is akin to

failing a student for having a grade below the passing mark after midterm examinations in a

CHM 201 class. Specifically, there is still approximately 26% of the Medical Pharmacology

class remaining in Year 2 according to the course progress chart provided by GUSOM. In

regards to a Year 1 remediation, the Medical Pharmacology course book states "If a student is successful in the remediation process, the failing grade (F) will remain on the transcript, but a notation will be added indicating the student passed the remediation. If the student is successful in the remediation process, the student's score will be adjusted to be at passing for the course (i.e. set to 70% of the course point total). The "ZU" will be changed to a "ZP" (Pass by Remediation at the end of Year 1) on the *internal* transcript [not original italics]. (More recent course book has been updated to reflect handbook language) However, there is no mention of a failure ("F") being recorded on neither the internal nor the official transcript for a course considered "In Progress" in the student handbook which states, "For longitudinal Foundational Phase courses that remain "In Progress" after Year 1, below passing performance at the end of Year 1 will be assigned an internal designation of "ZU". Upon successful remediation of an "In Progress" course at the end of Year 1, the internal designation of "ZU" will be replaced with "ZP" to indicate that it has been passed by remediation; the student will from that point forward be considered passing in that "In Progress" course as s/he enters Year 2, and hence a notation of "ZZ" (**Exhibit 22**) will be recorded on the student's official transcript." John has attempted to order his official transcript twice and both orders have been unsuccessful. However, as he was withdrawn from his classes due to his dismissal, his unofficial transcript (**Exhibit 26**) reflects "WF" for a withdrawal while failing as opposed to "F" for Medical Pharmacology, further indicating that the course is not yet completed.  John's unofficial transcript reflects an "F" for Physiology for the Spring 2023 semester because he was below passing at the completion of that course, further demonstrating that Medical Pharmacology was not complete the semester of Spring 2024. John's transcript aligns with the handbook, not the course book.

127.    While Georgetown University may claim broad discretion in dismissing students for academic deficiencies, the institution did not invoke such discretionary authority in John Doe's dismissal. Instead, the dismissal letter specifically cited the provision stating that "while on Academic Probation, any student who receives a failing grade in any academic unit recorded on the transcript (courses in the first and second year; clerkships in the third and fourth year) will be dismissed from the School of Medicine" This language imposes a clear condition precedent: an actual failing grade ("F") in a unit on the transcript: defined as courses (not portions – checkpoints – or individual semesters) in the first and second year and clerkships in the third and fourth). However, at the time of dismissal, John had not failed any course. The Medical Pharmacology course was officially listed as "In Progress," and his year-end designation of "ZU" (unsatisfactory progress) is, by institutional definition, not equivalent to a failing grade. Georgetown's own course book and transcript policy confirm that the Medical Pharmacology course remains incomplete until the end of Year 2, and that a failing grade ("F") may only be issued upon final completion. Accordingly, the school applied a policy condition, failure of a course, that had not been met. This point was shared with the COSA and faculty in preparation for John's appeal. To retroactively argue broad discretion in this context is disingenuous and contrary to the principle of fundamental fairness. When a university elects to justify dismissal under a specific policy, it must adhere to the terms and thresholds of that policy. Here, no such threshold was met. As a result, even discounting the contested deduction, John's dismissal lacked both procedural integrity and a legitimate academic basis under the institution's own standards.

128.    Additionally, in *Fellheimer v. Middlebury College*, the court held that Middlebury College breached its contractual obligations to the student, Fellheimer, by failing to provide

adequate notice of the charges against him. Specifically, the college did not inform him that he was being charged with "disrespect for persons," which was a separate charge from the initial accusation of rape. This lack of notice prevented Fellheimer from adequately preparing his defense, rendering the disciplinary process fundamentally unfair.  Similarly, to retroactively invoke academic discretion in this dismissal effectively deprives John of his right to appeal under the grounds used to justify his dismissal as the "failure on probation" policy was cited as the reason for his dismissal; further exasperating the procedural error and breach of contract.

129.    In its correspondence denying John's dismissal appeal, while citing the provision from the Student Handbook regarding dismissal while on academic probation, the COSA stated that "any student who receives a failing grade in any academic unit recorded on the transcript . . . will be dismissed from the School of Medicine without further consideration by the COS." However, the ellipsis in this quotation omits a critical qualification originally contained in the Handbook; the Handbook defines "academic unit" for transcript purposes as "courses in the first and second year, [and] clerkships in the third and fourth year." By excluding this establishing operational definition, the COSA's statement materially alters the scope and application of the policy. This omission is particularly significant given that the academic concern used to justify dismissal did not clearly involve a failing grade in a formally defined "academic unit", but rather an element not included on John's transcript.

130.    While it may be argued that the weight of this omission is speculative, it is important to note that the policy inconsistency was raised during John's appeal. Regarding this, John's letter to Dean Kumar and Dean Jones stated: *"On this note, both my letter from the COS and The Policies and General procedures of the School of Medicine state, "while on Academic Probation, any student who receives a failing grade in any academic unit recorded on the*

*transcript (courses in the first and second year; clerkships in the third and fourth year) will be dismissed from the School of Medicine without further consideration by the COS." I have not received a failing grade in courses as I passed all of my courses completely held in year 1. Pharmacology finishes in year 2 and interim grades are not recorded on the transcript."* As mentioned, the "failure on probation" policy was cited in its full and unaltered form on his letter from the COS informing him of his remediation plan. Thus, making the removal of the qualifying language of "academic unit" material to the rationale for dismissal and denial of appeal; this suggests an intentional misrepresentation, or at minimum a misapplication, of governing academic policy.

131.     Courts have consistently recognized that when academic institutions choose to articulate standards or procedures in student handbooks or official documents, they are bound to follow those standards with consistency and fairness. The selective quotation used by Georgetown, omitting the handbook's explicit operational definition of "academic unit," may constitute an arbitrary application of policy in a high-stakes disciplinary context. Here, by removing qualifying language and interpreting a remediation plan/part of a course as a failed academic unit on the transcript, Georgetown effectively expanded the reach of its dismissal policy beyond what the official handbook allows. This raises serious concerns regarding procedural fairness and may support a claim that the dismissal was not based on a fair or accurate application of institutional policy.

132.     Any attempt to reframe "failure" as a functional or informal designation (in reference to the remediation exam, unsatisfactory progress, or failure to meet progression standards) rather than a formal, grade on the transcript is invalid under the school's own policy language. The dismissal policy cited applies to students who "receive a failing grade in any academic unit

recorded on the transcript." Thus, the term "failing grade" is not abstract or discretionary; it is a clearly defined academic outcome specified by the Handbook. Thus, applying the dismissal policy to this situation requires an improper expansion of its scope converting internal remediation difficulty into an official "failure" where none existed. This interpretive stretch is not only inconsistent with the text of the policy but also undermines the school's obligation to administer academic standards with clarity, consistency, and good faith.

133.    When an institution selectively quotes its own policies in a way that materially alters their meaning, especially in a context as consequential as academic dismissal, it raises serious procedural fairness concerns. Although academic institutions are afforded substantial discretion in their evaluations, this discretion does not extend to distorting or misapplying written standards. This selective citation and misapplication form the basis of a bad faith breach of the school's contractual obligations to treat students in accordance with established policies.

## IV. Procedural Misapplication and Arbitrary Dismissal

134.    Furthermore, the facts of this case show that the deduction that triggered this chain of events was a product of a material procedural error and defended in retaliation; as now supported by expert opinion, authoritative medical sources, examination of other student assignments, statements by physicians, and the admission that the assignment would have been upgraded had John included supplementary references. This intrinsically invalidates John's dismissal. Ignoring such evidence is "arbitrary action without sound basis in reason" as defined in *Pell v. Board of Education,* 34 N.Y.2d 222, 231 (1974), and fails the test of rational academic discretion in a matter analogous to APA § 706(2)(A), which invalidates agency decisions that

are "arbitrary, capricious, or not in accordance with law." Further, when internal grading

inconsistencies are discovered after the dismissal decision, and those inconsistencies were

unknown to both student – materially effecting the process of initiating a formal appeal and to

the COS at the time of deliberation, the original decision lacks factual foundation. John's

academic record was materially compromised due to this procedural error, and the decision to

dismiss him on this basis cannot withstand scrutiny under either contract law or administrative

law standards. To deny these facts further undermines any notion of objective or fair academic

discretion. Although students are expected to maintain academic standards, John was

specifically prevented from doing so due to Georgetown's failure to follow its own clearly

articulated grading and dismissal procedures. Therefore, based on the overwhelming evidence

of procedural unfairness and retaliation, the dismissal must be reversed to restore justice and '

uphold the integrity of the academic process.

135.    Georgetown's decision to dismiss John must be evaluated not only by the outcome but

also by the integrity of the process used to arrive at that outcome. In this case, the Committee on

Students (COS) and Committee on Student Appeals (COSA) mischaracterized an in-progress

longitudinal course as a failed one, contrary to the school's own grading policies and transcript

codes

136.    Furthermore, if Georgetown had intended to invoke its separate policy allowing for

dismissal at any time for academic deficiencies, it could have done so. But it did not. That

policy carries broader discretion. Instead, Georgetown relied on a policy with narrow, objective

criteria and then proceeded to misapply those criteria.

137.    This misapplication is further exacerbated by the internal inconsistencies and lack of

procedural transparency. If the university now claims that "unsatisfactory progress" in a

longitudinal course constitutes failing a course at the end of Year 1 (whether on academic

probation or not), that interpretation must have been clearly published in the handbook or

course documentation, and consistently enforced. Neither is true. Nowhere in the handbook

does it define unsatisfactory progress as a course failure; nor does it say that a student failing to

reach a benchmark partway through a longitudinal course has "failed" that course outright. In

fact, the official transcript contradicts that conclusion.

138.    To dismiss a student for "failing a course" that was neither failed nor complete is

arbitrary, capricious, and inconsistent with Georgetown's published grading and dismissal

procedures. In *Pell v. Board of Education*, 34 N.Y.2d 222 (1974), the New York Court of

Appeals held that "arbitrary action is without sound basis in reason and is generally taken

without regard to the facts." Similarly, under § 706(2)(A) of the Administrative Procedure Act,

agency actions must be overturned when they are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law." That standard is met here.

139.    Georgetown's failure to do so by both mislabeling a grade and ignoring the difference

between "ZU", "WF", and "F" is not only a procedural flaw, but also a material breach of its

academic obligations.

140.    Georgetown's failure to adhere to its own grading and dismissal policies, compounded

by the erroneous and retaliatory grade deduction, constitutes arbitrary and capricious decision-

making. This not only violated John's rights under procedural fairness but also breached the

implied contract between him and the institution. As such, Georgetown's dismissal of John is

unjustifiable both on the merits and as a matter of law.

141.    A potential assertion that Georgetown University's dismissal decision is consistent with

prior dismissals involving similar or stronger academic records does not justify the fairness or

reasonableness of the decision. Uniformity in the application of a flawed policy does not

inherently equate to a just or legally sound outcome. The fact that previous dismissals might

have been handled similarly does not absolve the decision-making process of scrutiny; rather, it

raises further concerns about the arbitrary and unduly rigid application of a policy that fails to

account for the individual circumstances of each student. Dismissing students based on a

technical deficiency, such as a minor grade shortfall in an ongoing course undermines the

fundamental purpose of academic evaluation. The decision to apply this standard uniformly,

without sufficient consideration of the student's academic trajectory or the incomplete nature of

the course, suggests that Georgetown's dismissal process is more concerned with rigid policy

adherence than ensuring academic fairness and the exercise of discretion in matters of such

profound consequence.

142.    In sum, John's dismissal lacks procedural or rational basis. The decisions rendered by

the COS and the COSA relied not solely on objective academic metrics but instead on

subjective interpretations, internal grading categories, misapplication of standards, and

unofficial academic standards, thereby straying from accepted legal norms.

143.    Both committees referenced "Low Pass" grades in communication with John that

summer. However, in a Pass/Fail curriculum, the concept of a "Low Pass" is neither a failing

mark nor a recognized academic deficiency for official standing and thus dismissal purposes.

Any effort to use a non-failing internal designation as part of a basis for dismissal, particularly

given the current state of residency admissions, introduces an arbitrary element that courts have

consistently rejected when evaluating academic discipline. Furthermore, the irrationality of this

concept also shines through in the way GUSOM treats students who marginally miss

proficiency. This complaint came to the court because John received a grade 0.08% shy of the

percentage needed to continue in a longitudinal class only 75% complete with extra credit opportunities available in Year 2. If John's 69.92% is deemed unsatisfactory with no qualifications because it falls under the satisfactory mark, then logic dictates that the COS must consider his scores above the satisfactory mark as satisfactory with no qualifications in accordance with a Pass/Fail grading scheme. The use of unofficial measure like "a pattern of low passes" to justify the results of an official dismissal decision fails to meet the standard of valid academic judgment.

144.     Moreover, at no point during his official post-block academic progress meetings with Dr. Kumar was John's performance in his "Low Pass" courses identified as a cause for concern; despite at least one of those grades falling within the Low Pass range at the time of the check-ins **(Exhibit 14)**. Georgetown's failure to raise any academic red flags during these formal assessments, particularly while John was on probation, undermines any post hoc justification that his Low Pass grades rightfully factored materially into his dismissal. If such performance truly risked justifying dismissal, even in part, it would have been incumbent upon the institution to communicate that risk explicitly. The omission of any such warning deprived John of the opportunity to remedy perceived deficiencies and therefore defeats the argument that he received adequate notice of the standards by which his progress would be judged. As a result, Georgetown cannot now retroactively invoke these grades to support its decision without violating the principles of fair notice and rational academic discretion. Georgetown University School of Medicine may argue that "Low Pass" grades, though not failures, are indicative of academic underperformance, particularly when a student is on academic probation, and that the Committee on Student Affairs (COS) has broad discretion to assess such records as inadequate progress.

145.        Additionally, they may assert that students are expected to recognize that multiple

Low Pass grades signal academic deficiency, even without explicit warnings during periodic

check-ins. Finally, they might contend that the Low Pass grades were not used retroactively to

justify dismissal, but rather considered holistically alongside all other performance markers.

However, these arguments fail to account for the procedural fairness and clear communication

that should have been afforded to students, particularly those on probation. Additionally, there

is no policy basis in the student handbook that equates Low Pass grades with failure or

establishes them as automatic grounds for dismissal. The absence of such warnings, especially

after formal evaluations, creates a reasonable expectation that the student's academic standing

was acceptable, and the university's silence in this regard cannot be treated as neutral. In this

context, the university's failure to communicate effectively and provide fair notice strengthens

the argument that Georgetown's actions were procedurally flawed.

146.        Furthermore, any claim of an alleged "pattern of academic deficiency" raises serious

procedural concerns, particularly in light of the remedial structure imposed by the COS. The

COS expressly required John to repeat the entire Year 1 curriculum, not merely selected courses

he struggled with, after his initial academic difficulties during AY 2022–2023. This

distinguishes his case from a scenario involving continuous enrollment, where deficiencies are

remediated incrementally through targeted course repetition.

147.        Upon successful completion of the repeated coursework in AY 2023–2024 (including

courses he had previously passed) it is procedurally inconsistent and arguably arbitrary for the

COS to cite past deficiencies from the original attempt as part of the justification for dismissal.

To penalize John based on remediated conduct undermines the integrity of the remediation

process itself and blurs the line between formative evaluation and punitive sanction.

148.     Courts have recognized the importance of procedural fairness in academic dismissal

cases, even within institutions that are afforded considerable discretion. It would be

procedurally questionable to compel remediation while simultaneously reserving the right to

later use that same remediated performance as evidence of unsuitability. Doing so would violate

basic norms of fairness and finality, effectively converting remediation into a trap rather than a

second chance. Accordingly, the use of resolved academic issues as part of the rationale for

dismissal is procedurally inconsistent with the institution's own remedial directive and invites

judicial scrutiny under both contractual and due process frameworks. This rightfully removes

deficiencies from AY 2022-2023 from John's dismissal decision. In light of these facts, John's

academic performance during AY 2023–2024, after restarting the curriculum, should arguably

be viewed as the relevant benchmark. To move to justify dismissal partially on the basis of

resolved or internally subjective measures from the prior year can be considered lacking both

academic integrity and procedural justification.

149.     In regards to John's AY 2023-2024, his Histology course remediation was approved, and

upon passing the examination (or receiving credit pursuant to the student handbook's provision

for graduate-level coursework) that deficiency will be corrected. It is also important to note that

his Histology remediation had no contingency bases on his Pharmacology remediation.

Furthermore, Dean Kumar's advice to divert attention away from Histology and direct it to his

other classes materially impacted his grade for Histology. It would be unreasonable and violate

the principals of fair notice to penalize John for following institutional advice.

150.     As demonstrated by the facts of this case, there is no rational academic or medical basis

for the deduction in John's Medical Pharmacology class. Thus, it should not have not occurred

and John should have had his earned grade of 70% reflected which would have given him satisfactory progress into Year 2.

151.    Under these circumstances, the record does not support a legitimate academic basis for John's dismissal, especially under the policy cited. Rather, the decision appears to be the result of inconsistent application of academic standards and a failure to follow fair and transparent procedures; resulting in a procedural error.

## SECOND CAUSE OF ACTION

## Breach of the Implied Covenant of Good Faith and Fair Dealing Under District of Columbia Law

152.    John repeats the allegations of all of the above paragraphs as if fully set forth herein.

153.    The Georgetown University Notice of Non-Discrimination and the Georgetown University School of Medicine Medical Student Handbook afford John certain rights that are contractual in nature. *See Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34 (1st Cir. 2007) ("A student's relationship to his university is based in contract…The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook.");

154.    Furthermore, under District of Columbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action.

I.      Material Procedural Error: Improper Use of "Low Pass" Designations to Bias
        Academic Record Review

155.    Georgetown materially breached its obligations to John by allowing unofficial "Low
        Pass" designations to improperly influence the review of his academic record during critical
        stages of his dismissal proceedings.

156.    Regarding Low Passes, the handbook states, "For courses that are Pass/Fail, students
        scoring in the lowest percentiles (e.g. 10% or lower) of those who pass a course and marginally
        meet passing criteria generally receive a Low Pass; an internal grade used to identify students at
        potential risk, recorded as a Pass on the transcript." Thus, by nature of it being an internal
        measure officially recorded as "pass" grades, school policy states that they are not a part of a
        student's formal academic standing. Additionally, the use terms like "marginally" and
        "generally" in the school's official designation of the internal Low Pass grades as well as
        reserving the designation for "students scoring in the lowest percentiles" show that the
        designation is intrinsically arbitrary, vague, and lacks consistent enforcement standards.

157.    Therefore, per school policy, all scores above the established passing threshold are
        treated as "Pass" grades for official purposes. John, like other students, reasonably relied on this
        structure when prioritizing coursework, allocating study time, and balancing research and
        leadership commitments essential for post-graduate placement. His academic and professional
        planning was directly influenced by the understanding; fostered by Georgetown's official
        policies suggesting that for official purposes all passing grades met institutional expectations
        and satisfied program equally.

158.    Georgetown's policies acknowledge that multiple Low Pass performances may, in some

circumstances, trigger internal repercussions such as academic probation. However, as per

school policy they are not officially material deficiencies, it is arbitrary to factor these internal

designations in to official adverse actions such as dismissal.

159.    Despite this, at every stage of academic review including initial COS review, COSA

proceedings, and dismissal deliberations unofficial Low Pass designations were treated as

material deficiencies. Reviewers were improperly influenced to view John's record regarding

these classes as evidencing contributing to "global academic deficiencies" even though John

had formally passed the courses at issue.

160.    The reliance on informal labels to undermine a student's standing within a pass/fail

framework is arbitrary and fundamentally inconsistent with Georgetown's academic structure. It

created an improper bias against John at each stage of the academic review process, depriving

him of the fair and impartial evaluation to which he was entitled.

161.    Georgetown's actions thus materially prejudiced John's ability to defend his academic

performance, breached the implied covenant of good faith and fair dealing, and contributed to

the unjust outcome of his dismissal

162.    Any potential assertion that references Low Passes as merely providing "context" does

not cure the material bias introduced into the review process. In a Pass/Fail system, selectively

emphasizing certain passing performances over others, when no such distinction is formally

recognized, is inherently arbitrary. It improperly converts passing work into evidence of

deficiency, undermining the very standards on which students are expected to rely.

163.    Even assuming other academic concerns existed, the improper characterization of John's

record based on Low Pass references tainted the fairness of the overall review. When an

adjudicative process is materially influenced by improper considerations, the resulting decision

should not stand; even if other grounds for concern were present. Georgetown's reliance on

unofficial, non-binding academic classifications deprived John of a fair evaluation under the

standards published and reasonably relied upon.

164.     Finally, any assertion that Low Passes did not factor into dismissal is belied by the

structure of the communications John received. The emphasis on Low Passes in his academic

summaries and communications with the COS and COSA evidences that these unofficial marks

played a material and improper role in the assessment of his academic fitness.

165.     Accordingly, Georgetown's improper use of unofficial Low Pass designations materially

biased the review of John's academic record at every stage, in breach of institutional fairness,

good faith, and the implied contract between student and university.

166.     Georgetown may attempt to minimize the review of Low Passes in this decision by

citing its broad discretion to dismiss students for "lack of academic progress." However,

institutional discretion is not a license to disregard procedural fairness, ignore published

standards, or arbitrarily apply vague informal metrics. Even where schools reserve the right to

make academic judgments, courts have consistently held that such discretion must be exercised

in accordance with the institution's own policies and in good faith. Here, Georgetown did not

cite "lack of academic progress" as the basis for dismissal at the time of decision, depriving

John of meaningful notice and the opportunity to respond under that standard. Retroactively

invoking that clause as a post hoc rationale for dismissal is legally impermissible and

undermines the integrity of the process. Moreover, John's awareness of the internal Low Pass

system does not equate to reasonable notice that such designations would be treated as formal

deficiencies when evaluating official adverse actions like dismissal; especially when

Georgetown's own policies state that Low Passes are internal and recorded as passing grades. The university's discretionary authority does not extend to mischaracterizing internal grades, selectively elevating unofficial metrics, or shifting rationales after the fact. As such, the discretionary clause cannot cure the procedural and substantive defects in the dismissal process.

II.     Dr. Partridge acted in bad faith by committing to correct John's grade when he had no intentions of doing so and instead reevaluated the assignment without John's knowledge and in a manner not aligned with how he assessed other students. Dr. Partridge's withholding of material information prejudiced John's ability to prepare his defense and file formal appeal of assignment grade, violating fairness norms.

167.     Dr. Partridge made a false promise as to future performance/acted in bad faith by telling John that he was committed to changing his grade. John relied on Dr. Partridge's reasonable promise to his detriment as he prepared for his appeal with the promise that Dr. Partridge remained committed to correcting the grading error. This is demonstrated in his appeal letter sent to Dean Kumar and Dean Jones in which John addressed this issue only as an error (**Exhibit 18**). John did not accuse Dr. Partridge of biased grading or prepare to demonstrate that his assignment was graded inappropriately because of Dr. Partridge's commitment to support a correction. He only found out that this was not the case on Friday evening via Dr. Partridge's response to the letter from Dr. Ailani. Dr. Partridge did not share the other perceived deficiencies with John's submission until Sunday August 4, 2024 when he shared a Google Doc (**Exhibit 19**) outlining them. The comments on the Google Doc that Dr. Partridge cited as

evidence for other perceived deficiencies in the assignment were dated July 21, 2024. He received John's defense of his answer with the aforementioned 24 references on July 16, 2024 and confirmed review of the document on their zoom meeting on July 18, 2024. This demonstrates that the false promise to correct the grade on the basis of the defense document made on July 29, 2024 was delivered without intent to ever uphold said promise.

168.    Furthermore, John prepared for his appeal on the bases that his response for the seizure case led to the deduction and had no reason to believe otherwise given the original the assignment feedback provided on May 15, 2024 which stated, "case 4 diabetic medication glyburide caused blood sugar to crash... - John Partridge" (**Exhibit 20**) and Dr. Partridge's comments during the summer. The school's policy states that documents for COSA meetings must be submitted two business days prior to the scheduled meeting by 9:00AM. Dr. Partridge withheld this information from John knowing the effect it could potentially have on his appeal, further showing a bad faith attempt to undermine the merits of John's case. Additionally, when John sought informal resolution as required for the grade appeal process, these new deficiencies were never mentioned. Had Dr. Partridge responded to the attempt at resolution and shared these other deficiencies, John could have had concrete merit on which to base his formal appeal beyond claiming that his answer was also correct which would very likely not have been sufficient to overcome faculty discretion given the handbook comments saying that errors resulting in grade changes are extremely rare.

169.    Furthermore, as demonstrated earlier and seen in the Google Doc, Dr. Partridge's reevaluation of John's assignment contained perceived deficiencies not in line with how other submissions were graded. If Dr. Partridge did not support a grade change for John or expressed regret for the deduction only casually, he could have said this when directly asked whether or

not he would support a grade change based on the evidence shared; instead, he agreed to do so if given permission. If he claims that grades cannot be changed, this is untrue as John had a technical issue uploading an assignment for another class and after verification of said issue the course director regraded his assignment initially given a zero for non-submission **(Exhibit 11)** because as former Dean for Medical Education Dr. Lee Jones explained to John, "Course directors can do what they want." **(Exhibit 14)** Furthermore, the handbook makes allowances for a delay of assigning a final grade that has been challenged due to a formal grade appeal which John claims he would have pursued if given the fill context that Dr. Partridge claims for the deduction. Even if special approval is required from the registrar, faculty, and administration, the facts and stakes of this case would have warranted such measures. Additionally, if he genuinely did not support John's original answer despite the medical literature and expert opinion, he could have left his original critique of John's assignment as is to be evaluated by the COSA on its own merits against John's claim. Instead, his actions in retaliatory defense of his grading of this assignment were arbitrary, capricious, and in bad faith.

170.    Even if Dr. Partridge/GUSOM maintain that grades are discretionary and subject to change upon further review, such discretion must be applied consistently and in accordance with institutional norms of fairness and good faith. In John's case, the reevaluation of his assignment was not part of any routine academic process, nor was it applied uniformly to all students. Rather, it was an isolated, delayed, protective, and retaliatory act triggered only after John informed Dr. Partridge that he would be using the assignment as a central component of his dismissal appeal. No other student was subjected to a second round of grading under new standards, and John was not notified that the deduction in question underwent reassessment and given additional justifications. At the time of his appeal preparation, John relied in good faith on

Dr. Partridge's explicit commitment to support a grade correction if given permission. Instead,

the grade was secretly re-evaluated with harsher criteria, and the critiques were withheld until

after the deadline for appeal materials had passed. Such conduct exceeds the bounds of

academic discretion and demonstrates a willful abuse of authority, carried out in bad faith.

171.    In Gupta v. New Britain General Hospital, the court said that "bad faith may be overt or

may consist of inaction, and fair dealing may require more than honesty."  Id. cmt. d. "Bad

faith" involves "evasion of the spirit of the bargain, lack of diligence and slacking off, willful

rendering of imperfect performance, abuse of a power to specify terms, and interference with or

failure to cooperate in the other party's performance."  Id. "Bad faith means more than mere

negligence." Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 687 A.2d 111, 122 (1996)

(citation and internal quotation marks omitted)


III.    Dr. Partridge acted in bad faith by promising a letter of support then directly

submitting a letter to the opposite effect; he portrayed John's performance in a

negative light intentionally misaligned with course grading policies.


172.    Dr. Partridge's efforts to discredit John's legitimate claim are also seen in the letter that

he promised to write in support of John's appeal. This deception is further demonstration of Dr.

Partridge acting in bad faith. John ended the first three blocks of the school year above the

passing mark for Medical Pharmacology and was even complimented for his performance in the

course by Dr. Partridge directly on multiple occasions. Dr. Partridge's expressed this view in his

email offering the letter of support, describing John's performance as only coming up "less than

a point short." The Pharmacology course never became the topic of discussion during his calls

with Dr. Kumar after Blocks 1 and 3 to discuss target areas for improvement. **(Exhibit 14)** Dr. Partridge drafted the letter in question to retroactively paint John as a student who did not perform satisfactorily in course content throughout the year. Effectively, this letter used John's exam scores compared to class averages to undermine the merits of his appeal and minimize the effect of the deduction in question (consistent with Dr. Partridge's "hung up" comment and his instructions telling John to focus on other deficiencies).   John's reliance on Dr. Partridge's promises were reasonable and he suffered damages as a result of the reliance on said promises and qualify for promissory estoppel. *See Cohen v. Cowles Media Co., 501 U.S. 663 (1991).*

173.        Also, as explained above and per class and school policy, exam scores comprise only one aspect of performance in a course and carry no independent bearing on a student's academic standing; as a professor and course director, Dr. Partridge is reasonably aware of this. As stated earlier, grading policy of the course, "allows all students to pass the course *regardless of the class mean*". Dr. Partridge's letter shows bad faith via a willful misrepresentation of class and institution grading standards considering; firstly – multiple elements beyond examinations comprise total points for the course, second – points are aggregated from examinations and other assignments (examination points are not "weighted" more than assignment points, thus giving examination points no increased importance as far as standing is concerned), and thirdly – both institution policy and course policy of student's grades being independent from their classmates' performances. Even in the event Dr. Partridge classify this letter as a letter of support, his criticism of John seen in the letter would still be disingenuous due to its misalignment with grading standards reflected in the course handbook (stating that satisfactory progress is independent of class averages); especially considering that progress in the course would not have been an issue without the 0.08% or 0.2- point deduction in John's poisoning

cases assignment. Even if he wished to provide a "neutral" or "honest" assessment, that assessment would still need to align with class and institutional grading standards in which course total is determinative.

174.     Had John earned every point in the Medical Pharmacology course up until Block 4 examinations and then proceeded to score zero points for the course in said examinations he would have scored above the passing threshold for the course, further demonstrating that exam performance in isolation is a non-issue as far as academic performance and promotion are concerned by the nature of school policies and curriculum. Thus, rendering Dr. Partridge's negative comments heavily focused on John's exam performance, an arguably deliberate misinterpretation of John's class standing within the context of the class grading structure; suggesting a self-serving effort to diminish his claim of a grading procedural error that he committed.

175.     If he indeed did not support John's appeal, Dr. Partridge could have merely not volunteered to write a letter of support, offering to do so then proceeding to give a predominantly negative evaluation relying on selectively unfavorable metrics suggests intent. John never received a warning or notification from a faculty member regarding a low examination score within a specific class because this is not how progress is assessed in the curriculum, thus Dr. Partridge's portrayal of his class standing did not align with school evaluation principles and were made in bad faith.

176.     John's reliance on Dr. Partridge's promises were reasonable and he suffered damages as a result thus qualifying for promissory estoppel. John initially relied on the belief that a letter from the professor who made the deduction supporting his appeal and admitting the validity of the answer would bolster his claim. However, despite Dr. Partridge's comments affirming the

answer, he ultimately elected not to include the letter in his appeal due to the objectively

negative evaluation that Dr. Partridge gave about his performance, the comments made toward

his family, and Dr. Partridge ending the letter saying that he is unsure whether or not John

should receive another chance directly contradicting the nature of a letter in support of an

appeal. Ultimately, John went into his appeal without the promised letter of support from the

professor in question. John relied on this promise to his detriment. *See Cohen v. Cowles Media*

*Co., 501 U.S. 663 (1991).* In *Megenity v. Stenger* the court said, "In a companion case, *Perry v.*

*Sindermann,*408 U.S. 593, 601-602, [ 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570] (1972), we held

that "agreements implied from `the promisor's words and conduct in the light of the

surrounding circumstances'" could be independent sources of property interests. See *Bishop v.*

*Wood,*426 U.S. 341, 344, [ 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684] (1976) (implied contracts).

Megenity v. Stenger, 27 F.3d 1120, 1124 n.2 (6th Cir. 1994)". In *Gupta v. New Britain General*

*Hospital*, the court said that "bad faith may be overt or may consist of inaction, and fair dealing

may require more than honesty."   Id. cmt. d. "Bad faith" involves "evasion of the spirit of the

bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of

a power to specify terms, and interference with or failure to cooperate in the other party's

performance."   Id. "Bad faith means more than mere negligence . " *Gupta v. New Britain Gen.*

*Hosp.,* 239 Conn. 574, 687 A.2d 111, 122 (1996) (citation and internal quotation marks

omitted).

IV.    Dr. Partridge misdirected John in an official capacity regarding his remediation examination, constituting a procedural error.

177.    As previously mentioned, as course director Dr. Partridge misguided John who was directed to him by faculty for preparation regarding his remediation exam. He instructed him not to memorize the names of drugs and confirmed this advice during a zoom meeting where Dr. Partridge instructed him not to memorize drug names and told John that any drugs mentioned would be referred to by class rather than name. Despite this, both answers and question stems required knowledge of drug names. As course director and the person John was directed to in an official capacity for preparation, Dr. Partridge either knew or should have reasonably known the content of the remediation examination. Given that John needed a satisfactory performance on this exam to continue into Year 2, this constituted a high stakes situation. Courts have found that where students are encouraged to seek academic advice from institutional representatives, they are entitled to reasonably rely on that advice, especially when such guidance influences performance or decision-making. See *Guckenberger v. Boston Univ., 974 F. Supp. 106, 147 (D. Mass. 1997)* (noting that students are entitled to rely on representations made by school officials). As John was officially directed to Dr. Partridge for guidance during his preparation, this constitutes a procedural error.

178.    Dr. Partridge's involvement in the design and content of the remediation exam directly informs the expectations of the guidance he provided to John. As the course director, Dr. Partridge was responsible for overseeing the curriculum, including the design of examinations and assessments, and was therefore in a position to either have direct access to or at least be familiar with the content and structure of the exam. It is reasonable to deduce that Dr. Partridge, as course director, had either full or partial knowledge of the exam content, as his role would

necessitate such familiarity to ensure that students were appropriately evaluated. If, for any reason, Dr. Partridge was not aware of the specific content of the exam, his failure to seek such knowledge or provide accurate guidance would constitute negligence. By offering official advice that contradicted the exam's requirements, he would be failing to fulfill his duty as an academic advisor. If, on the other hand, Dr. Partridge was fully aware of the exam content and still misdirected John, his actions could be characterized as intentional or, at the very least, recklessly misleading. In either case, Dr. Partridge's failure to ensure that the advice he provided was consistent with the actual expectations of the exam represents a procedural error that cannot be excused by ignorance or oversight.

179.    It is also essential to underscore that official guidance from the course director carries significantly more weight than informal advice from peers or other faculty members. John was not merely seeking general academic advice but was specifically directed to Dr. Partridge for preparation regarding the remediation exam. This official direction elevates the nature of the guidance John received, making it reasonable for him to rely on it to a far greater extent than casual or unverified advice from other sources. The expectation of accurate, reliable, and authoritative guidance from the course director is fundamental, particularly when the advice provided influences decisions with critical academic consequences, as was the case with John's remediation. Dr. Partridge, as the faculty member tasked with preparing John for this high-stakes exam, had an obligation to provide informed, accurate guidance, knowing that John's future academic progression depended on his performance.

180.    Further, while it is acknowledged that John followed the guidance to focus on the "bigger items" and did not memorize drug names, which was consistent with the direction given by Dr. Partridge, the subsequent misalignment between this advice and the actual structure of

the exam is highly relevant. Dr. Partridge's recommendation to focus on the "bigger items" reasonably led John to prioritize key concepts from the Year 1 lectures and class sessions, as those would naturally constitute the most critical elements of the course content. This led to John tailoring his studying to satisfy the requirement of a mastery of said "bigger items" rather than prepare for the specificity of questions during normal block examinations. However, the exam deviated from this advice by including questions that required specific knowledge (including drug names), which could be considered outside of the scope of the "bigger items" as outlined by Dr. Partridge. This discrepancy led to John's underperformance on the exam, as he was unprepared for specific questions and drug names that were integral to the exam's structure.

181.    In this context, it is important to link this procedural error to the tangible consequences John faced. While the misdirection by Dr. Partridge is clearly outlined in the argument, the impact of this error on John's performance should be emphasized. John's performance on the exam was directly influenced by the incorrect guidance he received. His inability to answer questions involving drug names, a component that Dr. Partridge had explicitly told him to disregard, directly resulted in a lower score than would have been the case had he been correctly advised. This not only affected his exam performance on these specific questions, but also had significant psychological consequences throughout the examination, as the discrepancy between the guidance he received and the content of the exam caused confusion, anxiety, and diminished confidence. The harm suffered by John, both academically and psychologically, can be attributed directly to Dr. Partridge's official misdirection, which was a procedural error in the context of this high-stakes remediation exam.

V.    The COSA's decision was predetermined.

182.    Dean Kumar's comment about the COSA not overturning dismissal decisions and encouraging John to appeal "just so you can say that you did all that you could" **(Exhibit 14)** serve as evidence that the COSA appeals at GUSOM are not entirely fair or transparent, and that these procedures may exist more to give the appearance of due process than to provide a meaningful opportunity for redress.

183.    As she plays an integral part in COSA proceedings and given her role as Senior Associate Dean of Student Affairs, Dean Kumar's statement could be interpreted as indicating the official stance of the university, especially in terms of the appeal process. At minimum, an acknowledgment of COSA's predisposition in such matters and a process that university faculty themselves do not fully believe in.

184.    This combined with the facts that Dr. Kumar also discouraged John from mentioning the assignment in the appeal, imploring him to "be strategic", further corroborates the fact that a concerted effort existed to undermine John's appeal. Additionally, had Dr. Kumar genuinely only wanted John to "be strategic", she would have no reason to invalidate John's evidence and bias a committee by interjecting that Dr. Partridge made the deduction only due to Case 4 which was knowingly false (demonstrated by her inclusion in and response to the chain of emails outlining Dr. Partridge's new position). Also, a reasonable and neutral party would in no way recommend that a student disregard evidence pertaining to academically dishonest grading in a hearing supposedly interested in making a determination in good faith. This behavior further supports a claim of bad faith by GUSOM and that the COSA conducted John's appeal with no intent of genuinely hearing his case.

185.      Furthermore, in addition to Dr. Kumar explicitly telling John that the committee does not

overturn decisions and the COSA members apparent lack of interest in John's case, the COSA

scheduled his meeting for the afternoon of what should have been his first day of the new

semester. Given the importance of the meeting's results, it would be reasonable to expect a

committee assembled in good faith to hear John's case in time to avoid missing class sessions

should his appeal be approved.

186.      In *Gupta v. New Britain General Hospital,* the court said that "bad faith may be overt or

may consist of inaction, and fair dealing may require more than honesty."   Id. cmt. d. "Bad

faith" involves "evasion of the spirit of the bargain, lack of diligence and slacking off, willful

rendering of imperfect performance, abuse of a power to specify terms, and interference with or

failure to cooperate in the other party's performance."  Id. "Bad faith means more than mere

negligence." *Gupta v. New Britain Gen. Hosp.,* 239 Conn. 574, 687 A.2d 111, 122 (1996)

(citation and internal quotation marks omitted).


          VI.      GUSOM regularly suppresses student appeals via active discouragement and
                   formal grade appeal policies/procedures which render the process futile.


187.      Additionally, Dr. Kumar's comments further demonstrate the ineffective and dismissive

nature of appeal processes across the board at Georgetown, reflecting an institution-wide

attitude and culture where appeals are often disregarded, rendering them an essentially futile

exercise due to the school's lack of genuine consideration.

188.      In response to the evidence of academic dishonesty that John presented, the COSA cited

that John did not appeal the assignment in accordance with the student handbook. However, a

formal appeal of John's assignment would most likely have been fruitless. Not due to his claims

lacking merit (as demonstrated by the Clinical Neurologist's letter and Dr. Partridge's

statements), but due to Georgetown's intrinsically flawed grade appeal process. At GUSOM,

the grade appeal process is willfully, structurally, and practically futile. Students are dissuaded

from pursuing appeals through a combination of biased procedures and administrative behavior

that signals predetermined outcomes, rendering the formal process an empty exercise better

befitting a safeguard protecting the university from liability rather than a meaningful avenue for

redress.

189.    The student handbook's warning that *"errors and corrections resulting in grade changes*

*are extremely rare"* found in the section outlining grade appeals demonstrates institutional

coercion, bias in the appeal process, and effectively tells students that their appeals are unlikely

to succeed. This language, absent from other disciplinary proceedings such as those involving

academic dishonesty or Title IX violations, signals a predisposition to protect professors from

scrutiny, thereby discouraging students from appealing grades even when legitimate errors exist

and indubitably create a chilling effect across the student body. Courts have recognized that

coercion, often created through power imbalances, can vitiate a party's ability to make a free

and informed decision. In *Pantastico v. Department of Education,* 406 F. Supp. 3d 865, 878 (D.

Haw. 2019), the court noted that "unjustified coercive means, often accomplished through

disparate power dynamics, can vitiate consent." Georgetown's language, combined with

unofficial faculty warnings that challenging faculty would be futile, create an environment

where students are actively discouraged from challenging their grades. John's decision not to

appeal this specific assignment was not the result of carelessness, but rather a direct response to

an intentionally discouraging and structurally biased system that coerces students into forfeiting their right to appeal.

190.     While it may be argued that "transparency" is not inherently coercive, language that characterizes student appeals as "extremely rare" either in success and occurrence (especially when paired with opaque procedures and a structurally biased process) presented in an official capacity, the student handbook, can function as a deterrent that chills legitimate challenges, not just frivolous ones. Courts may not strike language down in isolation, but when coupled with a flawed process, such language may support a broader claim that the appeal mechanism is illusory or fundamentally unfair.

191.     The grade appeal process itself outlined by GUSOM further cements bias by requiring students to first informally appeal to the professor who issued the grade, which if not approached diplomatically, could very likely lead to entrenchment and a response rooted in self-defense. This presents an inherent conflict of interest. As courts have consistently recognized, a fair appeal process requires decision-makers to be free of bias. The involvement of the professor in the initial step of the appeal process creates an environment in which the professor is the judge of their own actions, undermining impartiality.

192.     A professor's reluctance to admit fault, especially when such an admission carries the potential for professional consequences or institutional scrutiny, can constitute a serious conflict of interest in academic evaluation.

193.     This dynamic is particularly harmful at Georgetown, where the explicitly warning cites grade changes as "extremely rare." This language does more than simply set a high bar for correction, it creates an institutional narrative that grade changes are virtually never justified. Within such a culture, any professor who acknowledges an error, or any colleague who supports

a grade correction – particularly in the formal appeal process where the appeal is reviewed by the professor's department chair, is not merely admitting to a mistake but is effectively asserting that an extraordinarily rare and institutionally discouraged event has occurred. This transforms a simple grading correction into a reputational and professional risk, reinforcing reluctance among faculty to acknowledge or rectify errors. It also undermines the feasibility of internal checks, as instructors or committee members would likely not want to be seen as contradicting a standard that casts grade changes as exceptional to the point of improbability. As a result, the official policy itself exacerbates the conflict of interest by making the cost of admitting fault disproportionately high; further eroding the fairness and viability of the appeal process.

194.     Even if the discouragement of grade appeals was not the university's intent, the resulting coercive environment created by the handbook language, informal faculty warnings, and biased appeal process, had the consequence of preventing students from pursuing legitimate appeals. This unintended outcome is no less damaging to the fairness of the academic process. Georgetown must be held accountable for the design of its system, which, despite its original intent, undermines students' rights to challenge unfair grading decisions.

Collegial Alignment Would Have More Than Likely Prevented John from Receiving an Unbiased Formal Appeal

195.     In John's case, Dr. Partridge's grading decision was not merely a subjective academic judgment; it was a demonstrated procedural error that carried life-altering consequences, as it directly contributed to John's dismissal. Yet, his response to evidence of this was to attempt to raise additional justifications in defense of his grading.

196.     Dr. Partridge's behavior reflects a concerning pattern of self-preservation that undermines the fairness of the academic evaluation process. His pattern of shifting justifications, deflection of blame, and eventual retaliation is not only troubling, it also suggests that Dr. Partridge was more concerned with shielding himself from the professional consequences of admitting a mistake or institutional scrutiny than with evaluating the work fairly. Courts have recognized that such inconsistent conduct and retaliatory action can reflect a lack of good faith and that shifting rationales may demonstrate bad faith.

197.     This conduct is especially troubling given the institutional policies which bind faculty at GUSOM. If Dr. Partridge was unaware that generalized seizures can cause postictal hypotension, then his grading violated Georgetown's Faculty Rights and Responsibilities policy requiring professors "to remain current in their subjects and courses." If he was aware and still issued the deduction, his conduct failed the obligation to provide grades "honestly, fairly, and without bias." Either scenario reflects a professional failing, and acknowledging the grading error would have directly implicated Dr. Partridge's compliance with these duties. Further illustrating the conflict, Dr. Partridge actively discouraged John from raising the assignment as the centerpiece of his appeal, urging him to "focus on other areas of deficiency" (namely addressing John's low passes and his interim Histology course grade) and stating he was getting "hung up" on the issue. This rhetoric, paired with the retaliatory regrading and selective minimization of the deduction's impact, underscores Dr. Partridge's strong incentive to avoid admitting error.

198.     Georgetown may argue that Dr. Partridge simply changed his mind in good faith or reevaluated John's assignment as part of a broader, legitimate academic process. However, even if a change of mind were made in good faith, (an unlikely scenario given the timing and

context) Dr. Partridge never communicated this alleged reevaluation to John, despite knowing that the assignment was central to his appeal. This lack of transparency is inconsistent with fair academic practice and further undermines the credibility of any post hoc justification and is further evident of bad faith. This also applies to withholding the full rational for the grade from John while he was still within the procedural window to initiate a formal grade appeal. Moreover, there is no academic rationale that would support the justification of a deduction dependent on deviations from grading standards and medical standards. As courts have noted, academic discretion is not a license for unchecked or unaccountable decision-making, especially when the stakes involve a student's academic standing and future.

199.    Given this behavior and the potential professional consequences of acknowledging that he failed to follow grading standards or had a lack of knowledge in subject matter, he cannot be considered an impartial initial reviewer had John appealed his assignment according to the student handbook. His role would have presented a textbook conflict of interest, both in perception and practice. The reputational incentive to maintain his original position, regardless of the validity of John's answer, creates an impermissible conflict of interest under both academic fairness and legal standards.

200.    Moreover, if a student's appeal is not resolved satisfactorily at the professor level, it must be escalated to the department chair. However, given the chair's professional relationship with the faculty member, there exists an inherent conflict of interest that reasonably calls into question the impartiality of the review process. As highlighted in *Doe v. Purdue University,* 928 F.3d at 663, the court noted that procedural unfairness can result in tangible harm, and this harm is compounded when "bias or conflicts of interest" are present in the decision-making hierarchy. Thus, the working relationship between the professor and the department chair undermines the

impartiality of the appeal process and violates the fundamental principle of neutrality essential to fair adjudication. The court in *Morongo Indians v. State Water Resources Control Bd.,* 45 Cal.4th 731, 737 (2009), emphasized that "a fair hearing requires that the decision maker is free of bias for or against a party." While private universities like Georgetown are not required to provide due process in the same way as public institutions, the principles of fairness and impartiality still govern institutional procedures. Here, Georgetown's grade appeal system appears to fail in providing the kind of unbiased and neutral review required to ensure fairness for students.

201.     The nature of this relationship was seen when John shared the facts and documents concerning his appeal with the Department Chair Dr. Kellar who would have been the final adjudicator in his formal grade appeal. In response, Dr. Kellar said "I will confer with Dr. Partridge and read the materials you sent me when I get back". At first glance, this may seem like a routine and neutral plan to address both sides. But the phrasing matters, especially in situations that demand impartiality. Even if Dr. Kellar intended to review all materials, his immediate default to "confer with Dr. Partridge" reveals an embedded hierarchy of credibility and suggests implicit bias. While it is not uncommon for a department chair to consult with a course director, Dr. Kellar's immediate reference to "conferring" with Dr. Partridge raises a reasonable concern about impartiality in this specific context. Given that John's complaint directly implicated Dr. Partridge in a grading irregularity, any suggestion of collegial deference, even at the linguistic level, warrants scrutiny. Where the person who would have served as adjudicator of a student's formal complaint indicates an instinctive alignment with a faculty colleague under review, the credibility and integrity of the process may be called into question. The use of the word "confer" as opposed to, for instance, "investigate," "review," or even

"speak with" implies alignment and shared authority, which is inconsistent with the duty of impartiality expected of an appellate reviewer as it implies a collaborative or deferential conversation between colleagues.

202.     While Georgetown may argue that such conversations are standard academic practice, that defense falls flat under scrutiny. In cases where student claims involve retaliation and ethical misconduct (as would have been the case for John's formal grade appeal had Dr. Partridge provided his full reasoning for the deduction), "standard practice" does not excuse compromised procedure. Had John pursued a formal grade appeal, it is reasonable to conclude that the matter would have escalated beyond Dr. Partridge and landed with Dr. Kellar. This likelihood is reinforced by the fact that Dr. Partridge responded to the clinical neurologist's endorsement of John's answer, with visible dismissiveness and subsequent retaliation. Thus, further illustrating Dr. Kellar's importance in this process and demonstrating the problematic nature of the implicit bias and deference seen in his responses to John. Effectively, this would have rendered John's appeal process not only tainted, but futile and fundamentally unfair. Due process and fair dealing require impartiality and cannot function with preloaded faculty loyalty. Indeed, a critical principle of fair adjudication is that decision-makers begin by weighing the evidence rather than by reaffirming relationships.

203.     Georgetown may also claim that the email is irrelevant because no formal appeal had been submitted. But that's precisely what makes this exchange revealing. It was a statement rooted in reactionary institutional deference to a departmental colleague.

204.     Additionally, Dr. Kellar received John's concern and formed his stance of "I talked with Dr. Partridge. I'm sorry, but there is nothing that I can do to change this situation" before Dean Beauchamp made John's final appeal decision. Thus, his review of the situation wasn't

meaningless; rather, it was potentially decisive. Had Dr. Kellar, as Department Chair, objectively reviewed the detailed evidence of grading irregularities and retaliation, he could have formally raised concern, flagged the dispute for reconsideration, or advocated for the procedural error to be corrected. However, like the COSA, Dean Kumar, and Dean Beauchamp, Dr. Kellar made no reference to the evidence presented.

205.    Georgetown may argue that Dr. Kellar's comment refers only to the dismissal itself, rather than the procedural error that led to it. However, this defense fails to account for the full context of the communication. The materials sent to Dr. Kellar included the procedural error in grading and the alleged retaliatory conduct by Dr. Partridge. Thus making the dismissal deeply intertwined with those antecedent issues. To suggest that Dr. Kellar could consider the dismissal in isolation, without implicitly reviewing or addressing the allegations of bias and retaliation that led to it, ignores the integrated nature of the facts presented. As the dismissal arose from a procedural error in grading, then any fair analysis of the dismissal necessarily requires unbiased engagement with the evidence confirming the error. This exchange, then, is not just a footnote. It's a representative snapshot of how GUSOM's internal structure likely would have handled John's appeal had he submitted one. The person tasked with ensuring objectivity had already shown a willingness to rely predominantly on the accused faculty member's narrative and enter into a shared decision with him regarding the facts of the case; further substantiated by a lack of reference to an independent review in his email response. That is not impartial process; it is circular reinforcement. In *Felkay v. City of Santa Barbara,* 62 Cal. App. 5th 30 (2021), the Court of Appeal evaluated the futility exception and concluded it applied to both the ripeness and administrative exhaustion doctrines in this case. Essentially, the futility exception holds that when a decision maker has clearly demonstrated a firm opposition to the petitioner's preferred

course of action, the usual procedural requirements, such as exhausting administrative remedies, do not need to be followed.

206.     This is another example of how Georgetown's internal appeal structure relies not on neutral fact-finding, but on faculty alignment. It also likely demonstrates why, as stated by school policy, "errors and corrections resulting in grade changes are extremely rare". When the individual responsible for adjudicating a claim is situated within the same departmental hierarchy as the person whose conduct is being challenged, a structural conflict of interest cannot be reasonably denied. Even in the absence of overt bias, there exists a built-in institutional incentive to uphold the original decision. This incentive stems not only from a desire to maintain departmental cohesion and authority, but also from the reputational risks associated with acknowledging error. Faculty members may be reluctant to admit that they, or their colleagues, have made a mistake; particularly in a context where such an admission could carry formal or even legal consequences. The implicit pressure to preserve the credibility of the department or institution can subtly, yet powerfully, influence the outcome of internal reviews, thereby undermining the integrity of the adjudicative process.

207.     This dynamic is especially problematic at GUSOM, where hierarchies are tightly knit and decisions made by faculty often are extremely unlikely to go unchecked by external oversight. Without meaningful procedural safeguards such as independent review, clear separation of roles, or external adjudication, there is a heightened risk that claims will be dismissed not on the basis of merit, but out of institutional self-interest. This calls into question the fairness and objectivity of the process, and may, in some cases, rise to the level of constructive denial of due process.

Collegial Alignment Materially Impacted John's COSA Meeting

208.    This failure of due process was not merely theoretical; it also played out plainly in the

COSA hearing itself. Despite clear evidence that Dr. Partridge's grading was inconsistent,

retaliatory, and unsupported by his own prior statements, the hearing was shaped not by facts,

but by institutional alignment. As John presented concrete examples (ie. student responses

graded differently, timestamped lecture support, and even screenshots of new critiques showing

Partridge's name and profile attached to the feedback) Dean Kumar interjected claiming that

according to Dr. Partridge the grade deduction was "only due to Case 4." **(Exhibit 14)** This

interjection flatly contradicted Partridge's own email statement (which Dean Kumar had

received) that there were "other deficiencies that warranted" his grade for the assignment,

shared only after John provided Dr. Ailani's letter to her and Dr. Partridge.

209.    This interjection further signaled institutional alignment (now including a senior faculty

member) and risked further undermining the committee's neutrality. The COSA did not

question her statement or reconcile it with the evidence. The evidence was never addressed.

Both the interjection and the failure to consider evidence constitute further error which rendered

the appeal process flawed. The COSA's handling of this information and exchange show further

institutional deference to colleagues in light of facts, such indifference further demonstrates the

global futility of appeal processes as GUSOM.


The COSA Had a Disregard For the Nature of John's Claims

210.    Even more revealing was the previously mentioned remark by the COSA Chair who

dismissively asked, "So you got a 93 [%] and wanted higher?". This minimization reflected not

only the willful misconstruction of the appeal claim (which again, had relevance beyond this claim even before the evidence of inconsistent grading), but also the broader institutional tendency to trivialize student concerns in defense of faculty and process.

211.    While it may be tempting for Georgetown to suggest that the COSA's failure to address key evidence stemmed from Senior Associate Dean Kumar's mischaracterization of the dispute, this defense is neither credible nor curative. The issue is not limited to one misstatement. Rather, it is emblematic of a broader systemic failure. As demonstrated by the COSA Chair's dismissive framing of the issue, the committee was never interested in fairly evaluating the procedural errors or retaliatory conduct that John raised. Aside from asking John policy questions, the COSA only made an investigative effort to determine how the faculty members who wrote John's letters of support became involved in the matter.

212.    The COSA extended the lack of due care and attention for John's evidence submitted prior to the meeting to the evidence presented grading inconsistencies displayed by the Google Doc despite this grading directly resulting in John having to account to the COS for Medical Pharmacology. Thus making the grading of this assignment, the coercive efforts to cover it up, and Dr. Partridge's deceptive attempt to undermine John's competency in the class and thus credibility/impact of his claim outside of the bounds of academic norms, good faith, and well beyond the scope of a grade appeal.

213.    John repeatedly explained, including to directly Dr. Donnelly before the entire committee, that the dispute was not a grade appeal, but rather centered on evidence of an error followed by biased regrading that directly impacted his dismissal. Despite this, COSA treated the issue as nothing more than a grade dispute, ignoring contradictory and dismissing any need for further inquiry.

214.    Offering a rehearing in the same procedural framework would not resolve these defects, it would reinforce them. Given that the dismissal policy grants broad discretion to the COS to remove a student "at any time," Georgetown could simply reach the same result again, even if the grade were restored. In other words, a rehearing is not a meaningful remedy. It would be a procedural rerun that preserves institutional discretion while evading accountability. Worse still, there is no guarantee that a new panel would act independently, given the demonstrated pattern of administrative alignment and deference to faculty narratives regardless of evidence. At this point, the process is so fundamentally compromised that offering another round within the same flawed structure would amount to constructive denial of due process, not remediation of it.

215.    This willingness to overlook facts, evidence, clinical authority, structural bias, the need for neutrality, and even to disingenuously restructure student claims demonstrates a willful indifference to due process and further confirms that the grade appeal process at GUSOM was not designed to yield a fair result. Rather, it functioned as a closed-loop system that served to insulate faculty actions from meaningful review, leaving students like John with no viable recourse. Taken together, these moments exemplify the constructive denial of fair dealing and demonstrate the COSA were not neutral adjudicators. The hearing became not a neutral forum for evaluating claims, but a coordinated effort to protect a colleague at the expense of fairness, evidence, and integrity.

216.    In *Alcorn v. Vaksman* the court said, "The evidence of bad motive is mainly circumstantial, but that is usually the case. That is why the law allows motive, or any ultimate fact, to be proved by circumstantial evidence. State v. $11,014.00,820 S.W.2d 783,·785 (Tex. 1991); Investment Properties Management, Inc. v. Montes,821 S.W.2d 691, 695 (Tex.App. — El Paso 1991, no writ); *Paragon Hotel Corp. v. Ramirez,*783 S.W.2d 654, 658 (Tex.App. — El

Paso 1989, writ denied); see Clements,835 F.2d at 1005 (summary judgment in academic

dismissal case is unwarranted where state of mind is the critical issue and "solid circumstantial

evidence exits to prove plaintiff's case"); accord *Wakefield v. Northern Telecom, Inc.,*813 F.2d

535, 541 (2d Cir. 1987). *Alcorn v. Vaksman,* 877 S.W.2d 390, 400 (Tex. App. 1994). As bias is

related, ""[T]he presumption of impartiality can be overcome only by specific evidence

demonstrating actual bias or a particular combination of circumstances creating an unacceptable

risk of bias." (Id. at p. 741.)" *Doe v. Univ. of S. Cal.,* No. B321883, 17 (Cal. Ct. App. Jan. 16,

2024).

> The Embryology Manuscript Review Further Demonstrates Institutional Chilling
> of Appeals and Indifference to Student Concerns About Fairness

217.     Another specific example of this institution wide suppression is seen in the Embryology

class. The course's rebuttal policy for the Peer-reviewed Manuscript assignment states, "A

**rebuttal process** is in place that should minimize evaluators purposefully assigning low scores.

If authors determine that their manuscript has been judged unfairly, they will be able to rebut

their review ONCE through a formalized rebuttal process; however, this determination should

not be taken lightly and is not without consequences (e.g. possibly lowering of grade). This

option should only be used IF there is evidence of major problems with the critique. To *submit a

rebuttal* of the critique and corresponding score, the corresponding author should send to the

Manuscript and Course Director(s) as an email attachment, a one-page document summarizing

the challenge to the critique and provide rationale for why the grade should be adjusted. Acting

as editor-in-chief, the Manuscript Director(s) or their designate will arbitrate poor critiques and

determine consequences for the authors and/or the reviewers involved. **If the Manuscript Director and/or a review committee member is asked to arbitrate and find that the critique was fair, the committee *reserves the right to lower the authors' grades on the manuscript if errors previously missed by the reviewers are detected.*** Conversely, if the critique is found to be unfair, poorly written, or significantly off-target, the committee ***reserves the right to lower the evaluators' grades on the critique portion of their grade*** (e.g. 20 points *from quality of critique portion of the grade)*. The decision will be final and students must accept the adjusted grade without further challenge. *This rebuttal process is reserved for major problems with the review only.* It is **not** an opportunity to gain a few points for minor issues (e.g. grammatical errors, etc.) Therefore, before submitting a rebuttal, the group must decide if their discontent is warranted with respect to content and approach and be ready to accept the consequences. (original formatting)"

218.    This policy further exposes a deeply suppressive approach to student appeals and reflects the institutional attitude that discourages legitimate academic challenge. The policy explicitly warns students that submitting a rebuttal, even in cases of unfair or inaccurate grading, may result in a lower grade if the review is upheld and if new issues are "detected during arbitration." This means that even when concerns are valid, students are specifically instructed to consider whether or not seeking a rebuttal to have their correct grade reflected is worth the risk.

219.    Georgetown may further argue that students electing to rebut are opting into a system where faculty rather than peers regrade the work, thus justifying the risk of a lower grade. But this argument crumbles under its own weight as Dr. Gallicano, course director, has directly stated that rebutted manuscripts will be evaluated with increased scrutiny and has warned

students to think carefully before submitting a rebuttal. **(Exhibit 14)** In essence, students are being told that challenging an unfair evaluation could trigger a harsher review by a reviewer with the predisposition to make deductions as opposed to an objective or corrective one. This structure fosters a chilling effect, where students are forced to weigh the "consequences" against the potential benefit of receiving the corrected grade that they rightfully earned.

220.     Compounding these concerns is the fact that Dr. Gallicano as course director (or another appropriate faculty member) routinely reviews student submissions for the purpose of identifying exemplary work for potential publication in which he is listed as one of the authors ("This latter project will give students the opportunity to publish their work in a peer-reviewed journal listed on Pubmed or as a chapter within a medical book" – Fall 2023 ME Course Handbook). In doing so, he is in a position to detect substantive errors or deficiencies across all manuscripts, not only those submitted for rebuttal. Thus, many errors and deficiencies are "detected during review for publishing." However, under the current policy, grade reductions based on newly discovered errors are only applied to students who formally challenge their critique. This selective enforcement mechanism effectively penalizes students for exercising the very procedural rights the policy purports to offer. Furthermore, as errors discovered during the review process do not trigger grade changes for non-rebuttal students, then the selective penalization of rebuttal participants cannot be justified as neutral editorial rigor. Instead, it reflects disparate treatment deterring students from seeking redress due to fear of retaliation (or "consequences" as expressed in the course book).

221.     A further flaw in the integrity of the grading and appeal process arises from the dual role held by Dr. Gallicano as both course director and a recurring co-author on student publications derived from this component of the course. This presents a clear conflict of interest, as it creates

a system where the perceived academic or professional value of a student's submission, particularly its potential for publication, could consciously or unconsciously affect how grading standards are applied or how rigorously an appeal is analyzed. For instance, if Dr. Gallicano views Student A's submission as publishable and sees potential professional benefit from co-authoring it, he may be disincentivized from assigning harsh penalties or even from acknowledging flaws in that student's critique that Student B highlights in an appeal. Conversely, a student whose work he deems less valuable for professional gain may be scrutinized more strictly or dismissed outright in an appeal, especially if their challenge undermines the grade of a submission that he has already endorsed. This kind of asymmetry casts serious doubt on the objectivity of the grading process of this assignment; particularly where the same individual is the final arbiter of academic evaluation and stands to achieve professional advancement from student work.

222.    Such a framework not only undermines the fairness and legitimacy of the grading system but also raises serious legal concerns under basic principles of equity, contract law, and institutional accountability. The university cannot claim to promote academic integrity while conditioning punitive scrutiny on a student's decision to assert a grievance; doing so weaponizes process and suppresses dissent.

223.    Moreover, the policy places a disproportionate burden on students to prove that the issue constitutes a "major problem," while simultaneously warning them that minor or technical issues are not worth challenging. This institutional messaging suggests that students could be better off remaining silent; not because their arguments lack merit, but because the process is stacked against them. Allowing "minor problems" to go unaddressed is particularly troubling within an institution like GUSOM, where no such margin of leniency is extended to students as

far as final grades are concerned. As evidenced in John's case, even an infinitesimal shortfall can result in serious academic consequences. When institutional policies demand strict adherence to grading standards yet make allowances for grading errors not considered "major", they risk creating a double standard. This disparity has the potential to cause institutionally sanctioned harm, especially when students are held to unforgiving metrics while simultaneously discouraged from seeking redress for irregularities deemed insufficiently severe.

224.     Most notably, the policy exposes a troubling double standard: Georgetown explicitly acknowledges the possibility that students when acting as evaluators may assign unfair or low-quality grades and it outlines a mechanism to penalize those students for doing so. Yet, when it comes to faculty assigning grades, no genuine accountability exists as demonstrated by Dr. Kellar's, Dr. Beauchamp's, and the COSA's responses to the evidence of Dr. Partridge's grading inconsistencies and by structurally flawed appeal processes. Faculty evaluations, no matter how arbitrary, retaliatory, or unfounded, are not subject to the same scrutiny or consequence. Within this course the university has, in writing, created a policy that accepts the fallibility of students while upholding infallibility in faculty institutionally while simultaneously weaponing procedure to silence those who seek fairness.

225.     Further compounding the inequities of the Embryology manuscript rebuttal policy is the structure of the course itself, which combines both medical students who operate under a pass/fail curriculum and students from Georgetown's Special Master's Program (SMP), who are graded traditionally. The SMP cohort comprises over 100 students each year, the vast majority (if not all) of whom are actively seeking admission to GUSOM in the current or following application cycle. Their applications are considered in a separate pool, and only a small percentage are ultimately accepted, meaning SMP students are in direct academic competition

with one another. Despite the differing stakes, all students' manuscript assignments, whether from the SMP or medical school, are subject to double blind peer review by anyone enrolled in the course, regardless of program. Each year, concerns are raised by medical students that SMP reviewers may be more stringent in their grading due to the added pressure of distinguishing themselves for medical school admission. **(Exhibit 14)** However, Dr. Gallicano has routinely dismissed these concerns, **(Exhibit 14)** and instead of adjusting the process to ensure fairness, he has effectively used the risk of "consequences" language in the rebuttal policy to discourage students from challenging their reviews. This further shows GUSOM's institutional willful indifference to fairness.  In this case, it is especially troubling given that the policy is purportedly designed to serve as a safeguard against poor student evaluation. The result is a dynamic in which a structurally imbalanced grading system is shielded from scrutiny by institutional warnings and retaliatory consequences, undermining both fairness and academic integrity.

Institutional Suppression of Dissent: A Pattern of Unfair Appeals Processes

226.    Georgetown may attempt to justify these appeal policies and practices under the banner of academic rigor or discretion. But this case is not only about the content of academic decisions, rather, the process by which those decisions are reviewed. Threatening students with grade penalties solely for exercising their rights does not promote academic excellence; it suppresses valid dissent.

227.    The institutional appeal processes at GUSOM are not meant to protect academic standards; they are structurally designed to discourage dissent and shield institutional power

from challenge. The lack of openness to genuinely hear grade appeals at Georgetown University directly parallels the institution's unwillingness to fairly consider John's case during his dismissal appeal. Just as the grading appeal process is structured to discourage students from challenging their grades, through coercive language, biased procedures, and a lack of meaningful support, John's dismissal appeal was similarly undermined by the university's rigid adherence to technicalities rather than a genuine effort to assess his claim. In the instances described above, Georgetown demonstrated a pattern of appeal suppression and prioritizing procedural formalities over a real examination of the merits of a student's case. GUSOM's willful indifference to objectivity, protection of institutional decisions, and dedication to policies at the expense of fairness are demonstrated by both faculty and policies across the institution.

228.    In such a system, John's absence of a formal appeal is not evidence of negligence. It is evidence of a system designed to make justice feel out of reach and built to discourage dissent in the name of institutional preservation.

VII.    The COSA deliberately ignored evidence of misconduct and mischaracterized grievances; avoiding accountability and violating academic norms, good faith, and their own policies for overturning a decision; constituting procedural breaches.

229.    In reference to the assignment grade, the COSA's letter containing their decision stated "The COSA's procedures are not an alternative to the grade appeal process outlined in the Student Handbook and the COSA does not hear grade appeals. Therefore, the COSA found that

you did not specify a procedural error which may have substantially affected the COS process such that you were denied a fair process." However, the section of the student handbook outlining policies for recusal of COSA duties states that, "When reviewing cases involving student grades or evaluations, any member of the Committee who has involvement in administering adverse grades or evaluations of the student or adverse grades/evaluations in question shall recuse themselves from the corresponding discussion and deliberation." Another except from the handbook states that "The COSA may review any information or hear any persons it deems relevant to the issues under consideration." Thus, the COSA's claim that they "do not hear grade appeals" is contradicted by their own recusal policy, which anticipates situations "involving student grades or evaluations." This shows COSA does engage with grade-related matters, at least when they have downstream consequences (e.g., dismissal) leading to appeal. This contradiction undermines the legitimacy of COSA's refusal to engage with the grading dispute that influenced John's dismissal. The fact that John did not formally appeal the grade upon release due to the futility of the prescribed channels does not absolve the university from evaluating the merits of his claim, as it ultimately became integral to his academic standing and the dismissal decision. Therefore, the university had a duty under the principles of good faith and fair dealing to assess whether the grading decision was consistent with its own policies and procedures (ie. Consistently applied grading standards), regardless of the lack of a formal appeal. John's classmates had their true scores reflected in accordance with medical literature and without the grading bias/increased burden of proof demonstrated in the Google Doc while John did not. This made his initial meeting with the COS where they ruled that he remediate the first year portion of the Medical Pharmacology course a direct result of a procedural error and based in falsehood. Furthermore, Dr. PaJohn confirmed that this sentiment

represented his position as opposed to seeking resolution for a grade appeal in an email

response on August 4, 2024 to Dr. Partridge discouraging him from focusing on the question

during his appeal where he (John) stated, "My argument is not that one more point would have

helped me to pass. It is that I was denied fair process on a few different grounds" which

extended his grievance beyond the criteria for a grade appeal of the assignment. However, as

stated, the COSA did not address this evidence during the meeting or in their letter outlining

their reasoning for their decision.

230.     The Student Handbook provides that while students "have no right to submit written

materials and/or supporting documents" directly to COSA, they "may suggest such information

for COSA's review", with the final determination of what is "relevant" left to the COSA Chair's

discretion. This clause, not only threatens fair dealing principles, but allows the COSA to

dismiss any evidence contrary to their prescribed outcome. Still, although this discretion

arguably risks rendering the internal appeals process futile and structurally incapable of

providing meaningful review, the COSA still did not cite it as the reason John's procedural

grading concerns were not addressed. Instead, citing that the COSA does not hear grade

appeals; a statement refuted by their own policies.

231.     Specifically, COSA did not address John's substantiated claims of grading

inconsistencies despite the fact that these inconsistencies triggered the remediation examination

which subsequently triggered his dismissal.

232.     This failure to engage cannot be dismissed as a good-faith exercise of discretion. No

neutral, reasonable adjudicative body faced with concrete evidence of a faculty member

assigning disparate grades for substantively equivalent work, offering contradictory

explanations for the deductions, and engaging in biased regrading could plausibly find such

information irrelevant to the question of whether a student received fair academic treatment. The notion that grading improprieties directly contributing to a student's academic standing and ultimate dismissal are not within the COSA's scope is not merely incorrect, it defies the purpose of COSA as a safeguard against academic injustice.

233. COSA's invocation of the "discretionary" language in the handbook as a shield against engagement with uncomfortable evidence transforms a policy designed to ensure procedural integrity into a mechanism for institutional avoidance. This is especially egregious given the handbook's own language stating that COSA may review "any information" it deems relevant, language broad enough to support a good-faith, fair-minded inquiry into whether misconduct or error in grading occurred. Instead, by choosing to label John's appeal as a "grade dispute" and refusing to investigate further, COSA effectively insulated the University from accountability, and in doing so, weaponized process to suppress legitimate challenge.

234. As the validity of John's answer and Dr. Partridge's grading inconsistencies were no longer able to be reasonably refuted, this was a fair process claim demonstrating a material procedural error – reasonably qualifying for Condition One. In addition, as suspicion/ proof of his biased grading which was not reasonably available to John until the day before his meeting, the deduction and grading disparities also specifically constitutes qualification for Condition Two to overrule a dismissal decision and deprived John of the full scope of the grade deduction while in the window for formal appeal. Since a university has an interest in ensuring that students receive fair grades, an appeal committee who does not warrant clear evidence of biased grading as relevant is operating outside of professional judgement, academic norms, school policy, and good faith.

235.    The disregard for biased grading and clinical evidence/authority seen from the COSA
under the deviate from acceptable norms in academia and in medicine. Additionally, it violates
fair dealing standards.

236.    In *Horowitz v. University of Michigan,* 435 U.S. 78 (1978), the U.S. Supreme Court
affirmed that academic decisions, including dismissals based on grades or other academic
criteria, are primarily within the discretion of the university. However, the Court emphasized
that this discretion is not absolute. It acknowledged that while universities have broad authority
in making academic decisions, courts can intervene when there are violations of fundamental
fairness. As the Court noted, "The very nature of academic decision-making requires that courts
show great respect for the faculty's professional judgment" (435 U.S. at 87). Despite this
deference, the Court clarified that judicial review is warranted if the university fails to adhere to
its own procedures or if the decision is made in bad faith, or if it is arbitrary, capricious, or
fundamentally unfair. The Court further reasoned that while academic decisions generally fall
outside judicial review, courts may step in when procedural flaws exist, particularly if those
flaws compromise the fairness of the process or the student's rights (435 U.S. at 88).

237.    In *Alcorn v. Vaksman* the court stated that, "The appellants argue that we should give
"great respect to the decisions made by the professional educators." It is true that "[w]hen courts
review the substance of academic decisions . . . they should show great respect for the teacher's
professional judgment." *Clements v. County of Nassau,*835 F.2d 1000, 1005 (2nd Cir. 1987).
This sound rule is based on the belief that university administrators, not judges, should make
academic decisions needed to run a university. This assumes, of course, that the academic
decision was made in good faith. The trial judge found that the appellants acted in bad faith. If
evidence supports that finding, relief was justified. *Ikpeazu v. University of Nebraska,*775 F.2d

250, 253 (8th Cir. 1985) "An actionable deprivation in an academic dismissal case is proved . . .

if the decision was motivated by bad faith or ill will unrelated to academic performance." Id.;

see Clements,835 F.2d at 1005 *Alcorn v. Vaksman,* 877 S.W.2d 390, 397 (Tex. App. 1994). The

facts and evidence of this case show that the COSA's actions (disregard for relevant evidence,

refusal to investigate the claim of bias, dismissing John's presentation of clear bias as a grade

appeal) and Dr. Partridge's actions (false promises of support, academic dishonesty, ex post

facto grading) pertaining to John's grade and appeal were conducted in bad faith in response to

institutional and professorial challenge and without regard for fact. Said actions constitute,

"such a substantial departure from accepted academic norms as to demonstrate that the faculty

did not exercise professional judgment" *Regents of University of Michigan v. Ewing*, 474 U.S.

214, (1985). In this case, the court also noted that, "In deciding motive, we give no deference to

the appellants' prerogatives, because nobody has a prerogative to act in bad faith. *See Regents of*

*Univ. of Michigan v. Ewing*,474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985)

(stressing the difference between good faith and bad faith dismissals) *Alcorn v. Vaksman*, 877

S.W.2d 390, 397 (Tex. App. 1994). In *Youngberg v. Romeo*, the court also determined, "While

deference is typically given to universities in these matters, the court allows for liability when

"the decision by the professional is such a substantial departure from accepted professional

judgment, practice, or standards as to demonstrate that the person responsible actually did not

base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. 307, 322-23 (1982). In

*Gupta v. New Britain General Hospital*, the court said that "bad faith may be overt or may

consist of inaction, and fair dealing may require more than honesty."   Id. cmt. d. "Bad faith"

involves "evasion of the spirit of the bargain, lack of diligence and slacking off, willful

rendering of imperfect performance, abuse of a power to specify terms, and interference with or

failure to cooperate in the other party's performance." Id. "Bad faith means more than mere negligence." *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 687 A.2d 111, 122 (1996) (citation and internal quotation marks omitted)

238.    The rigid approach of the COSA attempting to inaccurately invoke policy over substantive review and fundamental fairness is not an isolated incident. Rather, it reflects broader patterns within the university, where strict policies often force students into easily avoidable setbacks. Every year, students at Georgetown face significant consequences (including mandatory remediation of an academic year, an unwanted leave of absence, or dismissal) due to inflexible enforcement of internal deadlines and policies, such as those governing the timeframe for passing the Step 1 examination. While some structure is necessary, other medical schools take a more flexible and student-centered approach, reserving extreme measures like extending medical education or dismissal for only the most severe cases. In contrast, Georgetown's unwillingness to engage in meaningful discussions about individual student circumstances, whether in the context of grade appeals or academic progression, highlights an institutional preference for rigid policy enforcement rather than case-by-case consideration.

239.    Ultimately, this lack of meaningful review undermines the credibility of both the grading appeal process and the dismissal appeal process. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Restaurant Workers Union Local 473, A.F.L.-C.I.O. v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)". Without a system that allows students to fairly challenge academic decisions, the university creates an environment where fairness is secondary to procedural formalities. By failing to account for the legitimate concerns raised by students in

the name of procedure, including John's well-founded challenge to his dismissal proceedings, Georgetown's system fails to provide an equitable academic experience.

240.     Another specific example of this is seen in *St. Peter v. Georgetown University*. St. Peter, a former medical student, alleged that Georgetown's administrative handling of curriculum changes and medical leave policies unjustly led to his dismissal.

241.     Despite these disruptions being prompted by documented medical issues and institutional changes, Georgetown ultimately dismissed St. Peter due to the university's academic policy mandating that all medical students must graduate within seven years of matriculation. By enforcing this deadline without adjusting for his medical leaves or the curriculum-induced repetitions, the university concluded that St. Peter would not graduate in time, resulting in his dismissal from the program in July 2020. (*St. Peter v. Georgetown University,* No. 1:23-cv-02058 (D.D.C. Dec. 15, 2023))

242.     Although St. Peter, ultimately did not prevail in his case against the university (partially due to statute of limitations issues and failure to state a claim), his case illustrates Georgetown's pattern of rigidly enforcing internal policies; even when the university's own conduct contributed to the student's predicament. Rather than acknowledging its own role in creating St. Pete's setbacks, Georgetown chose to have St. Pete repeat academic years he had already completed successfully while then proceeded to weigh the additional time against him which contributed ultimately ending his medical education due to of adherence to policy. That is not just a lack of neutrality, it is an institutional choice that undermined the basic tenets of fairness and due process.

243.     This kind of conduct is similarly seen by Georgetown in John's dismissal. Even if the "COSA does not hear grade appeals" were true, GUSOM cannot rely on a procedural/policy

technicality to avoid addressing John's claims of grading inconsistencies amounting to a procedural error (evidence of which only became available to his the day before his appeal) which differ from only substantive disagreement about whether or not the deduction should have occurred as described in the letter denying his appeal. While private universities are not subject to constitutional due process requirements, they are obligated to follow their own policies fairly, act in good faith, and ensure that their procedures do not create inherently biased or coercive barriers to justice. Courts have repeatedly ruled that private institutions must uphold their contractual obligations and cannot arbitrarily deny students the benefit of their own academic policies. Georgetown's refusal to fully engage with John's dismissal appeal is a clear violation of these principles. Given the breach of contract, breach of good faith and fair dealing, material prejudice, and institutional coercion, the university's enforcement of the grade appeal deadline should not be upheld as a mere procedural necessity it directly resulted in an unfair and avoidable academic harm that courts have consistently recognized as unlawful. Even if Georgetown argues that it followed the letter of its policy, it may still be liable for violating the implied covenant of good faith and fair dealing

VIII.    Dean Beauchamp as final arbitrator of appeal did not conduct an independent review of facts and misquoted school policies/curriculum facts.

244.     Georgetown University's handling of John's final-level appeal to Executive Vice President for Health Sciences Dean Norman Beauchamp Jr. further highlights a broader pattern of procedural unfairness that has characterized the institution's approach to student appeals. After John appealed the COSA's decision, Dean Beauchamp, through his Chief of Staff Sean

Hawkins, declined John's request to meet, stating that "The Executive Vice President ordinarily reviews appeals based on the written record." While Georgetown's handbook does not guarantee an in-person meeting at this stage, D.C. law requires Georgetown to act in good faith and adhere to its own policies, ensuring that its appeal procedures are not merely formal but substantively meaningful. The District of Columbia law implies a covenant of good faith and fair dealing in every contract. This obligation extends to Georgetown's internal processes, meaning that the university cannot arbitrarily limit John's ability to fully present his case. By denying John any opportunity for a substantive dialogue with the decision-maker, especially considering the serious concerns about grading irregularities. Georgetown breached its duty to execute the appeal process in good faith, depriving John of a fair opportunity for review.

245.        In *Gupta v. New Britain General Hospital*, the court said that "bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty."   Id. cmt. d. "Bad faith" involves "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."   Id. "Bad faith means more than mere negligence*." Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 687 A.2d 111, 122 (1996) (citation and internal quotation marks omitted).

246.        In his response letter, Dr. Beauchamp stated that he had thoroughly reviewed the information provided, along with the university's policies and procedures. However, the letter did not offer any explanation or justification for his independent decision-making beyond that general statement. It contained multiple factual inaccuracies, most notably referring to John's remediation plan as a "remedial Pharmacology course" and asserting that failure of the remediation exam resulted in "unsuccessful remediation of the course." Nowhere in the

GUSOM Student Handbook is a remediation plan defined as a formal course or an element that

appears on a student's transcript, nor does the handbook state or allude to remediation plans

being formal courses. Additionally, both the student handbook and the course handbook identify

Medical Pharmacology as a multi-semester course that remains in progress after the first two

semesters until its completion in the third. Even assuming the validity of Dr. Partridge's

disputed calculation, that John earned a 69.92% rather than the required 70%, this would not

constitute unsuccessful remediation of the entire course, but rather a deficiency specific to the

portion covered during the first two semesters. Which, according to the handbook, would result

in a remediation of the entire first year. At minimum, this suggests an improper review or

misunderstanding of school policies and, in the most extreme case, suggests a lack of genuine

intent to investigate the merits of John's appeal.

247.    Dean Beauchamp's response suggests that he merely adopted the decision made by the

COSA, as he provided no substantive independent rationale for his decision. This raises

concerns of bias and procedural unfairness. In *Doe v. University of Southern California*, the

court found that "the review panel did not issue any rationale for 'its' determination and,

instead, summarily adopted the findings of the Title IX investigator... In sum, the panel is

merely a proxy for the Title IX Office, which actually rendered the underlying decision. Against

this background, it is clear that the determination in the instant case was the product of a biased

adjudicator, as Title IX Investigator Noonan's and Title IX Coordinator Means' comments

against [Doe]... amply demonstrate an unacceptable probability of actual bias." *Doe v. Univ. of

S. Cal.*, No. B321883, 7-8 (Cal. Ct. App. Jan. 16, 2024). Similarly, here, Beauchamp's

uncritical adoption of the COSA's decision suggests that Georgetown's dismissal decisions are,

in effect, predetermined, and the appeal process serves only as a procedural formality rather than a genuine opportunity for meaningful review.

248.    Furthermore, the failure to meaningfully engage with John's appeal violates the principles of due process, as established in *Ahern v. Board of Education of School District*, where the court held that "a fundamental requirement of due process is the opportunity to be heard, 'at a meaningful time and in a meaningful manner.'" *Ahern v. Bd. of Educ. of Sch. Dist.*, 456 F.2d 399, 403 (8th Cir. 1972). The decision to uphold the dismissal without further engagement with John's claims, particularly given the inconsistencies in the facts and policies presented, denies John an adequate opportunity to be heard.


## THIRD CAUSE OF ACTION

### Violation of Title III of the ADA, 42 U.S.C. § 12182 et. seq. and Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794


250.    John repeats the allegations of the above paragraphs as if fully set forth herein.

251.    As described above, Georgetown's actions and practices, including expelling John from medical school partially due conditions set forth by his disability, violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. Georgetown is a covered entity for purposes of Section 504 of the Rehabilitation Act of 1973 because it operates a program or activity receiving federal funds.

252.    Georgetown's actions and practices described above discriminated against John, excluded him from participation in, and denied him the benefits of, Georgetown's programs, services, and activities because of his disability in violation of Section 504.

253.    As described above, Georgetown also violated Section 504 by failing to provide reasonable accommodations and/or make reasonable modifications that would enable John to have meaningful access to Georgetown's services, programs or activities and by using arbitrary "low passes" partially brought on by his disability as contributing justification for his dismissal.

254.    As a result of Georgetown's violations of Section 504, John was injured and damaged, as detailed above.

Executive Dysfunction Overlooked: Arbitrary Grading and the Distortion of Academic Progress

255.    Although John's formal ADHD diagnosis came after his dismissal, Georgetown was on constructive notice of his neurocognitive challenges well before that time. He had repeatedly raised concerns consistent with executive dysfunction, including difficulties with time management, sustained attention, and balancing competing academic demands, and had consulted with the university's counseling center regarding his mental health. This was not a case of a student withholding struggles or failing to engage with support resources. Rather, it was a case of the institution failing to consider how these known functional impairments may have influenced his academic record, particularly in a curriculum where unofficial and arbitrary "Low Pass" designations were weighed against him in his academic record.

256.    Georgetown's failure to consider this context in evaluating John's academic standing renders the decision to dismiss him both arbitrary and discriminatory in effect. The institution cannot rely on a narrow reading of procedural obligations to ignore substantive

red flags that, in totality, should have triggered further inquiry. The law does not require that

a disability be formally diagnosed before an institution's obligations are triggered

257.    Moreover, the use of internal "Low Pass" grades as a subjective tool of academic

evaluation in an official dismissal proceeding, particularly when those grades are neither

formally recognized by the registrar nor carry any weight in residency applications, only

exacerbates the harm. Applying unofficial metrics to penalize a student with known or

suspected cognitive impairment, without transparency or an opportunity to contest their use,

undermines any claim to objectivity or procedural integrity. John's academic performance

was heavily influenced by executive functioning issues triggered by a treatable

neurodevelopmental condition rather than a lack of capability.

258.    Moreover, the concept of a "Low Pass" introduces grading into a Pass/Fail element of the

curriculum. As Low Passes have no place on the official transcript, to weigh this metric

against John as part of the justification in a dismissal case qualifies as arbitrary. If the total

cost of a service rendered after taxes and all additional charges amounts to $54.99 and a

patron has $55.00, no entity will deny his business on the basis of only marginally meeting

the total cost. To do so would be unreasonable. Nor does this make the patron unfit to

receive the service rendered in any capacity. In an academic context, this logic is

comparable to punishing a student for consistently submitting assignments at 11:58 PM

when they are due by 11:59 PM and citing a punishable pattern of only marginally meeting

deadlines. In no way should such a student evaluated differently in any material way than a

student who submits assignments the day before as they both consistently meet the

prescribed deadlines. The irrationality of this concept also shines through in the way

GUSOM treats students who marginally miss proficiency. This complaint came to the court

because John received a grade 0.08% shy of the percentage needed to continue in a longitudinal class only 75% complete with extra credit opportunities available in Year 2. Simply stated, it is arbitrary and capricious to punish students for low passes in the Pass/Fail section of the curriculum especially while simultaneously having no regard for students who score just shy of a satisfactory mark. If John's 69.92% is deemed unsatisfactory with no qualifications because it falls under the satisfactory mark, then logic dictates that the COS must consider his scores above the satisfactory mark as satisfactory with no qualifications in accordance with a Pass/Fail grading scheme.

259.    This internal, subjective "Low Pass" designation has no place in high-stakes academic decision-making. Its use in John's dismissal process represents an arbitrary departure from the clearly stated Pass/Fail structure that governs the preclinical curriculum and violates the principle that a university's discretionary academic judgment must still be neither arbitrary nor capricious.

260.    GUSOM's invocation of "Low Passes", allegedly implemented to identify students in academic need, in an official disciplinary context also constitutes a breach of contract and a violation of the implied covenant of good faith and fair dealing. Under well-established contract law, once a university sets forth the standards and procedures by which academic performance will be assessed, in this case, Pass/Fail, it is bound to follow them.

261.    John prepared for his exams under the assumption, codified in school materials, that any passing score, whether exactly at or substantially above the mark for a course, would be treated the same for all official purposes. This is particularly relevant given the concurrent nature of the classes mentioned earlier. For instance, by the time "Block 4" examinations were upon him, John secured enough points in Physiology and Biochemistry where he knew

that he would perform well enough without dedicated preparation to meet the passing mark for the classes in question based on the remaining percentages in those classes. Furthermore, the poor performance Dr. Partridge referred to in his letter can be partially linked to these factors as well. Going into the last portion of the year, John had above the percentage threshold needed to make satisfactory progress in the Medical Pharmacology. With a relatively small percentage housed in the upcoming examinations, John dedicated more of his study time to more seemingly urgent classes with bigger remaining percentages and those with which he had more difficulty. This explains the poor performance in an "easier" section of the course that Dr. Partridge referred to in his letter.

262.     The use of an unofficial internal metric to later claim that John's scores were "technically passing, but not good enough" breaches the foundational understanding of a Pass/Fail curriculum. Georgetown cannot have it both ways; if a 69.92% is deemed unambiguously unsatisfactory with no qualifications, then every score above the satisfactory mark must likewise be treated as sufficient with no hidden penalties.

263.     To allow otherwise would be to permit an academic institution to offer one set of rules, enforce another, and then call the result "discretion." But discretion does not permit discrimination, subterfuge, or retroactive reinterpretation. It certainly does not permit a university to punish a student for adhering to the very standards it has published. This is not only educationally indefensible; it is legally untenable.

264.     Furthermore, in the modern integrated Pass/Fail curriculum at GUSOM, a marginal pass carries fundamentally different implications than it would in a traditional, graded academic structure. Historically, preclinical medical education involved sequential courses in anywhere from one to few (often no more than three, in rare cases) core subjects at a time,

allowing for compartmentalized mastery and time allocation. However, GUSOM's integrated system demands that students juggle multiple disciplines and are tested on up to eleven courses in a single exam block. In such an environment, a student with executive functioning challenges, such as those consistent with ADHD, may struggle not with content mastery but with task-switching, time prioritization, and workload management. These are precisely the functional areas where executive dysfunction manifests, and thus marginal performance is more reflective of cognitive load issues rather than intellectual capability or effort. To label such outcomes as academic deficiencies, especially where the student has demonstrated competence through passing, no matter how marginal, misrepresents the underlying cause of performance variance. This is further supported by John's anatomy grade in which he had no problem meeting the satisfactory progress mark as anatomy is tested continually throughout the year; with each test covering the material learned over the past two to three weeks of the course with no other subjects being tested simultaneously.

265.    Moreover, in today's residency selection landscape, preclinical grades play a far less significant role than they did in prior generations of medical education. With the USMLE Step 1 now scored Pass/Fail and the increased emphasis on holistic review, students are expected to distinguish themselves through research, leadership, community involvement, and clinical performance. Georgetown is aware of this shift, as evidenced by its institutional promotion of research engagement, leadership pathways, and alignment of its preclinical curriculum to Pass/Fail. When preclinical grades had a heavier bearing on residency placements, schools aligned their curricula in a manner that allowed students to have a narrow focus on their subjects to achieve the highest grade that they can possibly attain. Yet, while this is no longer the nature of the medical landscape, GUSOM paradoxically enforces

punitive academic measures for students who prioritize critical career-building activities while still fulfilling stated the necessary stated standards of academic performance. Penalizing students like John, who passed coursework but received unofficial "Low Pass" flags, places them in an impossible bind: either reduce time invested in meaningful activities gearing toward residency (which could delay or deny their desired residency placement) or risk institutional sanctions based on internal metrics never disclosed as academically determinative. This not only distorts the purpose of a Pass/Fail model but does so in a way that knowingly undermines the very professional growth the school purports to encourage.

266.    As previously noted, during the final block of his remediation year Dean Kumar explicitly advised John to focus on using his study time strategically, stating that he would be given an opportunity to remediate the year 1 portion of Histology if necessary. Likewise, during John's first year after seeking academic guidance, Dr. Partridge recommended that he temporarily set aside the Pharmacology material to prioritize improving his performance in courses that were he could see a greater benefit from a grade increase. These conversations are not just anecdotal; they reflect a faculty-endorsed understanding that GUSOM's integrated, modular curriculum intrinsically requires students to make strategic, real-time decisions about where to focus their limited study time.

267.    However, that very demand for triage, a form of high-level executive functioning, poses a particular challenge for students with ADHD; for whom decision-making under pressure, task switching, and cognitive prioritization are impaired. This is not merely a matter of studying harder or more efficiently; it is an issue of cognitive architecture.

268.    Far from undermining John's ADHD-related claims, the administration's own advice substantiates them. It affirms that strategic studying is a necessity within this curriculum.

The inability to perform that strategy due to disability should not be used against a student when the system itself demands it as a survival skill.

269.    This faculty-endorsed strategy only deepens the inconsistency in GUSOM's approach. If students are advised by leadership to study strategically by focusing on courses with the greatest impact on academic standing, then it is contradictory and unjust to later penalize them for the natural result of following that advice. Dr. Kumar is the Senior Associate Dean of Student Affairs, a role in which she directly supports students facing academic difficulty. Georgetown cannot have it both ways: if students are directed to rely on her guidance during moments of academic struggle, the University cannot later punish the very decisions made in accordance with her advice. When Dr. Kumar advised John to prioritize other courses over Histology with the understanding that remediation would be available, she provided strategic academic direction consistent with GUSOM's integrated curriculum. This guidance reflected institutional norms and punishing John for following it reflects inconsistency, if not bad faith. Courts have found that where students are encouraged to seek academic advice from institutional representatives, they are entitled to reasonably rely on that advice, especially when such guidance influences performance or decision-making. See *Guckenberger v. Boston Univ.,* 974 F. Supp. 106, 147 (D. Mass. 1997) (noting that students are entitled to rely on representations made by school officials and accommodations processes when navigating academic difficulty).

270.    For students managing disabilities like ADHD, this guidance becomes a survival tool - not a shortcut. Punishing the predictable academic outcome of that very strategy (e.g., low passes in deprioritized subjects or unsatisfactory progress in subjects promising remediation) reflects either a fundamental misunderstanding of the curriculum's demands or, more

troublingly, a disregard for how disability interacts with those demands. The institution

cannot simultaneously endorse strategic triage and then proceed to punish its consequences.

271.    Furthermore, any potential suggestions that John's academic performance reflects an

inherent unfitness for medicine is both medically and legally flawed. ADHD is not a

measure of competence; it is a condition that affects executive functioning rather than

intelligence, content mastery, or the capacity to care for patients. The medical literature

increasingly recognizes that ADHD does not equate to incompetence or lack of academic

ability. Rather, it primarily affects executive functioning; particularly in structured

environments not designed with neurodiverse learners in mind. A 2023 study published in

BMC Medical Education found that medical students with ADHD often experience

academic challenges due to traditional pedagogical structures, not due to lack of intelligence

or capacity. Importantly, students reported that once beyond the rigid demands of preclinical

curricula, they were better able to leverage their strengths (such as creativity, resilience, and

hyperfocus) to succeed in clinical settings. (See, e.g., Karen R. Gordon et al., The

Experiences of Medical Students with ADHD: A Phenomenological Study, 18 PLOS ONE

e0289879 (2023), https://doi.org/10.1371/journal.pone.0289879).

272.    While Georgetown has attempted to frame John's academic history as involving "three

attempts" at the Medical Pharmacology course, this characterization is misleading and fails

to reflect the structure of GUSOM's integrated curriculum. In traditional educational

models, a "course attempt" refers to a discrete, self-contained enrollment in a single subject

for instance, retaking the first semester of Organic Chemistry after a failing grade upon

completion. At GUSOM, however as discussed, the preclinical education is delivered

through longitudinal, modular blocks in which multiple disciplines (e.g., Pharmacology,

Histology, Physiology) are taught and assessed simultaneously, with individual exam

questions from each subject embedded within large, cross-disciplinary assessments. Even

though students may take multiple classes at once in undergraduate programs, those classes

generally have individual assessments and grading timelines; this is not the case in courses

at GUSOM (besides the anatomy course) where students have typically have two to three

days between module examinations in Year One to prepare for high order questions from up

to eleven individual classes over two months' worth of material. Thus, what the school has

described as "multiple attempts" at this course is, in reality, a complete re-enrollment in the

entire preclinical curriculum where John was required to retake all courses (including ones

he had already passed) during his remediation year and followed by a remediation exam in

Pharmacology. This can mislead internal reviewers and external evaluators, such as

residency programs, by implying persistent chronic deficiency in Medical Pharmacology

when in reality this characterization fundamentally misrepresents the curriculum's structure.

273.    By GUSOM's own reasoning, John would have had "multiple attempts" at every first-

year course including Biochemistry, Anatomy, Embryology, and others which he

passed/made satisfactory progress in simply by virtue of repeating the integrated curriculum.

Yet the school does not frame those subjects in such a way, because it acknowledges that in

a longitudinal, modular system, students do not attempt courses in isolation. The curriculum

is designed as a comprehensive, interconnected whole, and does not operate through lens of

isolated course retakes. If they did, there would be no reason for students to redo entire

academic years for isolated deficiencies as the school commonly requires. Thus, to carve out

Medical Pharmacology and label it as having been "attempted three times" is not only

inconsistent with GUSOM's own academic design, but distorts the nature of John's

academic record and mischaracterizes his performance for punitive effect. This selective framing, used only when advantageous to justify dismissal, reflects a lack of academic fairness and constitutes a breach of the implied covenant of good faith and fair dealing.

274.    By their reframing, GUSOM not only distorts its educational design but also potentially violates principles of fair academic evaluation as recognized in these legal precedents. Such mischaracterization undermines the integrity of the academic dismissal process and could be viewed as a breach of the institution's duty to provide transparent and equitable treatment to its students.

275.    Taken together, these factors (namely "Low Passes" and "third attempt" language) suggest that GUSOM's framing of John's academic record, as one of repeated failure and deficiency, relies on misleading interpretations of its own educational structure, labels that do not correspond with either its formal grading policy or with the evolving demands of medical education, and neurocognitive disability. This disconnect calls into question the fairness, transparency, and validity of not only the decisions made in John's case, but the elements used to arrive at said decisions. In this context, the school's continued reliance on internal, unofficial labels paired with deceptive summaries of John's academic history, reflects not a commitment to fairness or educational standards, but an arbitrary and capricious use of discretion that breaches the implied covenant of good faith and fair dealing.


**FOURTH CAUSE OF ACTION**

**Violation of the District of Columbia Human Rights Act DC law 2-38; DC official code**

**§2-1402.11**

276.     John repeats the allegations of all of the above paragraphs as if fully set forth herein.

277.     John has a disability and is in a protected class under the DC Human Rights Act.

278.     The DC Human Rights Act "makes discrimination illegal based on 21 protected traits for

people that live, visit or work in the District of Columbia. The DC Human Rights Act

prohibits discrimination in housing, employment, public accommodations and educational

institutions."

279.     The Georgetown University Notice of Non-Discrimination and the Georgetown

University School of Medicine Medical Student Handbook afford John certain rights that are

contractual in nature. *See Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34 (1st Cir. 2007)

("A student's relationship to his university is based in contract…The relevant terms of the

contractual relationship between a student and a university typically include language found

in the university's student handbook.")

280.     As described above, Georgetown's actions and practices constitute discrimination under

the DC Human Rights Act, in that Georgetown discriminated against John on the basis of his

disability, including expelling him from his medical school without providing reasonable

accommodations and/or making reasonable modifications for his disability and using

arbitrary "low passes" brought on by his disability as contributing reasons for his dismissal.

281.     As a result of Georgetown's violations of the DC Human Rights Act John was damaged

as detailed above.

## FIFTH CAUSE OF ACTION

### Intentional infliction of emotional Distress

282.    John incorporates by reference all preceding paragraphs as if fully set forth herein.

283.    Georgetown University and Dr. Partridge engaged in a pattern of conduct that was

extreme, outrageous, and beyond all possible bounds of decency. This conduct included, but

was not limited to: expelling John from medical school based on flawed and/or biased

grading; retaliating against John for raising concerns regarding academic evaluation; failing

to engage with evidence of grading error and bias during the appeals process and having that

critical evidence wrongfully invalidated by a Senior Associate Dean; willfully

mischaracterizing John's academic appeal during a high-stakes dismissal proceeding;

weighing deficiencies substantially impacted by John's disability against him; referring to

family medical hardships as "distractions"; providing misleading and detrimental advice

concerning remediation examinations; misrepresenting and misapplying school policies;

offering purported support with the appeal process while simultaneously undermining John

to the COSA; failing to respond to John's request for resolution of the assignment deduction

with the full reasoning behind the deduction while he was still in the window to formally

appeal; minimizing the impact of inconsistencies in grading; and discouraging John from

citing critical assignments essential to his appeal. These actions were not only intrinsically

emotionally exhausting, but they all substantially affected John's preparation for and

performance in the various stages of his appeal process and examination preparation.

284.    Despite receiving confirmation from a professor of Clinical Neurology that John's

response was medically plausible, and Dr. Partridge's own admission that the grade would

have been reconsidered had the references been initially submitted, Georgetown knowingly refused to correct the grading error. This deduction, left uncorrected despite substantial supporting evidence, materially contributed to John's dismissal.

285.    The emotional harm caused by Georgetown's actions was profound, immediate, and severe, particularly given Georgetown's publicly stated commitments to academic honesty, non-retaliation, and Jesuit values including the principle of cura personalis ("care for the whole person").

286.    Georgetown's response to John's repeated reports of executive functioning difficulties was grossly inadequate. Although John was referred to the counseling center, the services offered were limited to talk therapy and failed to address the underlying neurocognitive symptoms he described. At no point did Georgetown advise John to pursue neuropsychological testing or ADHD screening, despite clear indicators that his difficulties were consistent with an undiagnosed learning disability. This failure to meaningfully engage with the nature of John's complaints demonstrates reckless disregard for his mental health and academic success.

287.    Georgetown's shifting academic standards also caused John severe emotional distress. Although John did not fail any courses during the 2023-2024 academic year and performed above the published passing thresholds in his classes given the internal standing of "Low Pass", he was nevertheless forced to defend his performance before COSA, which these treated satisfactory marks as contributors to what they deemed "global deficiencies." Unofficial designations were used to diminish John's academic record which materially contributed to dismissal proceedings, despite the fact that such designations do not carry formal status.

288.    Georgetown faculty and administrators knew or should have known that John's assignment submissions had academic merit; that his symptoms of ADHD substantially impacted his academic behavior; and that his efforts at remediation were undertaken under conditions that were neither fair nor supportive. Rather than upholding their duty to apply policies fairly and support students facing disability-related challenges, Georgetown's actions subjected John to further academic harm and extreme emotional distress

289.    Under D.C. law, the tort of intentional infliction of emotional distress requires a plaintiff to demonstrate (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) resulting severe emotional distress.

290.    As a direct and proximate result of Georgetown's actions and Dr. Partridge's retaliatory conduct, John has suffered and continues to suffer severe emotional distress. He has experienced persistent anxiety, low affect, loss of appetite, disrupted sleep, emotional numbness, and uncharacteristic pessimism. These harms are substantial, ongoing, and were both foreseeable and avoidable.

291.    Accordingly, Georgetown and Dr. Partridge are liable for intentional infliction of emotional distress under District of Columbia law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, John Doe, requests that the court enter judgement on his behalf on all counts and grant him the following relief:

a) Preliminary and permanent injunctive relief reinstating John as a medical student in the M.D. program at GUSOM.

b) Preliminary and permanent injunctive relief ordering Georgetown's full cooperation in amending/correcting/expunging any and all records, adverse actions, and other consequences associated with John Doe and/or Georgetown which arose as the result of John's alleged unsatisfactory progress in Medical Pharmacology and to reflect a successful completion of Year 1 of the curriculum on all fronts including a course exemption for the Histology course as allowed for by the student handbook under "Registration for Students with Approved Course Exemption" for the year 1 portion of the course which he previously made satisfactory progress; a policy routinely used by Year 1 students accepted from Georgetown's Special Master's Program. The court has the authority to make requirements of a private university as seen in *Doe v. Carry*, "Although USC's procedures do not provide an accused student the right to submit questions to be asked of the complainant, the court required that the university do so." *Doe v. Carry*, B282164, 21 (Cal. Ct. App. Jan. 8, 2019)

c) Full compliance with SEVIS/F-1 Visa reinstatement/reapplication;

d) Preliminary and permanent injunctive relief preventing the academic year 2024-2025 and any other time lost from counting toward the time limit that students have to

complete the medical degree and/or any specified portion of the degree and written

agreement that there will be an exception to this school policy if needed;

e) Permanent injunctive relief restraining and enjoining Defendant, its agents,

employees, and successors from discriminating on the basis of disability against

Plaintiff in violation of the aforementioned acts, and denying Plaintiff the

opportunities and benefits afforded other medical students;

f) Review of school policies and procedures regarding appeals, dismissals, and mental

health screening;

g) Compensatory and punitive damages to the extent allowed for the loss of student loan

grace period;

h) Compensatory and punitive damages to the extent allowed under each of the

aforementioned counts;

i) Compensatory and punitive damages to the extent allowed for the harm described.

j) All other damages entitled under law and any other relief provided that the court shall

deem just and proper.

Respectfully submitted on this 9th day of May 2025,

*John Doe*

JOHN DOE (pseudonym)
Pro Se
4540 MacArthur Blvd. NW
Apt. 109
Washington, DC 20007
786-858-7853