# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLOMBIA

**CHRISTOPHER MOREE** )
4540 MacArthur Blvd )
**Apt. 109** )
**Washington, D.C. 20007** )
**786-858-7853** )
)
)
**v.** )
)
)
**GEORGETOWN UNIVERSITY** )     **Case No.:** 1:25-cv-01415
**3700 O St., N.W.** )          **Judge:**
**202 Healy Hall** )
**Washington, D.C. 20057** )
**202-687-0100** )
)
*Defendant* )
)
**and,** )
)
**DR. JOHN PARTRIDGE** )
**3900 Reservoir Rd NW,** )
**Med-Dent NW408** )
**Washington, D.C. 20007** )
**202-687-5196** )
jp374@georgetown.edu )
)
*Defendant* )

---

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Local Civil Rule 65.1,

Christopher Moree respectfully moves this Court for entry of a Temporary Restraining Order to



**RECEIVED**

MAY 19 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

enjoin Defendant Georgetown University to comply with SEVIS/F-1 Visa

reinstatement/reapplication and reenrollment in the MD program, pending a hearing on

Plaintiff's Motion for Preliminary Injunction.

In support of this Motion, Plaintiff states as follows:

## INTRODUCTION

1.  Plaintiff Christopher Moree respectfully moves for a Temporary Restraining

    Order to prevent further harm arising from his wrongful dismissal from Georgetown

    University School of Medicine ("GUSOM"). The dismissal, premised on a flawed policy

    application, arbitrary grading decision, and sustained through an appeal process that

    contravened Georgetown's own policies has caused irreparable harm and places Plaintiff

    at immediate risk of life-altering immigration consequences. Plaintiff asserts claims for

    breach of contract, breach of the implied covenant of good faith and fair dealing,

    intentional infliction of emotional distress, and violations of the Americans with

    Disabilities Act and Section 504 of the Rehabilitation Act.

2.  At the core of Plaintiff's claims is a grading dispute in his Medical Pharmacology

    course, where a 0.2-point deduction for an answer later supported by clinical experts

    caused his score to fall marginally below the passing threshold. Plaintiff sought

    resolution with course director and assignment grader Dr. Partridge within the window

    prescribed as outlined in the student handbook, but he did not respond. This deduction

    triggered a review by the Committee on Students remediation regarding the Year 1

portion of the course which, via action by the committee, procedurally terminated the Plaintiff's right to escalate to a formal appeal.

3.    The committee required the Plaintiff to successfully complete a remediation examination of the Year 1 portion of the longitudinal Pharmacology course to proceed to Year 2 of the curriculum. Following an unsuccessful remediation examination attempt, the Plaintiff was informed that he would be dismissed under the policy regarding receiving a failing grade recorded on the transcript in an academic unit while on academic probation. However, per school policy, a failing grade "F" is not recorded on the transcript in a longitudinal course until it's completion in Year 2; additionally, once remediation is granted policy states that failure of remediation results in a remediation of the entire year of the curriculum, no policies modify this for students on academic probation. During the call informing him of this news, Dean Kumar told the plaintiff that the Committee of Student Appeals ("COSA") does not overturn grade appeals but encouraged him to appeal just to say that he did all he could do.

4.    After the COS meeting, the course director Dr. Partridge expressed regret for the deduction and admitted that he would not make the deduction if he could "go back". In preparation for his appeal, the Plaintiff asked Dr. Partridge if he would support a correction of the assignment's grade based on evidence that the Plaintiff curated in defense of his original answer. Dr. Partridge confirmed that he would reverse the deduction if given permission by "the deans".

5.    In reliance on that assurance, Plaintiff prepared his dismissal appeal. However, when Plaintiff shared a corroborating expert opinion with Dean Kumar and Dr. Partridge, Dr. Partridge reversed course and claimed that other deficiencies "warranted" his grade

for this assignment outside of the case in question. These post hoc critiques that were not previously disclosed and when compared to students' assignments who received full credit, it becomes evident that the newly shared critiques were not consistently applied in grading.

6.     Rather than rectify this irregularity, Georgetown upheld the dismissal despite the material procedural errors (inconsistent grading and policy conditions for dismissal not met) that it relied on notwithstanding institutional policies that prohibit retaliation and require consistent grading practices. The COSA compounded the procedural harm by minimizing the Plaintiff's retaliation and grading inconsistency objections as a non-reviewable "grade appeal," despite clear handbook language authorizing COSA to consider any material that they deem relevant and recusal policies for cases involving adverse grades; indicating that individual grades fall within their purview.

7.     Further, Georgetown misapplied its own dismissal policy, which allows for dismissal of students on probation upon receipt of a failing grade in an academic unit recorded on the transcript. Plaintiff had not received an "F" in any academic unit for the Academic Year 2023-2024 at the time of dismissal; this is further emphasized by the fact that at the end of the year, GUSOM withdrew the plaintiff from his classes and recorded a grade of "WF" for withdrawn while failing as opposed to "F" for failed as is seen on his transcript form the previous academic year where the plaintiff failed full academic units (classes ending in Year 1). The course at issue remained marked "In Progress," and the remediation exam, on which dismissal was purportedly triggered, was not itself an academic unit under the school's grading policy; nor is "Year 1 Pharmacology". This

renders the dismissal decision contrary to Georgetown's established procedures and constitutes a breach of contract.

8.  Plaintiff also raises valid claims under the ADA and Section 504. Georgetown had constructive notice of Plaintiff's ADHD but failed to engage in the required interactive process or evaluate whether accommodations were needed. The school's use of unofficial and ambiguous "Low Pass" labels, unsupported by its pass/fail grading policy, to suggest academic deficiency in areas where none officially existed further prejudiced Plaintiff and introduced bias into the official evaluation of his academic standing.

9.  Most urgently, shortly following the Plaintiff's attempt at mediation, Georgetown terminated Plaintiff's SEVIS record on December 10, 2024, removing his lawful F-1 student status. Under federal immigration law:

- If a request for SEVIS reinstatement is not submitted within five months of the termination date, the student may become ineligible for reinstatement absent exceptional circumstances, which can result in the loss of F-1 status and the need to depart the United States to regain lawful status.

- An overstay of more than 180 days of unlawful presence, which Plaintiff is projected to reach on June 10, 2025, may trigger a three-year bar to reentry under 8 U.S.C. § 1182(a)(9)(B)(i)(I), if the individual departs the United States after accruing that period of unlawful presence.

10.  As a self-represented litigant, Plaintiff remains in the United States to pursue his legal claims and access the court system. If removed or denied reinstatement due to the university's SEVIS termination and procedurally flawed dismissal, Plaintiff would suffer

irreparable harm, including loss of legal status, inability to complete his medical education, potential long-term immigration penalties, and derailment of his professional future.

11.    On May 5, 2025, Plaintiff transmitted a formal letter of demand to Georgetown University via email, outlining the underlying legal claims and requesting resolution to prevent further damages. The letter was confirmed delivered on May 6, 2025 via FedEx signature. Georgetown was expressly informed that failure to respond by May 7,2025 would result in the filing of a motion for a Temporary Restraining Order. The Plaintiff received no response. Accordingly, Plaintiff now seeks this Court's urgent intervention to prevent further irreparable harm.

12. Accordingly, Plaintiff respectfully requests that this Court issue a Temporary Restraining Order:

- Enjoining Georgetown from opposing, obstructing, or failing to affirmatively cooperate with Plaintiff's application for SEVIS reinstatement, including by providing any necessary documentation or communications required by U.S. immigration authorities;

- Preserving the status quo pending resolution of Plaintiff's motion for a preliminary injunction, including Georgetown's recognition of Plaintiff's academic status as a second-year student;

- Requiring Georgetown to take all reasonable and necessary steps to facilitate Plaintiff's reinstatement to lawful F-1 status and his return to the Year 2 curriculum, consistent with university and federal regulatory procedures; and

- Prohibiting any further retaliation, directly or indirectly, against Plaintiff or any individual who supported his appeal, legal claims, or request for accommodations, including but not limited to academic, disciplinary, or immigration-related retaliation.

13. The balance of equities, the public interest in transparent academic processes and compliance with disability and immigration protections, and the irreparable nature of the harms involved all weigh heavily in favor of immediate injunctive relief.

## FACTUAL BACKGROUND

Plaintiff is a former medical student at Georgetown University School of Medicine (GUSOM) who was dismissed in 2024 following an adverse academic determination that, upon further investigation, was significantly tainted by procedural irregularities, inconsistent grading practices, and denial of reasonable consideration for a newly diagnosed disability. The following facts, drawn from sworn affidavit testimony based on individual conversations the Plaintiff had with faculty and supported by written correspondence and institutional records, establish a likelihood of success on the merits and irreparable harm absent injunctive relief:

14.     Plaintiff entered GUSOM in 2022 with strong credentials, including a 3.888 GPA from a Master's program in Biomedical Sciences, a 510 MCAT score, and a history of

Division I athletics, clinical research, and leadership. At GUSOM, Plaintiff was active in student leadership, Orthopedic Surgery research, and received positive feedback from clinical preceptors.

15.     Early academic challenges were linked to undiagnosed ADHD and misleading study guidance from the Office of Student Learning and Academic Advising (OSLAA), which advised students to study in ways that later proved, for the plaintiff, inadequate under the unique modular curriculum's detailed assessment structure and concurrent nature. GUSOM teaches and tests multiple body systems at a time and rather than individual grades within each system, students are graded in individual disciplines (ie. Physiology, Pathology) by aggregating the exam points from these class' representation in module exams; effective studying requires increased executive functioning. OSLAA advised students that it was acceptable to feel unprepared and to focus only on "main points" rather than deep understanding, which materially impacted the Plaintiff's exam preparation and performance.

16.     Plaintiff ultimately did not complete Year 1 of the curriculum successfully and entered into a remediation of the entire Year 1 curriculum in Fall 2023.

17.     In Spring 2024, Plaintiff received a 69.92% in Pharmacology, 0.08% below the 70% required threshold, following a deduction of 0.2 points on a written Clinical Toxicology assignment.

18.     The question involved a fictitious patient who ingested various medications. It asked, *"Twelve hours after arrival [to the hospital] his mental status had not improved. He had a generalized seizure. What might be happening now?"* The Plaintiff said *"Medications reached peak affect due to him remaining in the hospital and not eating,*

*his BP fell severely".* In line with the lecture's comment regarding this case of *"This kid ate all the meds, was fine when he got there because it hadn't started working yet, then he just spent 12 hours in the ICU not eating."*

19.     Dr. Partridge's initial assignment feedback sated that the anti-diabetic medications ingested would cause have caused the patient's blood sugar to fall.

20.     The Plaintiff's clinical reasoning was based on the recognition that both low blood sugar (hypoglycemia) and a post seizure drop in blood pressure (postictal hypotension) can be relevant considerations given the clinical context; the former as a potential cause of the seizure and the latter as a possible life threatening consequence of a generalized seizure.

21.     The Plaintiff also understood that the question, "What could be happening now?" might reasonably be interpreted as asking for a potential postictal state of the patient, prompting him to think about postictal hypotension. While hypoglycemia likely contributed to the seizure, and this was likely the specific answer Dr. Partridge was looking for, both hypoglycemia and postictal hypotension are clinically relevant frames that support the rationale behind my response.

22.     After review of supporting documents curated, a professor of Clinical Neurology confirmed this reasoning via a letter of support calling the Plaintiff's answer "equally plausible".

23.     The Plaintiff's response reflected commentary from the relevant class material and was supported by peer-reviewed literature and training undergone at Georgetown in clinical reasoning.

24.     After the release of grades, Dr. Partridge denied Plaintiff's request for an

opportunity to earn extra credit and subsequently failed to respond to Plaintiff's timely

request, submitted within the applicable Student Handbook window, for reconsideration

of a grading deduction. Given this lack of response, combined with the ambiguous and

faculty-controlled nature of the appeal process, Plaintiff reasonably concluded that formal

appeal would be futile, particularly where the basis was that Plaintiff's answer, while

different, was also academically acceptable. Under the school's appeal framework,

Plaintiff had no realistic prospect of the department chair overruling a colleague on such

a seemingly discretionary grading judgment. The 0.2-point deduction at issue directly

prevented Plaintiff's promotion to the second year of medical school and triggered a

mandatory remediation exam, ultimately contributing to Plaintiff's dismissal. These

events underscore the futility of further internal remedies and the immediate, irreparable

academic and immigration harms Plaintiff now faces

25.     Plaintiff was officially instructed to seek remediation guidance from Dr.

Partridge, who advised not to memorize drug names, emphasizing conceptual knowledge

("bigger items") instead. The Plaintiff sought clarification regarding this unusual advice

to not memorize drug names for Pharmacology examination, the advice was then

reaffirmed and the caveat later added was "maybe some antibiotics". Contrary to this

guidance, the exam included questions requiring specific drug names and details beyond

conceptual knowledge, placing Plaintiff at a distinct disadvantage and undermining the

validity of the remediation process.

26.     After failing the remediation exam, Plaintiff was notified by phone of dismissal.

Dean Kumar advised him to appeal "just so you can say that you did all that you could"

as she candidly stated that the COSA does not overturn dismissal appeals; suggesting the process was a formality. Plaintiff nonetheless appealed.

27.     Following dismissal, Plaintiff obtained an independent diagnosis of ADHD, confirming the suspected disability and further explaining prior academic challenges. Plaintiff also compiled a 17-page document defending the original assignment response, supported by 24 peer-reviewed citations and a eventually letter from a Professor of Clinical Neurology affirming the answer's medical validity and advocating for the deduction's reversal.

28.     In Zoom meetings during the summer, Dr. Partridge expressed regret about the grading decision, stating he would not make the same deduction again. When explicitly asked if he would support a grade reversal, he said he would be willing to do so if given permission by "the deans". When Plaintiff forwarded the clinical neurology expert letter to Dr. Partridge and the Dean, Dr. Partridge abruptly reversed course and claimed that other deficiencies hat had not been raised before "warranted" his grade given for this assignment; raising concern that Plaintiff was being subjected to heightened scrutiny in retaliation for seeking redress.

29.     Additionally, Dr. Partridge wrote, "[…] if you had turned the version of the assignment that you forwarded to me more recently I would consider this an upgrade." However, the assignment did not require supporting evidence, and none of the peer submissions the Plaintiff reviewed in preparation for my appeal included citations or external sources either. For clarity, the "version of the assignment" referred to is the 17-page document with 24 references that the Plaintiff prepared in defense of his original answer. He did not alter my response, he only provided supporting evidence.

30.    Dr. Partridge later told the Plaintiff he was concerned that he was getting "hung up" on the Clinical Toxicology assignment and discouraged him from raising it/seeking redress during my appeal; as did Dean Kumar.

31.    Plaintiff received a Google Doc with these new deficiencies the day before his appeal. He responded to each of the new deficiencies with a quote from the lecture, a peer's response who responded similarly, or both. Examination of the peer assignments showed that the Plaintiff's responses were later deemed deficient for materially similar or less complete responses. The evidence demonstrated inconsistent application of grading criteria and indicated that Plaintiff's work had been evaluated more stringently than peers.

32.    In the newly provided feedback for the seizure patient case, Dr. Partridge stated that he left "feedback" (made a deduction) "to help with students who may have missed this point that with poisoning cases you need to consider ingested drug half-lives." However, in response to the following question in the case, the plaintiff addressed the possibility of low blood sugar by recommending intravenous dextrose as a treatment. This treatment presupposes recognition of hypoglycemia as a clinical consideration. Thus, the plaintiff did not omit the concept identified in the feedback.

33.    Moreover, a new comment left on a question in the following case, Dr. Partridge acknowledged that although the plaintiff did not address a particular toxin distribution pathway in that specific answer (the question did not ask for or require a mechanism), the concept of the distribution mechanism was "addressed in [the] final question," and no deduction was applied.

34.    This demonstrates that in the same assignment, the Dr. Partridge accepted discussion of a core concept elsewhere in the case as satisfying the learning objective. The inconsistent application of this standard; crediting it in one question but penalizing it in another supports the plaintiff's claim that grading was arbitrary and not applied according to a uniform or objective rubric.

35.    Despite the significant evidence of inconsistency, procedural unfairness, and subsequent disability diagnosis, Plaintiff's appeal was denied. During the appeal hearing, the COSA chairperson dismissed Plaintiff's core argument regarding grading irregularities (asking "So you got a 93 [%] and wanted higher?" despite explaining in written materials and during the meeting the evolving significance of the deduction) and prematurely attempted to conclude the hearing before Plaintiff could present all grounds for appeal. Additionally, Dean Kumar interjected during the presentation of the evidence of inconsistent grading to tell the COSA that Dr. Partridge only made the deduction in regards to the question about the seizure patient, despite her inclusion in the communication where he said that other deficiencies warranted his given grade.

36.    The COSA's summary dismissal of the appeal, despite admissions by the course director that the deduction would not be made again, corroboration by an external clinical expert, and clear evidence of disparate grading treatment, reflects a structurally biased and arbitrary process that fails to afford fair or meaningful redress.

37.    Decision was then appealed for a final time to Dean Normal Beauchamp, Executive Vice President for Health Sciences, who denied to meet with the Plaintiff and misquoted/misrepresented key elements of the school's curriculum in his letter denying

appeal despite citing a thorough review of school policy for his denial of the appeal request.

38.     Plaintiff's attempts at remedy including a petition (signed by students, physicians, family, and friends), an attempt at mediation, additional physician support letters, and a demand letter have been unsuccessful.

39.     These facts support the need for immediate injunctive relief to preserve Plaintiff's opportunity to continue medical education pending final adjudication. Absent relief, Plaintiff faces irreparable harm, including the loss of a medical career, reputational damage, and the inability to seek accommodations or a fair academic assessment of merit

## LEGAL STANDARD

A TRO is appropriate where the moving party demonstrates:

- A substantial likelihood of success on the merits;
- That it will suffer irreparable harm in the absence of relief;
- That the balance of equities tips in its favor; and
- That an injunction is in the public interest.

*See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)

# ARGUMENT

## I. Plaintiff Is Likely to Succeed on the Merits

### Breach of Contract and Unfair Academic Evaluation Justifying TRO Relief

40.    Plaintiff asserts a likelihood of success on his breach of contract claim under District of Columbia law. Georgetown University's School of Medicine Student Handbook constitute binding contractual documents governing the student-university relationship. See *Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34 (1st Cir. 2007) ("A student's relationship to his university is based in contract..."). Georgetown explicitly promises to protect students from retaliation and discrimination, and to ensure fair academic and disciplinary treatment.

### Georgetown breached these obligations in multiple respects:

#### Retaliation in Violation of Georgetown's Non-Retaliation Policy

41.    Dr. Partridge's issuance of a retroactive, adverse academic grading document following Plaintiff's protected activity, his appeal and this assignment's role is said appeal, constitutes retaliatory conduct under Georgetown policy. This pattern mirrors the retaliatory scrutiny in *Kennev v. Aspen Techs.,* 2020 WL 3638388 (6th Cir. July 6, 2020): initially tolerated conduct becomes scrutinized only after protected activity. The Google Doc authored by Dr. Partridge, post-appeal, supports this retaliatory inference and reflects a shift in grading rationale absent any prior procedural basis.

Arbitrary Grading

42.     Dr. Partridge's grading decision violated faculty responsibilities to provide grades "honestly, fairly, and without bias, using appropriate criteria." The disputed grading penalized Plaintiff for providing a clinically valid answer, well supported by published medical literature and letters from practicing physicians.; not because it was incorrect, but because it did not perfectly align with his teaching objective.

43.     In the updated feedback for the seizure patient case, Dr. Partridge explained that his grading/remarks were intended "to help with students who may have missed this point that with poisoning cases you need to consider ingested drug half-lives." Yet, the plaintiff effectively demonstrated understanding of a related clinical issue, hypoglycemia, by recommending intravenous dextrose in response to a subsequent question in the case, indicating that the relevant concept was fully acknowledged and integrated into the clinical reasoning.

44.     Furthermore, Dr. Partridge explicitly conceded in later comments in a different question that while the plaintiff did not discuss a particular toxin distribution pathway in one answer (a question that did not specifically require this detail), the concept was "addressed in [the] final question," and no penalty was imposed.

45.     This selective and inconsistent application of grading standards, crediting the plaintiff's knowledge when presented in one context, but penalizing for its absence in another, reveals a lack of uniform criteria and supports the contention that the grading was arbitrary rather than based on a clear, objective rubric.

46.     Additionally, the Plaintiff's answer of *"Medications reached peak affect due to him remaining in the hospital and not eating, his BP fell severely"* could reasonably be

considered substantively aligned with the lecture's comment regarding this case of *"This kid ate all the meds, was fine when he got there because it hadn't started working yet, then he just spent 12 hours in the ICU not eating"* as far as addressing possible state and effects of the medication is concerned with the additional context of a possible post seizure fall in blood pressure.

47.      As medicine is inherently interdisciplinary, Dr. Partridge's rejection of the answer due to its misalignment with a pedagogical goal rather than medical inaccuracy undermines fair academic evaluation. This renders the grade arbitrary under *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214 (1985), which permits judicial intervention where academic decisions are made in bad faith or without any discernible academic basis.

Inconsistent and Ex Post Facto Standards

48.      The Plaintiff was penalized not for incorrect clinical reasoning, but for failing to intuit Dr. Partridge's subjective teaching goal. Dr. Partridge also admitted that he would consider the answer "and upgrade" had it been submitted with the 24 references curated for the plaintiff's appeal; an evidentiary burden not required of other students. As in *Keen v. Penson*, 970 F.2d 252 (7th Cir. 1992), grades based on post hoc rationales, inconsistent standards, or nonacademic motivations violate contractual obligations. In Keen, the court found unlawful a professor's imposition of retroactive grading criteria tied to non-academic factors. Likewise, here the faculty member's later justification, offered only

after the grade was challenged, demonstrates a deduction not grounded in the syllabus, literature, or fair criteria. The decision to penalize an evidence-based answer solely because it was not the intended teaching target mirrors Keen's warning that academic discretion cannot become a license for arbitrary punishment or retaliatory grading.

<u>Deviation from Institutional Academic Standards</u>

49.     The grading also contravened Georgetown's emphasis on evidence-based medicine and interdisciplinary reasoning, and the Faculty Responsibilities policy requiring instructors to remain "current in their subject matter." If Dr. Partridge was unaware that seizures may cause postictal hypotension, he failed this duty. If he was aware and deducted points regardless, it evidences grading without regard to student merit, in violation of standards articulated in the AAUP Statement of Professional Ethics, cited with approval in Keen, 970 F.2d at 256. Dr. Partridge's grading of the Plaintiff's pharmacology assignment constituted a material procedural error. The deduction at issue was not based on a consistent, objective rubric, but instead reflected shifting, post hoc rationales that prioritized alignment with the professor's teaching goals over clinical accuracy.

50.     While the Plaintiff correctly assessed the patient's condition using accepted medical reasoning, including hypoglycemia due to Glyburide and fasting, Dr. Partridge penalized him for not inferring an emphasis on drug half-lives, a criterion that specifically appeared only after the student challenged the grade. Meanwhile, other students received full credit for similarly vague or medically equivalent answers in other questions. This inconsistent and retrospective grading approach deviates from

Georgetown's own policy requiring fair and unbiased evaluation, and exceeds the bounds

of protected academic discretion. Where a grade is determined by arbitrary or unequal

standards, it becomes a procedural failure, not a discretionary academic judgment,

especially when it triggers dismissal. Under well-established case law, including *Keen v.*

*Penson*, such irregularities are not entitled to judicial deference

<u>Failure to Provide a Neutral and Adequate Appeal Process</u>

51.    Plaintiff's appeal was summarily dismissed despite the procedural irregularities

and strong evidence of medical validity. The chair of the appeals committee

mischaracterized Plaintiff's argument, prematurely cut off his presentation, and

Georgetown Dean Kumar interjected to misrepresent grading rationale, despite

documentary evidence to the contrary. The COSA removed qualifying language defining

academic unit from the policy cited for dismissal in communication discussing their

decision. This conduct supports a finding of institutional bad faith and prejudgment,

further undermining Georgetown's contractual and implied covenant obligations.

52.    Furthermore, Georgetown's own policies mandate that grading appeals protect

students from evaluations based on "inappropriate criteria" or inconsistent standards. Dr.

Partridge violated this mandate by shifting his rationale for Christopher's grade only after

learning it would be a part of his dismissal appeal, and by applying new, harsher criteria

that were never communicated in advance. These post hoc justifications and the refusal to

engage with Christopher's inquiries rendered the appeal process procedurally defective and retaliatory.

53.     Such conduct also violated Georgetown's express non-retaliation policies and breached the implied academic contract, which includes fair application of stated procedures. Courts routinely enforce such policies when clearly stated in student handbooks. See *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007). Here, Georgetown's process failed to meet even minimal standards of fairness, Christopher was denied timely access to the grading criteria which materially impacted his perceived likelihood of success in a formal appeal, especially given the wide institutional chilling effect created by the university, was held to standards others were not, and was effectively barred from a meaningful appeal during his dismissal due to a lack of time to prepare a defense. Under *Keen v. Penson* and related case law, these failures constitute a breach of contract and procedural due process.

## Georgetown Breached Its Contract by Dismissing Plaintiff in a Manner Inconsistent With GUSOM Rules and Academic Norms, Constituting a Procedural Error

54.     GUSOM violated its own academic policies and procedures when it dismissed the Plaintiff, thereby breaching the contract between the institution and the student. The Student Handbook specifies that a student on academic probation will be dismissed "without further consideration by the COS" if they receive a failing grade in a course recorded on the transcript. The Plaintiff, while on probation, was dismissed on the grounds of "unsatisfactory progress" in a course OMED 205-06 Medical Pharmacology

that had not yet concluded and for which no failing grade ("F") had been recorded on the transcript.

55.    Medical Pharmacology is a longitudinal course explicitly defined in GUSOM's course book as spanning two academic years, remaining "In Progress" at the end of Year 1 and recorded on the transcript as "ZZ" for satisfactory progress or "ZU" for unsatisfactory progress, not "P"/"F." Under GUSOM's own grading policies, a failing grade in this course is only issued upon its completion at the end of Year 2. The Plaintiff's performance was internally designated as "ZU" (Unsatisfactory Progress), which is procedurally and substantively distinct from a failing grade per school policies. Indeed, this distinction is recognized in the school's own policies, where "Unsatisfactory Progress" and "Failing Grade" are listed separately, and only the latter is designated as grounds for automatic dismissal while on probation.

56.    The Plaintiff structured their academic strategy around these published rules, focusing additional effort on courses that concluded in Year 1. No policy notified the Plaintiff that falling below the threshold for "Satisfactory Progress" in an "In Progress" course would equate to a failing grade or justify dismissal. Moreover, the course handbook specifies that only after final course completion and an unsuccessful remediation would an "F" be recorded, further reinforcing that the Plaintiff's course had not reached a stage where dismissal was procedurally appropriate. As mentioned, once remediation is granted, school policy dictates that a failed remediation results in remediation of an entire school year.

57.    Georgetown's failure to adhere to its own defined standards, by treating an in-progress evaluation as a completed failing grade was both arbitrary and capricious. This

deviation from established policy contradicts the contractual relationship between student and school as recognized in case law, including *Southwell v. University of the Incarnate Word*, which holds that the student-university relationship is governed by the terms laid out in institutional policies and student handbooks.

58.     Furthermore, the COSA's appeal denial misquoted the applicable policy by omitting a critical clause that defines a transcript-grade-bearing "academic unit" as "courses in the first and second year; clerkships in the third and fourth year." This omission materially altered the policy's scope and excluded the necessary context that would confirm the Plaintiff's course was not complete and no failing grade had been issued; a point raised during appeal.

59.     Because the dismissal was based on a condition precedent that had not occurred, namely, a failed grade recorded on the transcript, the Plaintiff was deprived of fair notice, adequate opportunity to address the basis for dismissal, and the procedural protections outlined in the academic policies. Georgetown's actions thus constituted a breach of contract and procedural unfairness not covered under academic discretion, and the Plaintiff is likely to succeed on the merits of these claims.

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

<u>Structural Futility of GUSOM's Grade Appeal Process</u>

60.     The Plaintiff's request for emergency injunctive relief is further justified by the structural futility of GUSOM's internal grade appeal process. This process is not only procedurally deficient but also functionally biased and coercive, rendering it an

ineffective means for redress of the academic misconduct that substantially contributed to the Plaintiff's dismissal.

61.     Despite presenting credible evidence supported by a clinical neurologist indicating that the Plaintiff's answer was equally plausible, the university dismissed these concerns without meaningful review. The Plaintiff reasonably chose not to pursue a formal grade appeal, not due to lack of merit, but because the appeal process itself is fundamentally illusory.

62.     GUSOM's appeal policy is structurally designed to deter appeals. It requires students to first contest the grade informally with the original grading professor, creating a direct conflict of interest. In this case, that professor, Dr. Partridge, had a professional and reputational incentive to deny error, especially when confronted with expert criticism of his grading rationale. Dr. Partridge's pattern of justifying his decision post hoc, deflecting responsibility, and ultimately retaliating against the Plaintiff further underscores his inability to serve as an impartial first reviewer. Such conditions make a fair adjudication impossible at the outset.

63.     Compounding this issue, the student handbook's language warns students in the official grade appeal process section of the handbook that *"errors and corrections resulting in grade changes are extremely rare"* a warning not found from other sections outlining procedural steps for processes such as academic dishonesty and Title IX accusations. Courts have recognized that institutional coercion, especially when compounded by power imbalances, can vitiate voluntary action such as exercising the right to appeal. Here, the language, combined with informal warnings from faculty that appeals would be futile, created a chilling effect and effectively discouraged the Plaintiff

from pursuing a formal challenge. When presented with the evidence of this case pending a final decision from Dean Beauchamp, the Department Chair who would have adjudicated the formal appeal indicated early deference to the faculty member in question, stating he would "confer" with him; language suggesting a lack of independence or neutrality. Ultimately, he declined to act or even address the documented evidence of grading irregularities.

64.      Georgetown's internal appeal structure is inherently compromised by a lack of neutrality and reliance on departmental alignment. Because the individuals tasked with adjudicating appeals often belong to the same professional hierarchy as those whose decisions are being challenged, there is a built-in institutional incentive to uphold the original outcome. This alignment, coupled with the reputational and professional risks faculty face in admitting error, creates an environment where internal reviews are driven more by loyalty and self-preservation than impartial fact-finding. At GUSOM, where decision-making hierarchies are tightly knit and external oversight is minimal, this structural conflict of interest undermines the objectivity of the appeals process and, in effect, amounts to a constructive denial of due process. Faculty members may be reluctant to admit that they, or their colleagues, have made a mistake; particularly in a context where such an admission could carry formal or even legal consequences and when the school officially set the standard of errors and corrections as "extremely rare". This would require admitting that you or a colleague made a mistake egregious enough to qualify for the standard to warrant a grade correction.

65.      The cumulative effect of these policies, actions, and communications deprived the Plaintiff of a fair opportunity to challenge the procedural error that led to his dismissal.

Courts have long held that an appeal process infected by bias or conflicts of interest cannot serve as a legitimate substitute for judicial review. When institutional actors show a clear predisposition to uphold internal decisions without engaging with contrary evidence, the doctrine of futility applies, excusing further exhaustion of administrative remedies.

66.    The Plaintiff's request for a temporary restraining order is supported not only by the merits of his underlying claims, but also by the demonstrable absence of any effective internal remedy. Without judicial intervention, the Plaintiff remains irreparably harmed by an academically and professionally ruinous decision rendered through a fundamentally flawed and biased process.

67.    Further evidence of institution wide appeal futility at GUSOM includes the actions described from the Plaintiff's COSA meeting, the Dean's comment that the Plaintiff should appeal just to say that he did all he could do, and the grade appeal process in an Embryology manuscript peer graded assignment where students are directly told that appealed grades with be reviewed more harshly (this is emphasized by the fact that the course director reviews submissions for identification for publishing where he is a co-author and thus is in a position detect deficiencies in most if not all assignments, yet, only deducts points for these deficiencies if an appeal is initiated).

**Violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

68.    Georgetown is a covered entity under the ADA and Section 504 by virtue of operating programs receiving federal funds. By dismissing Plaintiff based in part on

academic performance impacted by a disability (ADHD), for which Georgetown had constructive notice; without meaningful accommodation or consideration of disability-related challenges, Georgetown discriminated against Plaintiff in violation of both statutes.

69.      Georgetown failed to engage in an interactive process, provide reasonable accommodations, or modify its practices to ensure nondiscriminatory access to its academic programs. This includes the arbitrary use of unofficial "Low Pass" designations, inconsistently applied by definition, not reflected on the transcript, and inconsistent with its own stated Pass/Fail policy as a part of the Plaintiff's official academic record for review during dismissal proceedings.

70.      At the time of dismissal, Plaintiff had disclosed ongoing cognitive challenges consistent with executive dysfunction and had sought help through the university's mental health services. Georgetown was on notice of a potential disability and declined to evaluate Plaintiff's performance in that context, despite evidence that his difficulties stemmed from treatable neurodevelopmental impairments rather than lack of capability.

71.      Further compounding the harm, Georgetown faculty advised Plaintiff to triage his study time and prioritize courses strategically; guidance he followed only to be penalized later for doing so. This inconsistent and retroactive application of standards undermines any claim to fairness or objectivity in the dismissal process and directly contravenes the school's contractual and legal obligations.

## II. Plaintiff Will Suffer Irreparable Harm Absent a TRO

72.      Georgetown's expulsion of Plaintiff, based on an arbitrary grading decision and

misapplication of policy, not only threatens to prevent him from completing medical

school, but also inflicts irreparable harm on his career trajectory, reputation, financial

standing, and immigration status. As a noncitizen on a student visa, Plaintiff now faces

imminent loss of SEVIS/F-1 reinstatement possibility, potential removal from the United

States, and potential bans for a visa overstay necessary to access the court for redress;

consequences that are all severe and irreversible. The alleged breaches of contract, breach

of good faith, retaliation, ADA violations, and arbitrary grading establish a strong

likelihood of success on the merits, particularly where, as here, no legitimate academic

basis supports the expulsion decision based on the policy applied.

## III. The Balance of Equities Favors Plaintiff

73.      The harm to Plaintiff from Georgetown's dismissal is immediate, severe, and

irreparable. If injunctive relief is not granted, Plaintiff will lose the opportunity to

complete his medical education after successfully completing a majority of the preclinical

curriculum. This will permanently derail his career trajectory in medicine, inflict

significant reputational damage, and cause substantial financial loss in the form of lost

future earnings. More urgently, dismissal from medical school directly jeopardizes

Plaintiff's immigration status, which is contingent on active enrollment and maintenance

of SEVIS record. Without reinstatement, he faces imminent removal proceedings, long-

term bars to U.S. re-entry, and the collapse of years of professional and academic investment.

74.    By contrast, the potential harm to Georgetown is minimal. Plaintiff is not seeking to override academic standards or interfere with internal decision-making. He seeks temporary reinstatement and a fair process that comports with contractual, statutory, and constitutional protections. Georgetown faces no undue administrative burden from allowing Plaintiff to re-enroll or continue academic work while his claims are adjudicated. In fact, given that Plaintiff has successfully passed or made satisfactory progress in the majority of coursework and sought resolution in good faith, continued enrollment aligns with the educational purpose of the institution.

75.    Moreover, Georgetown is a well-resourced institution that can readily accommodate a temporary, equitable remedy without incurring reputational or operational harm. The risk to Plaintiff, loss of legal status, career, and livelihood, is existential and irreparable. The risk to Georgetown is procedural and temporary. Equity weighs decisively in Plaintiff's favor.

**IV. The Public Interest Favors Injunctive Relief**

76.    Granting injunctive relief in this case serves the public interest by upholding the integrity of educational institutions in the District of Columbia, ensuring that universities adhere to contractual obligations, anti-discrimination statutes, and fair procedural standards. D.C. has a strong public policy interest in protecting students from arbitrary

dismissal, particularly where credible allegations of disability discrimination, retaliation, and procedural irregularities are involved.

77.    The District is also home to a large population of international students, and safeguarding their access to due process before life-altering consequences, such as deportation or career termination, ensures D.C. remains a hub for global education that respects both legal protections and human dignity. Ensuring students are not expelled under unclear or inconsistently applied standards promotes trust in the region's academic institutions and supports equitable access to education for all, including those with disabilities.

78.    By allowing Plaintiff to continue his studies while this matter is resolved on the merits, the Court affirms the District's commitment to fairness, disability rights, and the rule of law in higher education.

**EX PARTE JUSTIFICATION**

Despite Plaintiff's repeated attempts to address the issues surrounding his academic dismissal, including seeking mediation and submitting a formal demand letter, Georgetown University has demonstrated a consistent pattern of dismissiveness and non-responsiveness. The University's failure to adequately respond to the demand letter and to engage with Plaintiff's appeal in a meaningful way raises serious concerns about the institution's commitment to addressing the merits of the dispute. Furthermore, notifying Georgetown at this stage of the pending TRO request could lead to a willful delay or further obfuscation of the process, thereby exacerbating

the likelihood of irreparable harm to Plaintiff. Continued inaction or delay by the University would only serve to prolong Plaintiff's displacement from academic and immigration standing, further compounding the harm and making it increasingly difficult for Plaintiff to restore his lawful status and resume his medical education.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter the following emergency relief:

1.     A Temporary Restraining Order directing Georgetown University School of Medicine to immediately take all necessary steps to facilitate and not impede Plaintiff's SEVIS/ F-1 Visa reinstatement application, including but not limited to reactivating or issuing a Form I-20 and confirming continued academic eligibility for the duration of this proceeding;

2.     An order restraining Defendants from enforcing Plaintiff's academic dismissal or otherwise preventing him from continuing his education solely based on the challenged academic decisions, until the merits of his claims can be adjudicated;

3.     A finding that injunctive relief is warranted to prevent irreparable harm, including loss of lawful immigration status, potential removal, permanent disruption of Plaintiff's medical education, and reputational injury;

4.     Such other and further relief as this Court deems just and proper to maintain the status quo and preserve Plaintiff's legal rights while this matter is under review

Respectfully submitted on this 19th day of May, 2025,

_____
CHRISTOPHER MOREE
Pro Se
4540 MacArthur Blvd. NW
Apt. 109
Washington, DC 20007
786-858-7853