**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CHRISTOPHER MOREE, |
| *Plaintiff*, |
| v. |
| GEORGETOWN UNIVERSITY, *et al.*, |
| *Defendants.* |

Civil Action No. 25-1415 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Proceeding *pro se*, Plaintiff Christopher Moree commenced this action on May 19, 2025, Dkt. 7, and filed a Motion for Temporary Restraining Order that same day, Dkt. 9. Plaintiff did not serve Defendants, Georgetown University and Dr. John Partridge, however, until May 27, 2025. Dkt. 20; Dkt. 21. The Court held a scheduling conference shortly after Defendants were served and, at that time, concluded that Plaintiff's request for relief was not sufficiently urgent to proceed without first providing Defendants with an opportunity to file a written response. Dkt. 15 at 12 (explaining that Plaintiff could litigate the case from the Bahamas, if necessary). The Court, accordingly, treated the motion as a motion for a preliminary injunction and set a briefing schedule. *Id.* at 12–13. Defendants filed their opposition on June 17, 2025, Dkt. 24, and Plaintiff filed his reply on June 24, 2025, Dkt. 28.

Until recently, Plaintiff was a student at the Georgetown University School of Medicine ("GUSOM"). After a challenging two years, however, Plaintiff was dismissed for failure to satisfy the academic requirements. In his first year, he failed two courses and failed to "demonstrate passing performance" in three other courses (which were two-year courses and, thus, remained in progress at the end of his first year). He was then allowed to repeat his first

year but failed to "demonstrate passing performance" in two classes (which were two-year courses), and he received "low pass" grades in two other classes while on academic probation. GUSOM, then, provided Plaintiff with the opportunity to "remediate" the two classes for which he had failed to "demonstrate passing performance." After he received a failing score on one of his remediation exams, the Committee on Students decided to dismiss Plaintiff from the School of Medicine. After Plaintiff unsuccessfully appealed that decision to the Committee on Student Appeals and then to the Dean of the Medical School, Plaintiff commenced this action.

Plaintiff alleges claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq*., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the D.C. Human Rights Act, D.C. Code § 2-140-2.11, and intentional infliction of emotional distress. Dkt. 7. He maintains that his dismissal resulted from the misapplication of GUSOM policies, which he treats as contractual undertakings; an "arbitrary grading decision;" a flawed appellate process; and a failure to accommodate his disability. Dkt. 9 at 2. He further maintains that, unless he receives emergency relief, he will suffer a range of irreparable harms, including loss of the opportunity to complete medical school, damage to his reputation, and risk of "removal from the United States" based on "loss of SEVIS/F-1" status. *Id.* at 27.

For the reasons explained below, the Court will deny Plaintiff's motion for preliminary relief. The Court first concludes that Plaintiff is unlikely to prevail on the merits. There is no dispute that his performance was grossly deficient over a period of two years, and it is not the Court's role to second-guess the precise grading decisions (including the validity of a 0.2-point deduction on one assignment) that his professors made and that, in critical respects, Plaintiff failed to timely dispute. Nor does Plaintiff's disability discrimination claim fare any better, since

he did not timely bring his asserted disability to the attention of the Medical School or ever seek an accommodation. The Court is also unpersuaded that Plaintiff will suffer irreparable injury in the absence of preliminary relief. Although postponing his medical education for another year is not ideal, if Plaintiff is ultimately successful in the case, he can be made whole. The fact that Plaintiff may not be entitled to remain in the United States unless he is enrolled as a student is also of no moment, since the only reason that he has given for remaining in the United States is to attend medical school. Finally, neither the balance of hardships nor the public interest tilts the scales in favor of granting preliminary relief.

The Committee on Students' dismissal decision was undoubtedly devastating for Plaintiff, who worked very hard to gain admittance to GUSOM and who then worked very hard to pass his classes. The role of the courts, however, is limited to enforcing legal rights in an orderly and fair manner, and, here, Plaintiff has failed to demonstrate that he is likely to succeed on any of his legal challenges or that he will suffer any irreparable injury while his case is pending. Because Plaintiff has failed to make those essential showings, he is not entitled to a preliminary injunction.

## I. BACKGROUND

For purposes of resolving the pending motion, the Court credits most of the non-conclusory allegations contained in Plaintiff's complaint, Dkt. 7, and also relies on the evidence that he has submitted, Dkt. 2-5, Dkt. 4-1, Dkt. 8-1, the declaration submitted by Dr. Princy Kumar, the Senior Associate Dean for Students at GUSOM, Dkt. 24-1, and the accompanying documents, Dkt. 24-2, Dkt. 24-3, Dkt. 24-4, Dkt. 24-5, Dkt. 24-6, Dkt. 24-7, Dkt. 24-8, Dkt. 24-9. Notably, in his reply brief, Plaintiff does not dispute any of the specific facts set forth in the

Kumar declaration, although he does assert that, in general, Defendants' "emphasis" on his "past academic history misrepresents both policy and context." Dkt. 28 at 8.

Mr. Moree, who is a citizen of the Bahamas, started as a student at Georgetown University School of Medicine in August 2022 on an F-1 student visa. Dkt. 9 at 7; Dkt. 24 at 6. During the 2022–2023 academic year, he failed two one-year courses (Immunology and Physiology) and demonstrated "Unsatisfactory Progress" in three two-year courses (Pathology, Pharmacology, and Microbiology). Dkt. 24 at 7–8; Dkt. 24-1 at 4 (Kumar Decl. ¶ 11); *see also* Dkt. 9 at 8. Although a student does not receive a final grade for a two-year course until the completion of the second year, a mark of "Unsatisfactory Progress" means that the student is "failing" the class and may "not move on to the second year of the course[]." Dkt. 24-1 at 4 (Kumar Decl. ¶ 11).

In June 2023, the Committee on Students ("COS") asked to meet with Plaintiff to review his academic performance at the completion of his first year. Dkt. 24 at 7; Dkt. 24-3 at 2; Dkt. 24-1 at 4 (Kumar Decl. ¶¶ 10–11).[1] As the Chair of the COS explained in a letter to Plaintiff, the committee "decided to allow" Plaintiff to repeat his first year of medical school but placed him on "**Academic Probation** for the duration of [his] remedial First Year." Dkt. 24-3 at 2. The Chair further explained that Plaintiff would "be required to successfully repeat and /or complete all components of the First Year . . . curriculum" and cautioned Plaintiff that "*while on Academic Probation, any student who receives a failing grade in any academic unit recorded on the transcript . . . will be dismissed from the School of Medicine without further consideration by the*

---

[1] According to the Student Handbook of the Georgetown University School of Medicine, the Committee on Students "is a standing committee of the School of Medicine" made up of faculty and students that is "charged with oversight of the progress of students." Dkt. 24-2 at 46 (Student Handbook).

*COS.*"  *Id.*  But "[i]n the absence of any academic deficiencies," Plaintiff's probationary status would "be removed for the Second Year."  *Id.*  Plaintiff was informed of his right to appeal the COS's decision, *id.*, but he declined to do so.

The COS also "strongly encourage[d] [Plaintiff] to avail [himself] of all of the University resources that are available to help students with academic and personal challenges, including the imbedded School of Medicine Psychologist," who is a "confidential counselor available to meet with students."  *Id.* at 3.  Finally, the Chair told Plaintiff that, if he "require[d] reasonable accommodations, [he] [would] need to seek and obtain appropriate approval prior to taking any further examinations for any of [his] coursework," and cautioned Plaintiff that students "will not be provided accommodations retroactively."  *Id.*  She then provided him with the necessary contact information for seeking an accommodation.  *Id.*

Plaintiff repeated the first-year curriculum during the 2023–2024 academic year.  Dr. Kumar reports that she met with Plaintiff several times during his "second attempt at the first year of medical school because" Plaintiff "continued to struggle with his coursework."  Dkt. 24-1 at 5 (Kumar Decl. ¶ 16).  In his second attempt, Plaintiff received two "Unsatisfactory Progress" marks in two-year courses (Histology and Pharmacology) and two "Low Pass" grades in one-year courses (Physiology and Biochemistry).  *Id.* (Kumar Decl. ¶ 17).  A "Low Pass" signifies that the student has "only marginally [met] the criteria for a passing grade."  *Id.*; *see also* Dkt. 24 at 8; Dkt. 9 at 8.  As explained above, the "Unsatisfactory Progress" designation indicated that Plaintiff was failing the two-year classes (Histology and Pharmacology) and "could not move on to the second year of th[ose] course[s]."  Dkt. 24-1 at 4, 5 (Kumar Decl. ¶¶ 11, 17).

Plaintiff's claims in this case focus on his Pharmacology grade during the 2023–2024 academic year.  In that course, Plaintiff received a 69.92%, which was just 0.08% below the

passing threshold of 70%. Dkt. 9 at 8. He attributes that deficit to a 0.2-point deduction on a written bonus assignment in a course taught by Dr. John Partridge. *Id.* at 8–9. The relevant question concerned a hypothetical patient who had ingested various medications. *Id.* at 8. The hypothetical patient experienced a seizure twelve hours after arriving at the hospital. *Id.* The question asked: "What might be happening now?" *Id.* Credit was given if a student answered that one of "the anti-diabetic medications ingested would . . . have caused the patient's blood sugar to fall." *Id.* at 9. Plaintiff, however, answered as follows: "Medications reached peak affect due to him remaining in the hospital and not eating, his BP fell severely." *Id.* at 8-9. According to Plaintiff, he should have received credit because his answer was "equally plausible." *Id.* at 9–10.[2] Had Plaintiff not received a 0.2-point deduction on that question, he would have (barely) passed Pharmacology with a grade of 70%.

The GUSOM Student Handbook permits a student who "believes that an error has been made in a given grade" to "contact the Course/Rotation Director within 30 days of the posting of the grade." Dkt. 24-2 at 37 (Student Handbook). "If the matter is not satisfactorily resolved within 30 days of meeting with the Course/Rotation Director, or if the student wishes to formally appeal a grade," the student can write to the chair of the department, but any such appeal "must be requested within 60 days of meeting with the Course/Rotation Director AND prior to any Committee on Students action." *Id.* Pursuant to that procedure, Plaintiff asked Dr. Partridge to reconsider the 0.2-point deduction, but Dr. Partridge "failed to respond" to his request. Dkt. 9 at 10. Plaintiff did not appeal the deduction because he "concluded that formal appeal would be

---

[2] Plaintiff asserts that his answer was supported by "a professor of Clinical Neurology," who "confirmed" that his answer was "equally plausible," and that the answer "reflected commentary from the relevant class material," including a lecture comment about the effect that not eating can have on medications ingested prior to arriving at a hospital, "and was supported by peer-reviewed literature and training undergone at Georgetown in clinical reasoning." Dkt. 9 at 9.

futile;" he reasoned that there was "no realistic prospect" that "the department chair" would "overrul[e] a colleague" on a "seemingly discretionary grading judgment." *Id.*

After Plaintiff's unsuccessful second attempt at the first-year curriculum, the COS again asked to meet with him to review his academic performance. Dkt. 24-1 at 5 (Kumar Decl. ¶ 17). After the meeting, the COS Chair sent Plaintiff a letter indicating that the COS had "decided to allow [Plaintiff **an opportunity to remediate the Histology and Pharmacology courses**." Dkt. 24-4 at 2. Plaintiff was again reminded about the consequences of receiving a failing grade, about his right to appeal the COS's decision, about the resources available to him, and about the process for seeking an accommodation. *Id.* at 3.

Plaintiff took the Pharmacology exam first and received 64% on the exam, which was below the 70% threshold required to pass the course. Dkt. 24-1 at 7, 8 (Kumar Decl. ¶¶ 23, 33); *see also* Dkt. 9 at 10; Dkt. 24-8 at 3. After failing the exam, Plaintiff received a letter from the COS informing him that he was "dismissed" from GUSOM. Dkt. 24-7 at 2. The letter also informed Mr. Moree that he had "the right to appeal" his dismissal "to the Committee on Student Appeals." *Id.* at 3.

The Committee on Student Appeals ("COSA") will overturn a decision of the COS only if one of the following three scenarios is present: "(1) a material procedural error that may have substantially affected the process such that a fair process was denied; (2) new facts are presented which were not known or reasonably available at the time of the COS's meeting, and which the COSA determines warrant reconsideration by the COS or modification of the prior decision; or, (3) exceptional circumstances exist which the COSA determines warrant reconsideration by the COS or modification of the prior decision." Dkt. 24-7 at 3; *see also* Dkt. 24-2 at 51 (Student

Handbook). Plaintiff submitted a written appeal to the COSA asserting all three grounds for reversal.

*First*, he claimed that his dismissal resulted from several material procedural errors. He identified the allegedly erroneous 0.2-point deduction in Pharmacology as one example of error. Dkt. 24-8 at 2.[3] As another example, he argued that because the Student Handbook provides that a student on academic probation who receives "*a failing grade* in any academic unit *recorded on the transcript*" is subject to dismissal, that proscription does not apply to grades of "Unsatisfactory Progress," which merely reflect the student's first year of work for a two-year course. *Id.* (emphasis added). Nor, according to Plaintiff, did he qualify for dismissal under the general policy that provides for dismissal of "[a]ny student whose work quality, conduct, or physical or mental health renders him or her unqualified to enter the medical profession" because his failing Pharmacology grade was the result of the purportedly erroneous 0.2-point deduction. *Id.* at 2–3.

*Second*, he claimed that new facts warranted reconsideration. After failing the Pharmacology remediation exam, Plaintiff sought an evaluation from a mental health expert, and the expert concluded that he suffers from attention deficit hyperactivity disorder ("ADHD"). *Id.* at 3. Plaintiff claimed that this "untreated condition [] severely impacted [his] studying during [his] time" in medical school and asked that the condition be "considered" when determining

---

[3] In preparation for his COSA appeal, Plaintiff compiled a 17-page defense of his original answer and sent it to Dr. Partridge, who (according to Plaintiff) responded by expressing regret about the deduction, "stating he would not make the same deduction again," and saying that he "would be willing" to "support a grade reversal" if he was "given permission by 'the deans.'" Dkt. 9 at 11. Dr. Partridge later reversed course, stating that "other deficiencies" in the exam warranted the original grade, and he sent Plaintiff a document pointing out each of the other deficiencies. *Id.* at 11–12. Plaintiff, in turn, responded by contesting each of those new deficiencies with quotes from the lecture or examples of peers who received credit for similar responses. *Id.* at 12.

whether to uphold his dismissal.  *Id.* at 4.  He said that he understood, however, that "accommodations [could not] be applied retroactively for an examination."  *Id.*

*Third*, Plaintiff claimed that exceptional circumstances warranted reconsideration.  In particular, he pointed to family circumstances and a period of illness that explained some of his struggles during both the academic year and his inadequate preparation for the remediation exam.  *Id.*

The COSA denied Plaintiff's appeal, determining that there were no "grounds to reverse, remand, or modify the action of the COS."  Dkt. 24-9 at 3 (emphasis omitted).  With respect to the 0.2-point Pharmacology deduction, the COSA noted that Plaintiff had failed to appeal Dr. Partridge's failure to change his grade within 60 days and that, contrary to the requirements in the Student Handbook, he had not appealed until after the COS had already taken action.  *Id.* at 4.  The COSA, accordingly, declined to consider Plaintiff's challenge to the 0.2-point deduction.  With respect to Plaintiff's ADHD diagnosis, the COSA observed that "accommodations are not granted on a retroactive basis" and thus "did not find" that the diagnosis "warrant[ed] reconsideration or modification of the decision of the COS."  *Id.*  Finally, with respect to Plaintiff's family circumstances, the COSA "recognize[d]" Plaintiff's "resilience" but determined that the "circumstances" he presented did not "warrant reconsideration."  *Id.*

Plaintiff then appealed the COSA's decision to Dr. Norman Beauchamp, the Executive Dean of the Medical School and Executive Vice President for Health Sciences.  Dkt. 24-1 at 8 (Kumar Decl. ¶ 36); *see also* Dkt. 24-10 at 2.  After speaking with Dr. Kumar and reviewing Plaintiff's academic record, Dr. Beauchamp upheld the COS and COSA's decision to dismiss Plaintiff on August 19, 2024.  Dkt. 24-1 at 8 (Kumar Decl. ¶ 36); *see also* Dkt. 24-10 at 2.  Then, on December 10, 2024, GUSOM terminated Plaintiff's SEVIS record.  Dkt. 9 at 5.

Plaintiff attempted to file the present action on May 9, 2025, Dkt. 1, and ultimately succeeded in filing his complaint on May 19, 2025, Dkt. 7.  He asserts five claims against Georgetown University and Dr. Partridge: breach of contract (Count I), *see* Dkt. 7 at 39; breach of the implied covenant of good faith and fair dealing (Count II), *see id.* at 74; violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq.*, and violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count III), *see id.* at 120; violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Official Code § 2-1402.11 (Count IV), *see id.* at 131; and intentional infliction of emotional distress (Count V), *see id.* at 132.  Plaintiff filed a motion for a TRO on May 19, 2025, seeking a Court order directing GUSOM to readmit him during the pendency of this case and to support reinstatement of his SEVIS status and F-1 Visa by confirming Plaintiff's academic eligibility and issuing him a Form I-20.  Dkt. 9.  After the Court determined that the relief sought was not urgent and that Plaintiff could litigate the case from the Bahamas, if necessary, the Court treated the motion as a motion for a preliminary injunction and set a briefing schedule.  That motion is now fully briefed and ripe for decision.

## II. ANALYSIS

A preliminary injunction "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the movant "must establish" (1) "that [he] is likely to succeed on the merits;" (2) "that [he] is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in [his] favor;" and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  Although the moving party may rely

on "evidence that is less complete than in a trial on the merits," *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998), he nevertheless "bear[s] the burden[] of produc[ing] . . . credible" evidence sufficient to demonstrate his entitlement to injunctive relief, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (quotation marks omitted) (first alteration in original).

Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *id.* at 393 (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)), but it "has not yet needed to decide the issue," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) ("This circuit has repeatedly declined to take sides . . . on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction.") (en banc); *Sherley*, 644 F.3d at 393 (reading "*Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction'" but declining to decide the issue (quoting *Davis*, 571 F.3d at 1296)).

But even assuming that the sliding-scale approach continues to apply, when the moving party "fails to show *any* 'likelihood of success on the merits,'" the Court must deny the motion and "'need not proceed to review the other three preliminary injunction factors.'" *Corp. for Pub. Broad. v. Trump*, ___ F. Supp. 3d ___, ___, 2025 WL 1617191, at *5 (D.D.C. June 8, 2025) (quoting *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir.

2009)) (emphasis added). Similarly, "without a showing that irreparable harm is likely" in the absence of preliminary relief, "the movant cannot prevail on a motion for a preliminary injunction." *Id.* (citing *Winter*, 555 U.S. at 22).

Because the Court concludes that Plaintiff has failed to establish any likelihood of success on the merits or that he will suffer irreparable harm while this case is pending, and because neither the balance of equities nor the public interest weigh decisively in favor of granting preliminary relief, the Court will deny the pending motion.

**A.    Plaintiff Has Failed to Establish Any Likelihood of Success on the Merits**

    1.    *Breach of Contract and Breach of the Implied Covenant of Good Faith & Fair Dealing (Count I, Count II)*

To prevail on claims for either breach of contract or breach of the implied covenant of good faith and fair dealing, a plaintiff must establish an enforceable contract. *See Ponder v. Chase Home Fin., LLC*, 666 F. Supp. 2d 45, 48 (D.D.C. 2009) (dismissing breach of contract claim under D.C. law where the plaintiff failed to allege facts that would establish an enforceable contract); *Mero v. City Segway Tours of Wash., DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) ("[T]he absence of a contract alone is sufficient to defeat [an] implied covenant claim."). "For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations." *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009).

Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims are unlikely to succeed on the merits because he has not established an enforceable contract. He premises his contract claims on two documents: Georgetown University's Notice of Non-Discrimination, Dkt. 25-4, and GUSOM's Student Handbook, Dkt. 24-2. *See* Dkt. 7 at 39 (Compl. ¶ 78). On the current record, however, the Court is unpersuaded

that Plaintiff will be able to show that either of these documents constitutes an enforceable contract.

It goes without saying that not every policy announced by a university or other institution is enforceable as a matter of contract, particularly when the policy merely acknowledges and affirms an obligation that already exists as a matter of federal, state, or local law.  Here, the Notice of Non-Discrimination bears none of the hallmarks of a contractual undertaking.  The policy applies broadly to all "faculty, staff, and students," and, as relevant here, it merely provides notice that the University will comply with the laws forbidding discrimination on the basis of disability.  Dkt. 25-4 at 2.  Even more to the point, the Notice of Non-Discrimination places no reciprocal obligations on Plaintiff (or anyone else).  "For a contract to be enforceable" under D.C. law, "each party must undertake to do something the party otherwise is under no legal obligation to do, or to refrain from doing something the party has a legal right to do." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008) (alterations and internal citation omitted).  The Notice of Non-Discrimination states that "Georgetown University is committed to providing equal educational . . . opportunities," that "Georgetown University provides educational opportunities without regard to, and does not discriminate on the basis of . . . disability," and that "Georgetown University prohibits retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or otherwise exercising rights protected by law."  *See* Dkt. 25-4 at 2.  Those commitments apply to the University (and its agents) alone and do not represent the type of *quid pro quo* that is necessary to form a contract with any third party.

Nor is Plaintiff likely to succeed in establishing that the relevant portions of the Student Handbook are enforceable as a matter of contract.  To determine whether a student handbook

constitutes an enforceable contract, the D.C. Court of Appeals looks to "general principles of

contract construction." *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977).

"'[T]he [policy] document itself must be viewed as a whole' and 'the court should view the

language of the document as would a reasonable person in the position of the parties.'" *Pride v.*

*Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (quoting *Basch*, 370 A.2d at 1367). Here, the

language of the Student Handbook does not support Plaintiff's assertion that it constitutes a

binding contract. To start, the Student Handbook explicitly states that it "is not a contract." Dkt.

24-2 at 149. Express language of that type counsels against treating a handbook as a binding

contract. *See Grove v. Loomis Sayles & Co., L.P.*, 810 F. Supp. 2d 146, 149 (D.D.C. 2011)

(holding that an employee handbook was not an enforceable contract when it "disclaim[ed] the

establishment of contractual obligations"). In addition, GUSOM reserves the right to "update its

policies, procedures, . . . [and] graduation or degree requirements . . . at any time for any reason."

Dkt. 24-2 at 149. Retaining the unilateral right to change the policy, although not definitive,

further counsels against reading the handbook to give rise to contractual obligations. *See Davis*

*v. Joseph J. Magnolia*, 640 F. Supp. 2d 38, 45 (D.D.C. 2009) ("A contract lacks consideration

when one party's promise is illusory, and a promise is illusory when performance of that promise

is optional." (quoting Restatement (Second) of Contracts § 77 (1981))). Finally, as relevant here,

the Student Handbook makes clear that the COS retains "discretion" to "dismiss a student at any

time based on demonstrated academic deficiency" and that the COS "may impose any other

remedial action it deems appropriate for issues of academic or professional concern." Dkt. 24-2

at 40. Because Plaintiff does not dispute that his academic performance was deficient, and

because the Handbook grants the COS "discretion" to take whatever action it deems appropriate

under those circumstances (without first providing students with an opportunity to remediate),

14

*id.*, the actions that the COS took in Plaintiff's case fall beyond the scope of any contractual constraints or requirements.

Plaintiff focuses on a separate provision of the Handbook, which provides that if a student who is on academic probation "receives a failing grade in any academic unit recorded on the transcript," the student "will be dismissed from the School of Medicine without further consideration by the COS." *Id.* On Plaintiff's telling, this language gives rise to a contractual right to continued matriculation unless the failing grade is "recorded on the transcript," and he argues that his grades of "Unsatisfactory Progress" in Histology and Pharmacology do not count, since those were two-year courses, and thus no final failing grade was recorded on his transcript. Dkt. 30 at 5–6. That argument is of doubtful merit, given Dr. Kumar's explanation that "Unsatisfactory Progress" means that the student "was failing these . . . courses and could not move on to the second year of the courses." Dkt. 24-1 at 4 (Kumar Decl. ¶ 11). But even putting that difficulty to the side, Plaintiff ignores what the Handbook actually says: It does not say that a student *may not be* dismissed unless a final, failing grade is recorded on his or her transcript. It says only that the student *must be* dismissed under those circumstances. Dkt. 24-2 at 40. As discussed above, the following section of the Handbook then clarifies that the COS retains "discretion" to "dismiss a student at any time," without first giving him or her an opportunity to remediate, if the student's academic performance is demonstrably deficient. *Id.* Accordingly, the Court is unpersuaded that the Handbook can be read to establish a contractual obligation to give a student the opportunity to remediate or to establish a prohibition on dismissing a student whose performance has been deficient on a two-year course but who has yet to complete the second year of the course.

Plaintiff invokes *St. Peter v. Georgetown University*, 707 F. Supp. 3d 17 (D.D.C. 2023), as support for his contention that the Student Handbook and Notice of Non-Discrimination constitute enforceable contracts. *St. Peter*, however, offers no refuge. In that case, the Court merely concluded that the plaintiff had failed to identify "an explicit contractual term" supporting his claim. *Id.* at 24. For emphasis, the Court further noted that the plaintiff had not even "pointed to school policies or Student Handbook provisions" setting forth a specific contractual term that the University allegedly breached. *Id.* But the Court did not hold that the Student Handbook as whole constituted a binding contract or that any specific portions of the Handbook created rights enforceable in contract. *See id.* Indeed, if anything, St. Peter supports Defendants' position here, since, as in that case, Plaintiff has failed to identify "an explicit contractual term" found in the Handbook that the University allegedly breached.

Plaintiff's contract claims are also unlikely to succeed because D.C. law, quite sensibly, "counsels against courts second-guessing academic judgments made by universities." *Montesano v. Cath. Univ. of Am.*, 548 F. Supp. 3d 6, 9 (D.D.C. 2021). Even when called upon to determine "whether a university has complied with its own rules or contract, '[a] court must be careful not to substitute its judgment improperly for the academic judgment of the school.'" *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (cleaned up) (citation omitted). "The decision of an individual professor as to the proper grade for a student in his course . . . is not readily adapted to the procedural tools of judicial or administrative decisionmaking," *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978), and so "[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). In short, judges should avoid stepping into the shoes of individual

professors or faculty committees and second-guessing their "expert"—and often "subjective" or "evaluative"—views regarding the "cumulative" performance of their students. *Bd. of Curators of Univ. of Mo.*, 435 U.S. at 90.

Here, the record demonstrates that Plaintiff did not fall short of expectations only once or twice; he did so repeatedly over a period of two years.  Nor does the record reflect any bias or unfair or arbitrary action by the faculty at GUSOM; to the contrary, Plaintiff was given multiple opportunities to successfully complete the first-year curriculum, and he repeatedly came up short.  To be sure, Plaintiff disputes one 0.2-point deduction on one assignment, but the judicial process is poorly suited to re-assess whether that deduction was warranted and, more importantly, whether the assignment as a whole was satisfactorily completed.  More importantly, a disagreement with a good-faith faculty assessment of student performance is not itself actionable, and, in any event, it is undisputed that when given the opportunity to take a remediation exam in that class, Plaintiff failed the exam by a significant margin, *see* Dkt. 24-1 at 7 (Kumar Decl. ¶ 23) (noting that Plaintiff received a score of 64% on the remediation exam, which required a score of 70% to pass).  Under those circumstances, there is no basis to doubt that the members of the COS permissibly exercised their expert judgment to conclude that Plaintiff's performance was unsatisfactory and that he should be dismissed from the Medical School.

Finally, Plaintiff is unlikely to succeed on a promissory estoppel claim against Dr. Partridge.  *See* Dkt. 28 at 17.  Although not entirely clear, this claim appears to include two components.  First, Plaintiff asked Dr. Partridge whether "he would be willing to update" the grade on the Pharmacology assignment, which involved the disputed 0.2-point deduction, and, according to Plaintiff, "Dr. Partridge confirmed that he would update the grade if given

permission by 'the deans.'" Dkt. 7 at 28 (Compl. ¶ 64).  Second, Plaintiff asserts that Dr.

Partridge made an "unsolicited offer to write" a letter to the COS supporting Plaintiff's appeal,

yet the letter that he eventually sent was at best equivocal.  Dkt. 28 at 17.  Plaintiff is unlikely to

succeed on the merits with respect to either assertion.

To prevail on a promissory estoppel claim, "a plaintiff must establish (1) the existence of

a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied

on the promise to his detriment." *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C.

2007), *aff'd*, 552 F.3d 836 (D.C. Cir. 2009) (citing *Daisley v. Riggs Bank*, 372 F. Supp. 2d 61, 71

(D.D.C. 2005)).  But because "reliance on an indefinite promise is unreasonable," the plaintiff

must identify "a promise with definite terms on which the promisor would expect the promisee

to rely." *Id.* (quoting *In re U.S. Office Products Co. Securities Litigation*, 251 F. Supp. 2d 58, 73

(D.D.C. 2003)); *see also Myers v. Alutiiq Internat'l Solutions, LLC*, 811 F. Supp. 2d 261, 272

(D.D.C. 2011).  Although "a promise need not be as specific and definite as a contract," the

defendant must nonetheless (1) make a "promise" and (2) that promise must have terms that are

sufficiently clear and definitive to invite reliance.  *In re U.S. Office Products Co. Securities*

*Litigation*, 251 F. Supp. 2d at 73.

Here, accepting Plaintiff's version of events, it is far from clear that Dr. Partridge made a

"promise" of any sort.  But even if he did, neither statement was sufficiently definite to support a

promissory estoppel claim.  The first statement—in which Dr. Partridge allegedly "confirmed

that he would update" Plaintiff's grade on the one, disputed assignment—was expressly

contingent; on Plaintiff's own telling, Dr. Partridge said that he would do so only "if given

permission by 'the deans.'"  Dkt. 7 at 28 (Compl. ¶ 64).  Thus, absent a further representation

that the "the deans" had, in fact, given Dr. Partridge permission to change the grade—long after

18

the time to appeal that grade had run—Plaintiff could not possibly have relied on Dr. Partridge's assertion. It is also clear from Plaintiff's own allegations, moreover, that Dr. Partridge identified separate problems with Plaintiff's work on the assignment not long after his initial statement. *Id.* at 28–29 (Compl. ¶¶ 65–66).

The second statement that Plaintiff invokes—Dr. Partridge's offer to write a letter of support to the COS—fares no better. Although Plaintiff characterizes the letter that Dr. Partridge eventually sent as unhelpful and unduly equivocal on the central question of whether Plaintiff "should be given [another] chance," Plaintiff also acknowledges that the letter pointed to mitigating information, and, in particular, the "extensive [family] health problems" that may have distracted Plaintiff. *Id.* at 30 (Compl. ¶ 67). Plaintiff's dissatisfaction with Dr. Partridge's letter merely highlights the fact that offers of "support" are often inherently indefinite and insufficiently precise to sustain a promissory estoppel claim. Undoubtedly, letters of recommendation or support do not live up to expectations, but that does not mean that every equivocal letter provides grounds for a lawsuit.

For these reasons, the Court concludes that Plaintiff is unlikely to succeed on his claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

2.    *ADA, Rehabilitation Act, and DCHRA (Count III, Count IV)*

Nor is Plaintiff likely to succeed on his claims under the ADA, Rehabilitation Act, and DCHRA. These claims all depend on Plaintiff's contention that GUSOM failed to accommodate his ADHD disability and that it dismissed him "partially due" to "conditions set forth by his disability." *See* Dkt. 7 at 120, 132 (Compl. ¶¶ 251, 280). But to prevail on a claim for disability discrimination under the ADA, the Rehabilitation Act, or the DCHRA, a plaintiff must demonstrate that the defendant knew about his or her disability. *See Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896–97 (D.C. Cir. 1998) (ADA, Rehabilitation Act); *Chang v.*

*Inst. for Pub.-Priv. P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004) (DCHRA).  Here, however, Plaintiff did not obtain a diagnosis of ADHD until after he was dismissed, *see* Dkt. 7 at 121 (Compl. ¶ 255), and he does not allege that anyone—including himself—knew he had ADHD prior to that diagnosis.

Instead, Plaintiff seems to suggest that his academic struggles themselves should have put GUSOM on notice that he had a disability.  But to incur liability for disability discrimination, GUSOM would have to have "acted with an awareness of the disability itself, and not merely an awareness of some deficiency in [Mr. Moree's] performance that might be a product of an unknown disability." *Crandall*, 146 F.3d at 897.  Indeed, the D.C. Circuit has affirmed the dismissal of disability discrimination claims on facts almost identical to those presented here. *Ferrell v. Howard Univ.*, 254 F.3d 315, 315 (D.C. Cir. 2000) (unpublished) (per curiam); *see also Ferrell v. Howard Univ.*, 1999 WL 1581759, at *1 (D.D.C. Dec. 2, 1999) (dismissing claims under the ADA and Rehabilitation Act where plaintiff was dismissed from medical school, later received a diagnosis of ADHD, sought readmission, and was denied).  Here, moreover, the COS twice reminded Plaintiff that, if he required an accommodation, he would need to seek and to obtain the necessary approval before "taking any further examinations," Dkt. 24-3 at 3; Dkt. 24-4 at 3, yet he failed to take any action until after he was dismissed. Defendants cannot be held accountable for that inaction.

For these reasons, the Court concludes that Plaintiff is unlikely to succeed on his claims under the ADA, the Rehabilitation Act, and the DCHRA.[4]

---

[4] These claims are likewise unlikely to succeed against Dr. Partridge because individual liability does not attach to claims under the ADA and Rehabilitation Act, *see Di Lella v. Univ. of D.C. David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 8 n.8 (D.D.C. 2008), and because Plaintiff does not seem to allege a DCHRA claim against Dr. Partridge, *see* Dkt. 7 at 131–32 (Compl. ¶¶ 276–81).

3.    *Intentional Infliction of Emotional Distress (Count V)*

Finally, Plaintiff is unlikely to succeed on his claim for intentional infliction of emotional distress ("IIED").  To prevail on a claim for IIED under D.C. law, a plaintiff must demonstrate "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008).  "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 70 (D.D.C. 2018) (quoting *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014)); *see also E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 406 (D.D.C. 2020) ("The outrageousness requirement 'is not an easy one to meet.'") (quoting *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 264 (D.D.C. 2018)); Restatement (Second) of Torts § 46 (1965) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.").  As Defendants point out, this Court has uniformly rejected IIED claims based on dismissals from a university or based on grading decisions.  *See* Dkt. 25-2 at 28 (collecting cases).  Plaintiff, in turn, has failed to identify any contrary precedent, and he merely reiterates that, in his opinion, "the conduct described" in his complaint is "extreme and outrageous."  Dkt. 28 at 18.

The Court does not doubt that Plaintiff experienced grave distress due to his dismissal. But even if the Court were to credit Plaintiff's dubious characterization of events—"deliberate misinformation, retaliatory grading, suppression of appeal evidence, dismissal under changing standards, and withdrawal of promised support," Dkt. 28 at 18—those events would not rise to

the level of being "beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Jackson*, 327 F. Supp. 3d at 70.  The Court need not go that far, however, to deny Plaintiff's motion for preliminary relief.  He bears the burden of proof, and the record currently before the Court does not come close to establishing that Defendants engaged in extreme or outrageous conduct.

For these reasons, the Court concludes that Plaintiff is unlikely to succeed on his claims for IIED.

## B.    Remaining Preliminary Injunction Factors

Plaintiff has also failed to carry his burden of demonstrating that, absent preliminary relief, he is likely to suffer an irreparable injury; that the balance of equities tips in his favor; or that a preliminary injunction would serve the public interest.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  To qualify, the injury must not only be unrecoverable, it must also be "both certain and great; [and] it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Here, Plaintiff asserts that he will suffer two distinct injuries in the absence of preliminary relief: (1) "irreparable harm" will be "inflict[ed] . . . on his career trajectory, reputation, [and] financial standing;" and (2) he will face "imminent loss of SEVIS/F-1 reinstatement possibility, potential removal from the United States, and potential bans for a visa overstay necessary to access the court for redress."  Dkt. 9 at 27.  Neither of these asserted harms suffices.

With respect to the first category, Plaintiff does not explain why injuries to his career trajectory, reputation, and finances are not compensable with monetary damages after final judgment or why he could not, if successful, return to medical school after the case is resolved

on the merits.  To start, a delay in career trajectory is not inherently irreparable.  To the contrary, in similar situations, court have held that educational delays are compensable with monetary damages and thus do not qualify as irreparable harms.  *See Hodges v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 20-1456, 2020 WL 5017665, at *4 (E.D. La. Aug. 25, 2020) (collecting cases).  To be sure, courts have on occasion found that an educational delay constituted irreparable injury in the context of a plaintiff who has been suspended or expelled due to allegations of sexual misconduct.  *See Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *12 (N.D. Ind. May 8, 2017) (collecting cases).  But those cases raise the different and significant prospect that the plaintiff "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap."  *Doe v. Middlebury Coll.*, No. 15-cv-192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015).  One court opined that it would be "inevitable" that the student would need to "explain" the gap in his education to "future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct."  *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014).  Here, in contrast, Plaintiff will already have to explain why he was required to repeat his first year of medical school (at least once), and any additional stigma resulting from another year's delay does not compare with the stigma of revealing otherwise confidential information regarding allegations of sexual misconduct.

Plaintiff invokes the Fourth Circuit's decision in *Jones v. Board of Governors of the University of North Carolina*, 704 F.2d 713 (4th Cir. 1983), to support his contention that an educational delay is irreparable.  *See* Dkt. 28 at 22.  In that case, the Fourth Circuit determined that the plaintiff "w[ould] obviously suffer irreparable injury" because "she will be barred from

taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will be forced to explain throughout her professional life; [and] she will be deprived of the opportunity to complete her education with her fellow classmates." *Jones*, 704 F.2d at 716. But Plaintiff is not similarly situated to the plaintiff in that case because, as just explained, he has already repeated his first year of medical school once and has experienced a further year-long delay in his education since his dismissal. Plaintiff further contends that any additional delay "may permanently hinder" his "ability to match in his intended specialty" for purposes of residency. Dkt. 28 at 23. He has failed, however, to offer any evidence that a three-year delay would differ in material respects from the two-year delay. Plaintiff also posits that, in addition to potential reputational damage due to his irregular transcript, an educational delay might cause him financial injury. But that assertion is both speculative and, in any event, unhelpful, since a claim of financial loss is, by definition, compensable.

      Nor has Plaintiff shown that he is likely to suffer irreparable injury based on the immigration consequences of his dismissal. Plaintiff identifies three such consequences: loss of the possibility of reinstatement of his student visa, expulsion from the country, and potential bans from the country because he overstayed his visa. Starting with reinstatement of his student visa, Plaintiff asserts that Georgetown University terminated his SEVIS record (which is required to maintain a current student visa) on December 10, 2024. *See* Dkt. 9 at 5. Under the governing regulations, reinstatement must be requested within five months of termination unless the student can demonstrate "exceptional circumstances." *See* 8 C.F.R. § 214.2(f)(16)(i) ("USCIS may consider granting [a request for reinstatement] if the student . . . [h]as not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the

failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances."). Here, Plaintiff did not file his motion for a temporary restraining order until more than 5 months after his status was revoked, and so his request will fall outside of the five-month period whether this Court grants preliminary relief. He states that he has now "submitted a petition to USCIS for reinstatement of his SEVIS record and F-1 student visa status" that "notes that the matter is currently being adjudicated in federal court." Dkt. 28 at 21. Either way, though, he has failed to demonstrate that the prospect that USCIS will ultimately reinstate (or reissue) his visa turns in material and reasonably predictable respects on whether he can obtain preliminary relief now or must, instead, wait for final decision in the merits.

The other two potential injuries—removal from the United States and a reentry ban due to overstaying his visa more than 180 days—are entirely in Plaintiff's hands. To the extent that he has overstayed his student visa and wants to avoid removal from the United States or other negative consequences of that overstay, he can do so by leaving voluntarily. In his motion, and at the status conference on May 27, 2025, Plaintiff expressed a concern that he would be unable to litigate this case if he were to return to the Bahamas. *See* Dkt. 9 at 27; Dkt. 15 at 9 (May 27, 2025 Hrg. Tr. 9:3–6). The Court has assured him, however, that it would be "amenable to permitting [him] to appear by Zoom" for future hearings and that he could file papers by mail. Dkt. 15 at 9 (May 27, 2025 Hrg. Tr. 9:7–17). Plaintiff, accordingly, need not remain in the United States to litigate this case. Perhaps most significantly, Plaintiff does not assert a right to stay in the United States that adds anything to his claim of irreparable injury resulting from the interruption in his medical education: The only reason that he was admitted into the United States was to attend medical school, and, accordingly, if interrupting his education does not give

rise to an irreparable injury, requiring that he leave the United States will result in no separate, irreparable harm.

Plaintiff now asserts, in his reply brief, a different reason why he cannot leave the country: the USCIS will "generally" consider a reinstatement request "abandoned" if the petitioner "leave[s] the United States before [USCIS] make[s] a decision on [his] application." *See* Dkt. 28 at 21 (citing "U.S. Citizenship and Immigration Services," without further detail). But Plaintiff's request for a student visa is inextricably tied to the merits of the case: if he is not readmitted—that is, if he is not a student—he is not entitled to a student visa, and if the Court orders that he be readmitted, he can reapply for admission on a student visa. To the extent USCIS concludes that his reapplication should be denied for reasons that are not now apparent to the Court, that separate event is unduly speculative and, in any event, would likely break the causal chain and cannot be attributed to *Defendants*' actions.

For these reasons, the Court concludes that Mr. Moree has failed to establish that he will suffer an irreparable injury in the absence of preliminary relief.[5]

Finally, the balance of equities and the public interest both weigh in Defendants' favor. Georgetown University, as an institution, has a strong interest in maintaining the reputation of its medical school, and it does that, in part, by insisting on its academic standards. Similarly, there is a compelling public interest in ensuring that medical professionals are well-trained and capable of providing a high level of patient care. *See* Dkt. 24 at 18 (collecting cases). The Court, accordingly, agrees with Defendants that "the public's interests are best served by Georgetown rigorously enforcing its academic standards." *Id.* Plaintiff asserts that readmission

---

[5] Because Plaintiff has failed to establish that he will suffer an irreparable injury in the absence of preliminary relief, the Court need not address Defendants' further contentions regarding Plaintiff's delay in seeking preliminary relief. *See* Dkt. 24 at 14–15.

would not "undermine institutional standards" but would, instead "promote academic honesty and accountability for universities." Dkt. 28 at 29. Here, the merits and the equities necessarily converge, and because Plaintiff has failed to demonstrate that Defendants engaged in dishonesty or that they dismissed Plaintiff without reason, preliminary relief is unnecessary to restore the public's trust in GUSOM's fairness or processes. GUSOM gave Plaintiff several chances to succeed in medical school, and its decision to dismiss him when it did was neither precipitous nor evidently unfair. Under these circumstances, the public interest would best be served by leaving difficult evaluative decisions to those with the expertise, experience, and responsibility to make them.

## CONCLUSION

Because the Court concludes that Plaintiff has failed to show (2) that he is likely to prevail on the merits, (2) that he is likely to suffer any irreparable injury, or (3) that the balance of hardships or (4) the public interest weigh in favor of granting preliminary relief, the Court hereby **DENIES** Plaintiff's motion for a Temporary Restraining Order, Dkt. 9, and/or for a Preliminary Injunction.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 21, 2025