**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTOPHER MOREE,<br>*Plaintiff*,<br>v.<br>GEORGETOWN UNIVERSITY, *et al.*,<br>*Defendants.* | Civil Action No. 25-1415 (RDM) |

## MEMORANDUM OPINION

Plaintiff Christopher Moree, proceeding *pro se*, brings this action against Defendants Georgetown University ("Georgetown") and Dr. John Partridge alleging claims for breach of contract and breach of the implied covenant of good faith and fair dealing; violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq.*, Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-140-2.11; and intentional infliction of emotional distress. Dkt. 7 at 39–135 (Compl. ¶¶ 77–291). Pending before this Court is Defendants' motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 25.

For the reasons set forth below, the Court will **GRANT** Defendants' motion to dismiss.

## I. BACKGROUND

Plaintiff's complaint, Dkt. 7, alleges the following facts, which the Court accepts as true for purposes of the motion to dismiss, *see Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

Plaintiff Christopher Moree, a citizen of the Bahamas, enrolled as a student at the Georgetown University School of Medicine in the fall of 2022. Dkt. 7 at 9, 11, 13–14 (Compl. ¶¶ 13, 24–25, 30); *see* Dkt. 9 at 7. During his first year, he performed poorly in multiple classes, so he was unable to proceed to the second-year curriculum. Dkt. 7 at 15–16 (Compl. ¶ 35). Georgetown allowed Plaintiff to repeat the first-year curriculum during the following academic year, but it placed him on academic probation and warned him that another failure would result in dismissal. *Id.* at 16, 58–59 (Compl. ¶¶ 36, 119).

In his second attempt, Plaintiff again struggled, narrowly failing to reach the mark for satisfactory progress in both Histology and Pharmacology. *Id.* at 20, 22 (Compl. ¶¶ 48, 55). Plaintiff identifies one particular assignment (the "Toxicology Assignment") as the tipping point for his Pharmacology grade: a three-point written response on which Plaintiff's professor, Dr. Partridge, awarded Plaintiff 2.8 points. *Id.* at 17 (Compl. ¶¶ 39–40). If Dr. Partridge had awarded him full credit, Plaintiff alleges, then he would have made the mark for satisfactory progress in the Pharmacology course. *Id.* at 20 (Compl. ¶ 48). Plaintiff acknowledges that he "did not pursue the formal grade appeal process at the release of the grade." *Id.* at 19 (Compl. ¶ 43).

Instead, after failing the first-year curriculum for a second time, Plaintiff faced review before the Committee on Students, a body with the power to "dismiss students [of the Medical School] they deem unsatisfactory." *Id.* at 20 (Compl. ¶ 49); *see id.* at 69 (Compl. ¶ 135). Plaintiff wrote to the Committee on Students to provide context for his performance, explain his mental health and academic struggles, and identify "new strategies he planned to implement in the next academic year to ensure his performance improved." *Id.* at 22–24 (Compl. ¶¶ 56–57). The Committee on Students then gave Plaintiff one further opportunity over the summer to

remediate his failure to progress in Histology and Pharmacology, warning him that "a failed academic unit . . . would result in dismissal without further consideration." *Id.* at 24–25 (Compl. ¶ 57).

Plaintiff received advice from Dr. Partridge while preparing for his remediation exams. *Id.* at 25 (Compl. ¶ 58). Plaintiff alleges that Dr. Partridge's advice misled him about the nature of the exams. *See id.* After attempting to follow the advice, Plaintiff failed his remediation exam in Pharmacology. *Id.* The Dean of the Medical School then called Plaintiff to inform him that he "would be dismissed" and to advise him that he could appeal to the Committee on Student Appeals. *Id.* at 26 (Compl. ¶ 59).

At this point, Plaintiff sought a mental health evaluation and received an ADHD diagnosis. *Id.* at 26–27 (Compl. ¶ 60). Plaintiff also prepared a document arguing that he should have received full credit (instead of a 0.2-point deduction) on the allegedly pivotal Toxicology Assignment. *Id.* at 27 (Compl. ¶ 61). Plaintiff shared that document with Dr. Partridge, who "expressed regret for the deduction" and "confirmed that he would update the grade if given permission by 'the deans.'" *Id.* at 28 (Compl. ¶ 64). Dr. Partridge later reversed course, stating that there were "other deficiencies" in Plaintiff's original submission, which supported the grade that he received. *Id.* at 28–29 (Compl. ¶ 66). Dr. Partridge also offered to write a letter to the Committee on Student Appeals "on . . . Plaintiff's behalf," noting Plaintiff's "good progress" and near miss in Pharmacology. *Id.* at 29–30 (Compl. ¶ 67). Ultimately, however, Dr. Partridge's letter was equivocal, pointing out areas where Plaintiff had struggled and expressing uncertainty about whether Plaintiff should be reinstated. *Id.*

Before the Committee on Student Appeals, Plaintiff focused on three issues: (1) his Pharmacology grade and, in particular, his grade on the Toxicology assignment, (2) "his recent

ADHD diagnoses," and (3) family health circumstances that had impacted his performance. *Id.* at 34, 36 (Compl. ¶¶ 73, 76). The Committee upheld Plaintiff's dismissal. The Committee noted that Plaintiff did not appeal his Pharmacology grade in accordance with Student Handbook procedures, "that accommodations cannot be granted for conditions retroactively," and that his family circumstances were not "significant enough" to warrant a different decision. *Id.* at 36 (Compl. ¶ 77). Plaintiff then appealed the Committee's decision to Dr. Norman Beauchamp, the Executive Dean of the Medical School and Executive Vice President for Health Sciences, who upheld the dismissal. *Id.* (Compl. ¶ 78).

Plaintiff attempted to file the present action on May 9, 2025, Dkt. 1, but did not succeed in doing so until May 19, 2025, Dkt. 7. He asserts five claims against Georgetown University and Dr. Partridge: breach of contract (Count I), *see* Dkt. 7 at 39; breach of the implied covenant of good faith and fair dealing (Count II), *see id.* at 74; violation of Title III of the ADA and Section 504 of the Rehabilitation Act (Count III), *see id.* at 120; violation of the DCHRA (Count IV), *see id.* at 131; and intentional infliction of emotional distress (Count V), *see id.* at 132. On the same day he filed suit, Plaintiff moved for a temporary restraining order, seeking an order directing the School of Medicine to readmit him during the pendency of this case and to support reinstatement of his student visa by confirming his academic eligibility and issuing him a Form I-20. Dkt. 9. The Court denied that motion. Dkt. 33.

The Court now turns to Defendants' motion to dismiss, Dkt. 25, which is fully briefed, Dkt. 30; Dkt. 32.

## II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Facial plausibility exists when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 590 (D.C. Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678). To determine whether a plaintiff has stated a claim, the Court "assume[s] the truth of all well-pleaded factual allegations and construe[s] reasonable inferences from those allegations in [the] plaintiff's favor." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). The Court construes the pleadings of *pro se* litigants "liberally," *United States v. Palmer*, 296 F.3d 1135, 1143 (D.C. Cir. 2002), and holds them to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But the Court need not assume the truth of legal conclusions asserted in a complaint, *Iqbal*, 556 U.S. at 678, nor need it "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out" therein. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## III. ANALYSIS

### A. Breach of Contract and Breach of the Implied Covenant of Good Faith & Fair Dealing Claims (Count I & Count II)

To state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing, a plaintiff must allege facts that, if accepted as true, would plausibly establish that the parties entered into an enforceable agreement. *See Ponder v. Chase Home Fin., LLC*, 666 F. Supp. 2d 45, 48 (D.D.C. 2009) (dismissing breach of contract claim under D.C. law where the plaintiff failed to allege facts that would establish an enforceable contract); *Mero v. City Segway Tours of Wash., DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) ("[T]he absence of a

contract alone is sufficient to defeat [an] implied covenant claim."). District of Columbia courts apply "general principles of contract construction" to determine whether a university policy document constitutes an enforceable contract. *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977). "For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations." *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009). The third requirement, mutuality of obligation, demands that "each party must undertake to do something the party otherwise is under no legal obligation to do, or to refrain from doing something the party has a legal right to do." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008) (alterations and internal citation omitted).

Here, Plaintiff premises his contract claims on two documents: Georgetown University's Notice of Non-Discrimination, Dkt. 25-4, and the School of Medicine's Student Handbook, Dkt. 25-3. *See* Dkt. 7 at 39 (Compl. ¶ 78). The Court takes judicial notice of both documents, which are attached as exhibits to Defendants' Motion to Dismiss, Dkt. 25, "because they are referred to in the [C]omplaint and are integral to [Plaintiff's] [] claim[s]," *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Although Plaintiff asserts that both the Notice of Non-Discrimination and the Student Handbook "are contractual in nature," Dkt. 7 at 39 (Compl. ¶ 78), both claims fail as a matter of law.

The Court starts with the Notice of Non-Discrimination. The Notice of Non-Discrimination bears none of the hallmarks of a contractual undertaking. The policy applies broadly to all "faculty, staff, and students," and, as relevant here, it merely provides notice that the University will comply with the laws forbidding discrimination on the basis of disability. Dkt. 25-4 at 2. Rather than imposing new obligations on Georgetown, the notice acknowledges

and affirms obligations that already exist as a matter of federal, state, and local law. "[P]erform[ing] a pre-existing legal obligation does not create mutuality of obligation and cannot give rise to an enforceable contract." *Di Lella v. Univ. of D.C. David A. Clarke Sch. of L.*, 570 F. Supp. 2d 1, 11 (D.D.C. 2008); *see also United States v. Bridgeman*, 523 F.2d 1099, 1109–1110, (D.C. Cir. 1975) (observing that "the performance of a pre-existing duty [is] a typical example of invalid consideration").

In addition, the Notice of Non-Discrimination places no reciprocal obligations on Plaintiff. The Notice of Non-Discrimination states that "Georgetown University is committed to providing equal educational . . . opportunities," that "Georgetown University provides educational opportunities without regard to, and does not discriminate on the basis of . . . disability," and that "Georgetown University prohibits retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or otherwise exercising rights protected by law." *See* Dkt. 25-4 at 2. Those commitments apply to the University (and its agents) alone and do not represent the type of *quid pro quo* exchange that is necessary to form a contract with a third party. Plaintiff fails to allege that he offered anything in exchange for the promises of the Notice of Non-Discrimination, nor does he allege that he manifested an intent to be bound by its terms. He does not allege, for example, that he decided to attend the Medical School and paid tuition based, even in part, on the Notice of Non-Discrimination.

The Court, accordingly, concludes that the Notice of Non-Discrimination cannot form a basis for any of Plaintiff's contract claims.

Next, the Court considers the Student Handbook. Georgetown neither "express[ed] an intent to be bound" nor "assume[d] mutual obligations" through the Handbook, so the Handbook

is not an enforceable contract. *Dyer*, 983 A.2d at 356. For one thing, the Handbook explicitly states that it "is *not* a contract." Dkt. 25-3 at 149 (emphasis added). Express language disclaiming an intent to be bound indicates that the Handbook is non-contractual. *See Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016); *Grove v. Loomis Sayles & Co., L.P.*, 810 F. Supp. 2d 146, 149 (D.D.C. 2011). That is especially true when, as here, a handbook "appears to be intended as a means for the university to communicate its expectations regarding academic conduct to its students," rather than an intention "to bind itself to the handbook's provisions." *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 99 (D.D.C. 2012); *see Richter v. Cath. Univ. of Am.*, No. CV 18-00583, 2019 WL 481643, at *3 (D.D.C. Feb. 7, 2019). The Handbook also notes Georgetown's right to "update its policies, procedures, . . . course offerings and requirements, . . . and duration graduation or degree requirements . . . *at any time for any reason*." Dkt. 25-3 at 149 (emphasis added). Georgetown's unilateral discretion to change the terms of the Handbook bolsters the Court's conclusion that the document is non-contractual in nature, *see Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1001–02 (D.C. Cir. 1996); *Shankle v. DRG Fin. Corp.*, 729 F. Supp. 122, 124 (D.D.C. 1989), since mutual obligations cannot stem from the foundation of an illusory promise, *see Davis v. Joseph J. Magnolia, Inc.*, 640 F. Supp. 2d 38, 45 (D.D.C. 2009) ("A contract lacks consideration when one party's promise is illusory, and a promise is illusory when performance of that promise is optional." (citing Restatement (Second) of Contracts § 77 (1981))).

Plaintiff invokes *St. Peter v. Georgetown University*, 707 F. Supp. 3d 17 (D.D.C. 2023), as support for his contention that the Student Handbook constitutes an enforceable contract. Citing *St. Peter*, Plaintiff argues that if he identifies "explicit contractual term[s]" in the Handbook, then he has met his pleading burden. Dkt. 30 at 22 (modification in original)

(quoting *St. Peter*, 707 F. Supp. 3d at 24). But Plaintiff overreads that case. The Court in *St. Peter* suggested that a plaintiff "*could have* pointed to an explicit contractual term, or he *could* at least have pointed to school policies or Student Handbook provisions," 707 F. Supp. 3d at 24 (emphasis added), to prop up his contract claim. But the Court ultimately determined that, "to survive a motion to dismiss," the plaintiff "still ha[d] to allege sufficient facts to demonstrate" that the handbook was a contract, which "he ha[d] not done." *Id.* The same is true here. Plaintiff cannot imbue the Handbook with the binding force of contract just by identifying provisions within it that relate to his claims. Plaintiff's premise—that the Handbook is a contract—fails because the Handbook does contain language reflecting Georgetown's intent to "be bound by its terms," *Mosby-Nickens*, 864 F. Supp. 2d at 99, nor "reflect obligations mutually assumed by [Georgetown] as well as its students," *Richter*, 2019 WL 481643, at *3.

Even if Plaintiff could establish that the Handbook creates contractual obligations, Plaintiff's claim would fall short because he pleads no facts showing that Georgetown deviated from its own policies. Plaintiff argues that the Handbook "defines a specific trigger for dismissal"—namely, "receiving a failing grade on [a] transcript"—and thus, by negative implication, forbids dismissal in any other circumstance. Dkt. 30 at 23. But the Handbook elsewhere dispels the negative implication on which Plaintiff relies, making clear that the Committee on Students "may dismiss a student at any time based on demonstrated academic deficiency *at their discretion*." Dkt. 25-3 at 40 (emphasis added); *see* Dkt. 7 at 102 (Compl. ¶ 214) ("[T]he dismissal policy grants broad discretion to the [Committee on Students] to remove a student 'at any time.'"). It may even do so without "allow[ing] a period of remediation," *id.*, which it offered Plaintiff here. And although Plaintiff raised belated doubts about his second Pharmacology grade based on the Toxicology Assignment, Plaintiff acknowledges that when

given the opportunity to remediate that class, he failed the exam. Dkt. 7 at 25-26 (Compl. ¶¶ 58–59). Under those circumstances, Plaintiff cannot establish that Georgetown acted outside the scope of its asserted dismissal policy. Plaintiff's contention that any failure of a remediation exam must result in a repeat of the academic year, Dkt. 30 at 23–24, fails for the same reason.

In sum, Plaintiff has provided the Court with no reason to recognize the Medical School's student handbook as an enforceable contract. *See Newman v. Howard Univ. Sch. of L.*, 715 F. Supp. 3d 86, 103–05 (D.D.C. 2024); *St. Peter*, 707 F. Supp. 3d at 23–25; *Richter*, 2019 WL 481643, at *2–*4; *Shinabargar*, 164 F. Supp. 3d at 28–30; *Mosby-Nickens*, 864 F. Supp. 2d at 97–100. That "alone is sufficient to defeat [Plaintiff's] implied covenant claim," *Mero*, 826 F. Supp. 2d at 107, on top of his breach claim.

Finally, to the extent Plaintiff alleges a claim against Dr. Partridge for promissory estoppel, *see* Dkt. 7 at 82–85 (Compl. ¶¶ 172, 176), that claim also fails. A plaintiff bringing a promissory estoppel claim "must establish (1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his detriment." *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C. 2007), *aff'd*, 552 F.3d 836 (D.C. Cir. 2009). "The promise must be definite, as reliance on an indefinite promise is not reasonable." *In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003) (citing *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1040) (D.C. Cir. 1976)). And "[al]though a promise need not be as specific and definite as a contract, it must still be a promise with definite terms on which the promisor would expect the promisee to rely." *Id.* Plaintiff never identifies a statement by Dr. Partridge sufficient to support a claim of promissory estoppel.

Plaintiff alleges that Dr. Partridge made two false statements. First, "Dr. Partridge confirmed that he would update the [Toxicology Assignment] grade if given permission by 'the

deans,'" yet he never changed the grade. Dkt. 7 at 28–29 (Compl. ¶¶ 64, 66). And second, "Dr. Partridge offered to write" a letter on Plaintiff's "behalf to advocate for his dismissal decision to be reconsidered," *id.* at 29 (Compl. ¶ 66), yet Plaintiff alleges his letter was "objectively negative," *id.* at 84 (Compl. ¶ 176).

It is far from clear that either statement constituted a promise by Dr. Partridge or that Plaintiff relied on that promise to his detriment. But in any event, neither alleged promise was sufficiently definite to support a promissory estoppel claim. The first statement—in which Dr. Partridge allegedly "confirmed that he would update" Plaintiff's grade on the one, disputed assignment—was expressly contingent; on Plaintiff's own telling, Dr. Partridge said that he would update the grade only "if given permission by 'the deans.'" Dkt. 7 at 28 (Compl. ¶ 64). Absent a further representation that the "the deans" had, in fact, given Dr. Partridge permission to change the grade, Plaintiff could not reasonably have relied on Dr. Partridge's assertion. "Courts in this district have" ruled for defendants "where the alleged promise at issue in a promissory estoppel claim was conditioned on some other event" and that event has yet to occur, because "no injustice [] result[s] from failing to enforce the conditional promise [when] its condition ha[s] not been met." *Steele v. Fannie Mae*, 134 F. Supp. 3d 191, 199 (D.D.C. 2015) (citations omitted); *see also Newman*, 715 F. Supp. 3d at 105 (dismissing failure of promissory estoppel claim as to a merit scholarship because payment of scholarship was contingent on certain "metrics of academic success" that plaintiff "failed to [meet]"). The Court thus concludes that Plaintiff fails to state a claim based on the first statement.

The second statement that Plaintiff invokes—Dr. Partridge's offer to write a letter of support to the Committee on Student Appeals—fares no better. An offer of "support" is an indefinite and subjective proposal; without more, it is insufficiently precise to sustain a

promissory estoppel claim. *See In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d at 97 (explaining that "reliance on an indefinite promise is not reasonable"). Indeed, Plaintiff's complaint demonstrates the ambiguous nature of "support." Although Plaintiff characterizes the letter that Dr. Partridge eventually sent as unhelpful and unduly equivocal on the central question of whether Plaintiff "should be given [another] chance," Plaintiff also acknowledges that the letter pointed to mitigating information, and, in particular, the "extensive [family] health problems" that may have distracted Plaintiff. Dkt. 7 at 30 (Compl. ¶ 67). Plaintiff's dissatisfaction with Dr. Partridge's letter thus only underscores the Court's conclusion that Dr. Partridge's offer was too indefinite to induce reasonable reliance.

Because the Handbook and the Notice of Non-Discrimination do not "give rise to an enforceable contract," *Di Lella*, 570 F. Supp. 2d at 11, and because Dr. Partridge's purported promises were "indefinite" statements, *In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d at 97, that could not "reasonably induce[] reliance," *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d at 147, Plaintiff cannot sustain his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. The Court will accordingly grant Defendants' motion to dismiss Counts I and II.

**B. ADA, Rehabilitation Act, and DCHRA Claims (Count III & Count IV)**

Next, Plaintiff asserts a trio of claims under the ADA, Rehabilitation Act, and DCHRA. As an initial matter, Plaintiff's ADA and Rehabilitation Act claims fail with respect to Dr. Partridge because neither statute creates a cause of action against an officer or employee of the plaintiff's employer. *See Di Lella*, 570 F. Supp. 2d at 8 n.8; *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997). And Plaintiff does not appear to allege a DCHRA claim against Dr. Partridge. Dkt. 7 at 131–32 (Compl. ¶¶ 276–81). The Court will thus restrict its analysis to Plaintiff's disability claims against Georgetown.

Plaintiff's claims against Georgetown rest on two theories under the ADA, Rehabilitation Act, and DCHRA: disability discrimination and failure to accommodate his disability. *See*, *e.g.*, Dkt. 7 at 121 (Compl. ¶¶ 252–53). Standards under "[t]he ADA and Rehabilitation Act are 'virtually identical,'" *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 18 (D.D.C. 2022) (quoting *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999)), and since "claims under the DCHRA are subject to the same standards as ADA claims, [] the analysis merges," *id.* (citation modified). To plead disability discrimination under these statutes, Plaintiff must allege "(1) that [he] is qualified under the Acts; (2) that [he was] excluded from participation in or [was] denied the benefits, services, programs, or other activities for which the defendants are responsible or that [he] was otherwise discriminated against; and (3) [that] the exclusion, denial, or discrimination was by reason of [his] disability." *Id.* Similarly, a failure to accommodate claim requires Plaintiff to allege "[1] that [he] was disabled for the purposes of the [Acts], [2] that [Georgetown] had notice of [his] disability, and [3] that [Georgetown] denied [his] request for a reasonable accommodation of [his] disability." *Chenari v. George Washington Univ.*, 847 F.3d 470, 746–47 (D.C. Cir. 2017).

To state a claim on either of his statutory theories, Plaintiff must allege that Georgetown was aware of his disability at the relevant time; absent that allegation, Plaintiff cannot plausibly allege that Georgetown either discriminated against him because of his disability or that it denied a timely request for accommodation. *See id.* (failure to accommodate claims); *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896–97 (D.C. Cir. 1998) (disability discrimination claims). But Plaintiff's complaint makes clear that he cannot satisfy that threshold requirement. Plaintiff contends that Georgetown failed to accommodate his ADHD disability and that it dismissed him "partially due" to "conditions set forth by his disability." *See* Dkt. 7 at 120, 132

(Compl. ¶¶ 251, 280). As Plaintiff acknowledges, however, Plaintiff's ADHD diagnosis came only after the Committee on Students gave him one last chance to improve his performance, he failed his remediation examination in Pharmacology, and the Dean of the Medical School called to tell him that "he would be dismissed due to [that] failure." Dkt. 7 at 26–27, 121 (Compl. ¶¶ 59–60, 255). Plaintiff does not allege that anyone—including himself—knew he had ADHD prior to that diagnosis, nor does he allege that he sought an accommodation in a timely manner, despite numerous opportunities to do so.

Instead, Plaintiff seems to suggest that his academic struggles themselves should have put Georgetown on notice that he had a disability. Dkt. 7 at 121 (Compl. ¶ 255); *see* Dkt. 30 at 12, 30. But to incur liability for disability discrimination, Georgetown would have to have "acted with an awareness of the disability itself, and not merely an awareness of some deficiency in [Mr. Moree's] performance that might be a product of an unknown disability." *Crandall*, 146 F.3d at 897. Indeed, the D.C. Circuit has affirmed the dismissal of disability discrimination claims on facts almost identical to those presented here. *Ferrell v. Howard Univ.*, 254 F.3d 315, 315 (D.C. Cir. 2000) (unpublished) (per curiam); *see also Ferrell v. Howard Univ.*, 1999 WL 1581759, at *1 (D.D.C. Dec. 2, 1999) (dismissing claims under the ADA and Rehabilitation Act where plaintiff was dismissed from medical school, later received a diagnosis of ADHD, sought readmission, and was denied). Here, moreover, the Committee on Students twice reminded Plaintiff that, if he required an accommodation, he would need to seek and to obtain the necessary approval before "taking any further examinations," Dkt. 24-3 at 3; Dkt. 24-4 at 3, yet he failed to take any action until after he was informed that he had failed his remediation exam and, accordingly, would be dismissed. Defendants cannot be held accountable for that inaction.

Plaintiff argues that, "in hindsight," it is clear that the "behaviors and performance deficiencies" leading to his dismissal were "driven by an undiagnosed disability." Dkt. 30 at 30. But hindsight is not the standard for any of the disability discrimination claims that Plaintiff raises. He must allege facts showing that Defendants discriminated against him *because* they saw him as disabled or that he requested an accommodation in a timely manner and that request was unlawfully denied. "Although it is unfortunate that [P]laintiff's disability was not diagnosed" before his dismissal from the School of Medicine, "neither the Rehabilitation Act, nor the ADA, requires a university to reconsider a decision to dismiss a student" after persistent academic deficiencies "because the student is later diagnosed with a disability." *Ferrell*, 1999 WL 1581759, at *6. Nor does the DCHRA. The Court will accordingly grant Defendants' motion to dismiss Counts III and IV.

**C. Intentional Infliction of Emotional Distress Claim (Count V)**

Finally, Plaintiff asserts a claim for IIED. Under D.C. law, a plaintiff asserting an IIED claim must allege facts supporting elements: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008). "Liability requires more than mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) (citation modified). Instead, "[t]he conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 70 (D.D.C. 2018) (quoting *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014)). This is a "demanding standard." *Asare v. LM-DC Hotel, LLC*, 62 F. Supp. 3d 30, 35 (D.D.C. 2014); *see also E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 406 (D.D.C. 2020) ("The

outrageousness requirement 'is not an easy one to meet.'") (citation omitted); Restatement (Second) of Torts § 46 cmt. d (1965) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."). The Court concludes that Plaintiff fails to plead facts sufficient to support an IIED claim.

A plaintiff bringing an IIED claim must allege that he has experienced "severe emotional distress"—distress "of so acute a nature that harmful physical consequences might be not unlikely to result." *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (quoting *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C. 1982)). The Court does not doubt that Plaintiff experienced grave distress due to his dismissal: Plaintiff alleges that his dismissal took a "profound emotional toll" on him and has "manifest[ed] in both physical and psychological symptoms," Dkt. 7 at 37–38 (Compl. ¶¶ 82–83), including "persistent anxiety, low affect, loss of appetite, disrupted sleep, emotional numbness, and uncharacteristic pessimism," *id.* at 135 (Compl. ¶ 290). At the motion to dismiss stage, Plaintiff's allegations may be sufficient to "nudge[] [his] claim[]" as to the harm element of IIED "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. The Court need not resolve the question, however, because Plaintiff cannot establish the threshold requirement of an IIED claim: "extreme and outrageous conduct."

An IIED claim requires a plaintiff to allege conduct "beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Jackson*, 327 F. Supp. 3d at 70. Plaintiff's characterization of his dismissal, even if accepted as true, does come close to that level. Plaintiff alleges that Defendants expelled him "based on

flawed and/or biased grading," provided Plaintiff with "misleading advice" and "purported support," failed to give Plaintiff a fair hearing or appeals process, minimized Plaintiff's disability and "family medical hardships," and "misrepresent[ed] and misappl[ied] school policies." Dkt. 7 at 132–33 (Compl. ¶ 283). Plaintiff's frustration at the process leading to his dismissal is understandable. But he does not allege a level of mistreatment by Georgetown or Dr. Partridge that flouts all bounds of decency. The Court routinely rejects IIED claims predicated on university dismissals and grade disputes. *See, e.g.*, *North v. Catholic Univ. of Am.*, 310 F. Supp. 3d 89, 94–96 (D.D.C. 2018); *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 454 (D.D.C. 2016); *Althiabat v. Howard Univ.*, 76 F. Supp. 3d 194, 197 (D.D.C. 2014); *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 228, 241 (D.D.C. 2007). Indeed, outside the university context, courts routinely reject IIED claims in cases involving markedly more severe uses of force, falsehoods, and institutional failures. *See, e.g.*, *Harris v. District of Columbia*, 696 F. Supp. 2d 123, 137–38 (D.D.C. 2010) (concluding that the arrest of an employee at a daycare facility by twelve officers with guns drawn and in front of children coupled with a sergeant's falsified affidavit did not constitute outrageous conduct); *Larijani v. Georgetown Univ.*, 791 A.2d 41 (D.C. 2002) (concluding that a university's inaction in response to an employee intentionally causing a co-worker severe physical and mental injuries did not constitute outrageous conduct); *Asare*, 62 F. Supp. 3d at 36 (dismissing minority employees' IIED claim alleging that they were called trash, that an offensive poster referencing "work[ing] like a slave" was hung in the workplace, and that they were fired on racial grounds); *see also Rogala v. District of Columbia*, 161 F.3d 44, 57–58 (D.C. Cir. 1998) (finding no "extreme and outrageous conduct" when an officer threatened to arrest a woman repeatedly during a traffic stop, laughed at her hearing impairment and at her when she cried, and ultimately detained her for multiple hours); *Halcomb*

*v. Woods*, 610 F. Supp. 2d 77, 81–85 (D.D.C. 2009) (denying summary judgment on an IIED claim alleging that officers confined plaintiff in a cell with a "man dressed as a woman," made vulgar sexual remarks to her, and transported her, handcuffed, in the back of a speeding vehicle that had no seatbelt).

The Court concludes that Plaintiff's allegations cannot "satisfy [the] very demanding standard" for pleading an IIED claim under D.C. law. *Lewis v. District of Columbia*, 768 F. Supp. 3d 76, 117 (D.D.C. 2025). The Court will accordingly grant Defendants' motion to dismiss Count V.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss, Dkt. 25, is hereby **GRANTED**.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 30, 2026